1  KEVIN J. MIRCH, ESQ.
   kevinmirch@mirchlaw.com
2  California Bar No. 106973
   MARIE C. MIRCH, ESQ.
3  marie@mirchlaw.com
   California Bar No. 200833
4  1180 Rosecrans St., #104-552
   San Diego, California 92106
5  Telephone: (619) 501-6220

6                    UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
7                         OAKLAND DIVISION

8   RALPH  PETERSON,  M.D.,                    )
                                               )
9        Plaintiff,                            )
    v.                                         )
10                                             )
    SUTTER MEDICAL FOUNDATION;                 )   Case No.: 4:21-cv-04908
11  SUTTER BAY HOSPITALS (f.k.a.               )
    SUTTER EAST BAY HOSPITALS)                 )
12  d/b/a Alta Bates Summit Medical Center,    )   COMPLAINT
    a/k/a Sutter Delta Medical Center;         )
13  EDEN MEDICAL CENTER                        )   and Jury Demand
    d/b/a San Leandro Hospital;                )
14  SUTTER EAST BAY MEDICAL                    )
    FOUNDATION; NEIL STOLLMAN, M.D.,           )
15  ROD PERRY, M.D., PHILLIP RICH, M.D.        )
    CATHY L. LOZANO (Board Investigator),      )
16  KRISTINA LAWSON, (Board Member)            )
    HOWARD KRAUSS, M.D., (Board Member)        )
17  RANDY HAWKINS, M.D., (Board Member)        )
    RICHARD D. FANTOZZI, M.D. ,(Board Member)  )
18  HEDY CHANG (Former Board Member),          )
    DEV GNANADEV, M.D., (Board Member)         )
19  RONALD LEWIS, M.D., (Board Member)         )
    LAURIE ROSE LUBIANO,(Board Member)         )
20  ASIF MAHMOOD, M.D.(Board Member)           )
    RICHARD THORP, M.D.,(Board Member)         )
21  ESERICK WATKINS, (Board Member)            )
    FELIX YIP, M.D.(Board Member)              )
22  DENISE PINES (Former V.P of Board),        )
     MICHAEL BISHOP, (former Secretary of Board),  )
23  SHARON LEVINE, M.D. (Former Board Member), )
    EVELYN "GERRIE" SCHIPSKE,                  )
24  (Former Board Member)                      )
    JAMIE WRIGHT, (Former Board Member),       )
25  LINDA WHITNEY & DOES 1-10.                 )
                                               )
26       Defendants.                           )
    _____   )

27

28

                                     1

## COMPLAINT

1.  Plaintiff, RALPH PETERSON, M.D. ("Physician" or "Peterson"),  by and through his counsel of record, Kevin Mirch and Marie C. Mirch, alleges, avers and complains as follows:

## PARTIES

2.   At all times relevant hereto,  Ralph Petersen, M.D., was a physician licensed to practice in California,  residing  and practicing  medicine in Oakland, California.

3.  At all times relevant hereto,  Sutter Medical Foundation ("Sutter"), was  an IRC §501(c)(3)  tax exempt  California Corporation, legally and validly existing and  doing business in Alameda County.

4.  At all times relevant hereto,  Sutter Bay Hospitals  was  an IRC §501(c)(3)  tax exempt California Corporation, legally and validly existing and  doing business in Alameda County.  Sutter East Bay Hospitals is a former California non-profit corporation that merged into the surviving  Sutter Bay Hospitals corporation  on or about March 1, 2018.

5.  At all times relevant hereto,  Sutter Alta Bates Summit Hospital (Alta Bates Summit Hospital-Oakland), was  an IRC §501(c)(3) tax exempt  California Corporation, legally and validly existing and  doing business in Alameda County.

6.  At all times relevant hereto, Sutter Medical Foundation, Sutter Bay Hospital and Sutter Alta Bates Summit Hospital are referred to as Sutter.

7.  At all times relevant hereto, Neil Stollman, M.D.  was a physician licensed to practice in the State of California and doing business in Alameda County.  At all times relevant hereto, Dr. Stollman acted in his individual capacity and as an agent on behalf of the Sutter defendants.

8.  At all times relevant hereto, Rod Perry, M.D. was a physician licensed to practice in the State of California and working for Alta Bates as Chair for it Department of Medicine. At all times relevant hereto, Dr. Perry  acted in his individual capacity and as an agent on behalf of the Sutter defendants.

9.      At all times relevant hereto, Phillip Rich, M.D.  was a physician licensed to practice in the State of California and working for Alta Bates as President of its Medical Staff. At all times relevant hereto, Dr. Rich acted in his individual capacity and as an agent on behalf of the Sutter defendants.

10.     Defendants Stollman, Perry and Rich are referred to as the peer review panel or peer review panel members.

11.     At all times relevant hereto, Cathy Lozano was a former employee investigator for the California Medical Board ("CMB").

12.     At all times relevant hereto, Kristina Lawson, was a Public Member of the Medical Board of California.  Her term as Board Member is set to run  from 10/21/15-6/1/22.  Ms. Lawson is also an attorney and a  Partner at Hanson Bridgett LLP. In 2020, Ms. Lawson was elected President of the "CMB".  Hanson & Bridgett is sometimes referred to as the "common attorney or lawyers" for Sutter, its peer review panel and the "CMB".

13.      At all times relevant hereto, Howard Krauss, M.D. was a Physician Member of the Medical Board of California. His term as Board Member ran from 8/20/13-6/1/21.

14.     At all times relevant hereto, Randy Hawkins, M.D. was a Physician Member of the Medical Board of California.  His term as a  Board Member is set to run  from 3/4/15-6/1/24.

15.     At all times relevant hereto, Richard D. Fantozzi, M.D.  Was a member of the Californa Medical Board (Former Board Officer July 2002- June 2009).  Served as Board Secretary 2002-2004, Board Vice President July 2004 - May 2005, and Board President May 2005- June 2009)

16.     At all times relevant hereto, Hedy Chang was a former Board Member ( from July 2004 to July 2012).  She  served as Board Secretary from December 2007 to July 2011)

17.     At all times relevant hereto, Dev Gnanadev, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to  from 12/21/11-6/1/22.

18.     At all times relevant hereto, Ronald Lewis, M.D. was a Member of the Medical Board of

California. His term as Board Member is set to run from 8/20/13-6/1/21.

19. At all times relevant hereto, Laurie Rose Lubiano was a Public Member of the Medical Board of California. Her term as Board Member is set to run from 12/17/18-6/1/24.

20. At all times relevant hereto, Asif Mahmood, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to run from 6/3/19-6/1/23.

21. At all times relevant hereto, Richard Thorp, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to run from 7/26/19-6/1/23.

22. At all times relevant hereto, Eserick Watkins was a Public Member of the Medical Board of California. His term as Board Member is set to run from 6/1/19-6/1/23.

23. At all times relevant hereto, Felix Yip, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to run from 1/30/13-6/1/22.

24. At all times relevant hereto, Denise Pines was a Physician Member of the Medical Board of California and the Former President of the Medical Board of California. Her term as Board President ran from 7/2018-12/2020. Ms. Pines was Secretary of Board from 7/2014-7/2016.

25. At all times relevant hereto, Michael Bishop was former Physician Member of Medical Board of California, appointed in 2011, and reappointed in 2013.

26. At all times relevant hereto, Sharon Levine, M.D. was a former Physician Board Member of the Medical Board of California. Ms. Levine was Board President from 7/2013-7/2014.

27. At all times relevant hereto, Evelyn "Gerrie" Schipske was a former Board Member of the Medical Board of California. Ms. Schiske was Board Secretary from 7/2011-7/2013.

28. At all times relevant hereto, Jamie Wright was a former Public Board Member of the Medical Board of California. Ms. Wright was appointed in 2013 and reappointed in 2014. Ms. Wright is an attorney.

29. Defendants Lawson, Krause, Hawkins, Fantozzi, Chang, Gnanadev, Lewis, Lubiano,

Mahmood, Thorp, Watkins, Yip, Pines, Bishop, Levine, Schipske, and Wright are collectively referred to as the "CMB" or "CMB members".

30. At all times relevant hereto, Defendant Linda Wright was an Executive Director of the CMB residing in the State of California.

31. "California Medical Board" or "CMB" refers collectively to the individual Members of the Medical Board of California, namely Kristina Lawson, Howard Krauss, M.D., Randy Hawkins, M.D., Richard Fantozzi, Hedy Chang, Dev Gnanadev, M.D., Ronald Lewis, M.D., Laurie Rose Lubiano, Asif Mahmood, M.D. Richard Thorp, M.D., Eserick 2009-Watkins, and Felix Yip, M.D. Denise Pines, Michael Bishop, Sharon Levine, M.D., Ronald Lewis, M.D., Gerrie Schipske , Jamie Wright, Barbara Yaroslavsky and Linda Wright.

32. At all times relevant hereto, the California Medical Board was composed of a majority of physician  or "private members".

33. Defendant Does 1-10, are individuals, corporations, partnerships, trusts,  limited liability companies and/or any other entity that by their specific conduct are responsible for damages alleged herein.  At such time as their true names and identities are known, Plaintiff will seek leave to amend this complaint to add the same.

34. Plaintiff has exhausted his administrative remedies prior to filing this suit.

<u>JURISDICTION & VENUE</u>

35. The Jurisdiction of this case is conferred by Sections 28 U.S.C. Section 1331, 1343(3) and (4), and 42 U.S.C. Section 1983, 28 U.S.C. Sections 2201, 2202, and the fifth and fourteenth amendments to the United States Constitution.  Specifically, Plaintiff brings this action to secure equitable relief and damages from actions initiated by defendants under color of law, which are violative of rights, privileges, and immunities guaranteed him by the United States Constitution, and directly under and through Article I, section 10, Clause 1 and the first, fourteenth amendments to the United States Constitution.

36. This action seeks redress for the deprivation of Plaintiff's constitution and civil rights and

includes ancillary claims related thereto. Plaintiff's constitutional and civil rights are guaranteed by the Due Process Clause of the First, Fourth, Fifth and Fourteenth amendment to the United States Constitution, Sherman Anti-Trust Act (15 U.S.C. §§ 1 and 2), Clayton Act ( 15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53), AntiKickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS ), and The Stark Law (42 USC §1395nn).

37. Venue is proper pursuant to 28 U.S.C. Section 1391(a) and (b) as the conduct from which this action arises occurred in Alameda County, State of California.

## FACTS

## SUTTER HEALTHCARE

38. During January 1996, Sutter Healthcare (Sutter) was formed from a merger between Sacramento-based Sutter Health and California Healthcare System. Sutter operates as an IRC §501(c)(3) tax exempt corporation.

39. At all times relevant hereto, Sutter Medical Foundation operated as Sutter Health ("Sutter") and controls and owns a network of 24 hospitals with 53,000 employees, over 5200 physicians, 14,000 clinicians and business professionals. Sutter provides outpatient services, research facilities, home health and hospice care. Sutter monopolizes and controls healthcare and medical discipline in Northern California.

40. At all times relevant hereto, Sutter used a number of unlawful strategies to finance and operate its consolidation and monopoly of Northern California healthcare. Sutter's Strategies are hereinafter referred to as "Sutter's MediCal Strategy".

41. Sutter uses medical discipline to control physician referrals, acquisition of physician practices and to punish non-cooperating physicians thereby undermining their credibility as a witness and destroying their medical practices.

42. Sutter controls medical discipline by strategic placement of its "cooperating or compliant physicians" and/or attorneys on institutional peer review panels and the "CMB". Sutter's peer review panels and the CMB participated in strategic discipline used to divert its own malpractice onto Dr. Peterson and other uncooperative physicians.

43. As a result of its "MediCal Strategy", Sutter performed only profitable procedures, steering away unprofitable procedures to county medical facilities.

44. Revenues generated from Sutter's "MediCal Strategy" were used to pay unlawful "kickbacks" and to acquire physician medical practices.

45. At all times relevant hereto, Sutter's "MediCal Strategy" violated Federal and State Constitutions, HCQIA, Income Tax, Stark, Anti-Kickback, Medicare, MediCal and False Claims ("anti-kickback") laws and related statutes, rules and regulations.

46. The Medicare and Medicaid Patient Protection Act, also known as the AntiKickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS ), prohibits physician "kickbacks" which corrupt competent medical treatment decisions resulting in more expensive, unnecessary and/or harmful care being provided to vulnerable patients.

## ALTA BATES SUMMIT ACQUISITION

47. On December 28, 1999, Oakland's Summit Medical Center merged with Berkeley's Alta Bates Medical Center forming Alta Bates Summit Medical Center (Alta Bates). Shortly thereafter, Alta Bates became a Sutter affiliate.

48. At all times relevant hereto, Sutter/Alta Bates was a certified Medicare provider. As a Medicare approved entity, Sutter/Alta Bates was prohibited from discriminating against physicians and/or "protected class" patients.

49. At all times relevant hereto, Alta Bates was the East Bay's (Oakland's) largest private, not-for-profit medical center serving Oakland's indigent and under served MediCal community.

## SUTTER's "MEDI-CAL STRATEGY" .

50. At all times relevant hereto, Sutter's "MediCal Strategy" involved the profitization of MediCal procedures through unlawful steering and illegal billing practices.

51. Sutter's unlawful billing practices, included, but were not limited to: chargemaster manipulation, up-coding, requiring the performance of unnecessary medical procedures, charging for unused materials and demanding payment for physician "on-call" coverage.

52. At all times relevant hereto, Sutter paid cooperating physicians unlawful "kickbacks" out of MediCal funds. Defendants Stollman, Perry and Rich were members of Sutter's peer review panels and cooperating physicians.

53. Sutter used the physician disciplinary process to secure doctor cooperation in its unlawful steering of "protected class" patients. Sutter secured control over its peer review panel members and the "CMB" by strategically placing its "cooperating physicians", attorneys and allies on its peer review panel and/or the "CMB".

54. Sutter's "MediCal Strategy" directly impacted Oakland's indigent and under served patient community by reducing funds and physician availability for medical care.

## DR. PETERSON

55. Dr. Peterson is an African American physician and UC-Berkeley graduate born and raised in Oakland, California ("Oakland").

56. During 1972, Dr. Peterson's brother, Roland Peterson, was shot and killed by a police officer in Long Beach, California. *See*, Peterson v. City of Long Beach, 24 Cal.3d 238 (Cal. 1979). Because of that incident, Dr. Peterson has acted as a mentor and advocate for various individuals and/or organizations, including, but not limited to Oakland's indigent and under served Medical patient community.

57. From 1983, Dr. Peterson has practiced internal and gastroenterology medicine in Census Tract 4093, a Health Manpower Shortage Area (HMSA), pursuant to 42 U.S.C. §254n, serving Oakland's indigent and under served MediCal community.

58. From 1999 through 2009, Dr. Peterson's limited his privileges at Sutter's Alta Bates medical center to endoscopy procedures, only using its out-patient facilities.

59. Prior to February 12, 2009, Dr. Zealous Wylie, the "Big GI Group", took "call" for Dr. Peterson.

60. After February 12, 2009, Sutter gained control of the "Big GI Group", installing Dr. Stollman as its CEO.

61. At all times relevant hereto, Dr. Stollman received unlawful "kickbacks" disguised as

employment and/or consulting contract payments from Sutter.

62.   At all times relevant hereto, Sutter concealed its payment of unlawful "kickbacks"from Dr. Peterson.

PEER REVIEW SCHEME
"CALL COVERAGE EXCUSE".

63.   On February 2, 2009, Alta Bates Physician Peer Review Board members, Drs. Perry and Stollman, ordered Dr. Peterson to appear at Alta Bates without explanation. That meeting was rescheduled to February 12, 2009.

64.   On February 6, 2009, Dr. Peterson requested a formal HCQIA meeting and notice of allegations from Drs. Perry and Stollman. Drs. Perry and Stollman failed, refused and/or neglected to provide that information.

65.   On February 12, 2009, Dr. Perry ordered Dr. Peterson to increase his "call coverage" because of 3 quality of care patient issues that he allegedly failed to respond to through his answering service. In lieu of additional coverage, Dr. Peterson was told by Dr. Perry that he could pay a fee to Dr. Stollman for the same.

66.   At all times relevant hereto, Sutter controlled all available Alta Bates "call" approved physicians through the payment of unlawful "kickbacks", threats and/or the medical disciplinary process.

67.   On March 25, 2009, Dr. Peterson requested call coverage from Dr. Stollman. Dr. Stollman refused to cover without payment of an unreasonable fee.

68.   On March 26, 2009, Dr. Rich ordered Dr. Peterson to resign his Alta Bates privileges due to his failure to obtain additional "call coverage".

69.   On March 30, 2009, Dr. Peterson refused to resign or "steer away" his unprofitable indigent and under served MediCal patients to AHS (Alameda Health Services).

70.   On April 1, 2009, Dr. Peterson's privileges were summarily suspended without a hearing. There was no patient complaint or investigation.

71.   On April 6, 2009, Sutter constructively terminated Dr. Peterson's privileges at Alta Bates by forcing him to resign under threat of Peer Review and "CMB" discipline.

72. On April 8, 2009, Sutter prepared and published to the National Practitioner Data Bank a false Adverse Action Report (Form 805) stating Dr. Peterson had resigned to avoid further investigation into various quality of care complaints.

73. On April 15, 2009, "CMB" received Sutter's Form 805.

74. During August 2009, Dr. Peterson announced the opening of an independent endoscopy suite to compete against Sutter and serving Oakland's indigent and under served MediCal community.

75. On or about November 4, 2009, Dr. Peterson was listed as a percipient and expert witness for Dr. Ernest Bonner, another African American Physician, who also cared for Oakland's indigent and under served community and refused to cooperate with Sutter in its unlawful MediCal strategy.

## 805 - INVESTIGATION (ACCUSATION #12-2009-1985-92).

76. On November 18, 2009, Dr. Peterson received a notice from "CMB" that its investigator Cathy Lozano was conducting an investigation into the allegations contained in Sutter's Form 805 dated April 9, 2009.

77. On or about November 21, 2009, Dr. Peterson was informed by the "Medical Board Enforcement Program/Investigation Group" that a formal ACCUSATION had been filed by the CMB (#12-2009-1985-92) .

78. On December 1, 2009, "CMB" provided Dr. Peterson a "comprehensive summary" of the "Form 805 Complaint" without supporting exhibits and/or a complete investigation. The "comprehensive summary" contained a number of false and/or misleading statements (ACCUSATION #12-2009-1985-92).

79. Sometime during 2010, Lozano /CMB Lozano's investigation showed that no calls were made from Sutter's emergency room to Dr. Peterson. Lozano concealed her investigation from Dr. Peterson.

80. On October 27, 2010, Lozano notified Dr. Peterson that Accusation No. 12- 2009-1985-92 was "submitted to a medical consultant who determined that the allegations

were "not considered extreme enough to warrant pursuing administrative action" against him.   Neither the CMB nor Lozano informed Dr. Peterson that Sutter, its peer review panel and CMB were targeting Peterson because he refused to steer his "protected class" physicians or the payment of unlawful "kickbacks" to Stollman, Perry and Rich.

## B.E. Complaint.

81.   B. Edwards (B.E.) was an internal medicine patient of Dr. Peterson's from mid-1980's through September 10, 2009.

82.   As part of B.E.'s care, Dr. Peterson arranged appointments on February 18, 2008 March 3, 2008, October 10, 2008 and September 10, 2009 with cardiologists. B.E. did not present at any of these appointments.

83.   On September 9, 2009, B.E. presented at Sutter with after suffering a transient ischemic attack (TIA). Sutter performed a CT Scan which showed a 92% blockage of B.E.'s right carotid artery. Sutter did not disclose to Dr. Peterson the results of B.E.'s CT Scan, and discharged her without treatment or additional tests. Sutter's discharge constituted "steering" B.E. to county healthcare facilities.

84.   On September 10, 2009, Dr. Peterson referred B.E. to another cardiologist. B.E. did not present at that appointment, instead seeking care from Sutter's emergency ward.

85.   On September 21, 2009, BE suffered a stroke and was treated at a Palo Alto Medical Center facility in Dublin, California.

86.   BE's stroke was treated by Sutter.

87.   During 2010, Sutter encouraged and participated with B.E. in filing an unfounded medical board complaint against Dr. Peterson (Complaint Control # 12-2010-2407-08). Sutter encouraged and participated in the filing in order to defer its own malpractice in failing to properly treat B.E.

88.   On April 16, 2011, Dr. Peterson was electronically interviewed by Lozano with respect to B.E. complaint #12-2010-2407-08 (B.E.). Lozano knew and concealed from Dr. Peterson Sutter's malpractice in steering away B.E..

89. During 2010 through September 17, 2013, "CMB"  investigated  Accusation No. 12–2010-2047-08 during which it was determined that  Sutter had discovered BE's right carotid artery blockage, but, failed, refused and/or neglected to treat her. Instead, she was  steered away to county  medical facilities.

90. On October 3, 2011, "CMB" Executive Director Linda Whitney signed Accusation #12-2010-2047-08, which concealed Sutter's refusal and/or failure to diagnose, treat and it causing B.E.'s  September 21, 2009 stroke.

91. On November 11, 2011, River City Medical Group informed Dr. Peterson that because of the "CMB" Accusations,  his GI Specialty agreement was terminated effective November 30, 2011.

92. On January 2, 2012, Dr. Peterson requested that the "CMB's " disciplinary action Accusation  No. 12- 2009-1985-92 (Sutter Alta Bates)  be dismissed based on Investigator  Lozano's letter dated October  27, 2010.

93. CMB failed, refused and/or neglected to timely dismiss or close Complaint/Accusation No. 12- 2009-1985-92 .

94. On January 12,  2012, Dr. Peterson's Cigna provider contract was terminated due to "CMB" online accusations concerning an "[un]acceptable history relative to all types of investigations / disciplinary actions", unrestricted admitting or surgical privileges within his GI speciality; and, an inability to demonstrate "continuity of care devoted to ambulatory care.

95. On February 15, 2012, Dr. Peterson's Health Net provider contract was terminated due to the allegations in "CMB" Case No.: 12-2010-204708 (B.E).

96. On March 12, 2012, Dr. Peterson's Wells Fargo mortgage loan application was denied.

97. At all times relevant hereto, "CMB"  failed, refused and/or neglected to provide Dr. Peterson his complete file and/or any evidence supporting the allegations alleged in "CMB" Accusations  12-2009-1985-92 and/or  12-2010-2047-08 (B.E.).

98. On November 19, 2012, Dr. Peterson filed, in pro per, an action in Superior Court in

Oakland, Alameda County against Drs. Perry and Stollman for misusing the physician disciplinary process (Case No. RG12656812).

99.  During January of 2013, Dr. Peterson appeared before the "CMB" as a witness for Dr. Bonner, an African American physician, who also treated Oakland's indigent and under served patients.  "CMB" did not allow Dr. Peterson to testify for Dr. Bonner.

100. On January 28, 2013, Drs. Perry and Stollman filed a Special Motion to Strike Dr. Peterson's Complaint misstating the facts and existing law which was supported by THREE (3) fabricated declarations signed by Defendants Stollman, Perry and Joanne Jell.

101. On January 28, 2013, Hanson & Bridgett represented Sutter, its peer review panel members and the CMB.  This conflict was not disclosed to Dr. Peterson.

102. Starting at least as early as 2013, Sutter was the subject of a California Attorney General investigation concerning the unlawful payment of "kickbacks" to its compliant physicians. At the same time, a separate investigation was being conducted into the "CMB" discrimination against African American and Hispanic physicians. Neither the "kickback" nor discrimination investigations were ever disclosed to Dr. Peterson.

103. On April 2, 2013, Dr. Peterson was denied physician provider status with Hill Physicians Medical Group.

104. On or about April 12, 2013,  Aleshia Coenen-Washington (Plaintiff) as Conservator of the Person and Estate of B. Edwards ("B.E.") filed suit against Dr. Peterson in the Superior Court of California, County of Alameda, Civil - Unlimited Jurisdiction, Case No. RG12650611.   Attached to her complaint was Accusation #12-2010-2407-08.

105. At all times relevant hereto, "B.E.'s" case was prompted, perpetuated and encouraged by Sutter, its peer review panel members and the CMB in retaliation for Dr. Peterson refusing to cooperate in Sutter's "MediCal Strategy",  for appearing as a percipient and expert witness for Dr. Bonner, and to deflect its B.E. malpractice upon Dr. Peterson.

106. On or about April 23, 2013, a legislative plan was proposed to "strip" the "CMB" of its

physician investigative authority due to accountability issues related to fabricated investigations.  The proposed legislation and reasons for the same were  concealed from Dr. Peterson and the Court.

107.   On May 8, 2013, the Superior Court issued  a tentative order against Dr. Peterson in Peterson v. Drs. Perry & Stollman.

108.   As of  May 8, 2013, Dr. Peterson did not know that Drs. Stollman and Perry were receiving "kickbacks"  and/or that Sutter  and the "CMB" were being investigated by the State of California for discrimination, unlawful kickbacks and/or that it had an irreconcilable conflict existed with it using  Hanson & Bridgett which represented the Sutter, its peer review panel members and the  CMB.

109.   Dr. Peterson did not learn about these investigations until the airing of a December 2020 report by 60 Minutes.  Sutter, its peer review panel members, the CMB, and Hanson & Bridget had concealed these investigations and conflicts through confidential settlements and false declarations paying  "kickbacks" and threatening other witnesses with discipline.

110.   On June 21, 2013, Dr. Peterson was denied physician provider status with Alta Bates Medical Group.

111.   On  July 17, 2013,   CMB determined that there were no quality of care issues in B.E.'s treatment, but did not disclose that finding to Dr. Peterson.

112.   On August 31, 2013, Dr. Peterson requested documents from the California Attorney General's Office for "CMB" Case: 12-2010-2047-08 (B.E.).  Dr. Peterson  agreeing to pay for all copying charges related to his request.

113.   On  September 12, 2013, the Superior Court entered an order of judgment in  Aleshia Coenen-Washington as conservator for B. Edwards v.  Dr. Peterson,  in favor of Dr. Peterson, M.D. (Defendant), dismissing that action with prejudice.

114.   On October 16, 2013, Dr. Peterson was denied physician provider status with Blue Shield of California.

115.  On or about, December 18, 2013, "CMB" stated that its Board investigation revealed that during 2005 to 2009, Dr. Peterson did not "maintain sufficient record keeping regarding your [Dr. Peterson's] care and treatment of B. Edwards' diabetes and hypertension, as more fully described in Accusation No. 12-2010-204798" (B.E.).   That finding was not alleged in the underlying accusation, but was fabricated in order to pressure Dr. Peterson to settle the Accusation.  The order did not find any quality of care or treatment violations by Dr. Peterson.

116.  On February 20, 2014, the Supreme Court of California decided Fahlen v. Sutter Central Valley Hospital, No. S205568 finding jurisdiction for  violations of HCQIA and/or state related actions was  not  conditioned  on a prior successful mandamus challenge to a hospital's quasi-judicial decision to restrict or terminate medical staff privileges because a mandamus court could foreclose the physician's statutory right to litigate whistleblower retaliation.  Hanson & Bridgett served as counsel for Sutter  in Fahlen, *supra.*

117.   On or about April 18, 2014, "CMB" retaliated against Dr. Bonner by posting  a notice on the Internet  that his medical license was revoked. Medi-Cal terminated Dr. Bonner's provider status because of the "CMB" notice.  Dr. Bonner's license was revoked for failing to complete continuing education.

118.  On May 16, 2014, Dr. Peterson was denied physician provider status with Aetna because of the adverse action taken by "CMB" taken in 2014 and Alta Bates Summit in 2009.

119.  On or about September 10, 2014, a Qui Tam action was filed under seal against Sutter by a former compliance officer, Laurie Hanvey, for paying unlawful fees to its compliant physicians  in violation of the Federal and State  Stark Laws, False Claims Act[1] (FCA & CFCA) complaint.  The Qui Tam action was not unsealed until **November 18, 2019.**

120.  On September 29, 2014, African American CEO Wright Lassiter III was forced to resign from AHS after seeking to restructure a $200 million debt owed to the Alameda County. This debt was accumulated as a result of Sutter steering unprofitable MediCal business to its facilities.

121. On October 28, 2015, Hanson & Bridgett Attorney Kristina D. Lawson was appointed to "CMB".

122. On December 30, 2015, The First Appellate Court of California dismissed, in an Unpublished Opinion,  Dr. Peterson's Appeal to the Superior Court.  Drs. Stollman and Perry were represented by Hanson & Bridgett.

123. On February, 2016, Dr. Peterson filed a Petition for Review with the California Supreme Court (Peterson v. Perry, Stollman).

124. During January 2017, the California Research Bureau (California Library) issued its "Demographics of Disciplinary Action by the Medical Board of California (2003-2013)" Report finding that the "CMB" discriminated against African American and Hispanic physicians in its disciplinary process. This report was concealed ("buried").

125. On or about, January 5, 2018, Dr. Peterson met with Alameda Health Services executives (AHS) regarding the sale of his medical practice and endoscopy suite. Dr. Peterson provided financial data to AHS.  During initial negotiations, Dr. Peterson was told that AHS  CEO Delvecchio Finley was committed to providing care to Oakland's indigent and under served patient community.  Delvecchio Finley is African American.

126. On or about March 26, 2018, the University of California Berkeley released a study done by its Petris Center on Health Care Markets and Consumer Welfare College  confirming that Sutter's consolidation of  healthcare had substantially increased the cost of care in Northern California without an increase in quality of care.   That consolidation had decreased available care to Oakland's indigent and under served community.

127. On or about March 30, 2018,  California's Attorney General Becerra  sued Sutter Health for anti-competitive behavior after completing a six-year investigation into its anti-competitive  practices. The six-year investigation has never  been released to the public.

128. On or about October 21, 2018, Dr. Bonner filed a complaint against the "CMB" after claiming that Investigator Lozano had been fabricating "CMB" investigations (*Bonner v. California Board of Medicine*, et. al., United States District Court for the Eastern

District of California Oakland Division,  Case 2:17-cv-00445-KJM-DB).  The Bonner complaint alleged years of "CMB" abuse, including, but not limited to,  systematic discrimination against him.

129.  On or about November 14, 2019, the Sacramento Bee first reported that: "Sutter [had agreed] to pay $30 million to settle secret Kickback lawsuit; whistleblower to get slice". This article was leaked as Sutter's settlement was confidential with related investigations concealed from the General Public. The kickbacks discussed in the article involved "referral fees" ("kickbacks")  paid to its "compliant physicians", but did not mention Stollman, Perry and/or Rich.

130.  On or about November 18, 2019, the California Attorney General's office issued a statement that from September 1, 2012 through September 30, 2014, Sutter's physician referral payment programs violated "Stark" statutes and that Sutter  had been reimbursed for the physician  "kickbacks" by MediCal.  The article did not discuss payments to Stollman, Perry and/or Rich.

131.  On or about December 20, 2019,  Sutter agreed to pay out $575 million in damages and to have its business operations monitored for 10 years as part of a settlement with the State of California in AG Becerra's anti-competitive action against the hospital.  The settlement precluded disclosure of the AG investigation report.

132.  During November or December of  2019, Dr. Peterson's negotiations with Alameda Health System (Alameda Health) ceased without explanation.

133.  Pursuant to a December 20, 2019 consent decree, Sutter agreed not to engage in anti-competitive  practices, including, but not limited to,  paying  physician "kickbacks disguised as salaries or consulting fees.

134.  In Mid-December 2019, Sutter agreed  to limit its charges for out-of-network services providing public access to its  pricing, quality, and cost information. Sutter also agreed to stop measures that denied patients access to lower cost plans and stop all-or-nothing contracting deals, allowing insurers, employers, and self-funded payers to include some of

COMPLAINT                                    -17-

Sutter's hospitals, clinics, or other commercial products in their plans' network. Sutter also agreed to make facilities such as their rural hospitals and Sutter hospitals in San Francisco available to insurers, employers, and self-funded payers that use its system. Prior to this agreement, Sutter had unlawfully steered protected class patients paying "kickbacks" to cooperating physicians.

135.   On or about June 26, 2020, Dozens of healthcare workers staged a demonstration at Oakland's Alta Bates Summit Hospital after complaining about systemic racism at that Sutter facility.

136.   On or about November 13, 2020, Hanson & Bridget partner Kristina Daniel Lawson was elected "CMB" President.

137.   On or about November 25, 2020, CEO Delvecchio Finley was forced to resign from AHS after questioning Sutter's anti-competitive and discriminatory policies. Alameda Health serves Oakland's indigent and under served patient community through Highland, Alameda and San Leandro hospitals.

138.   On January 10, 2021, "CMB" member Lawson became Hanson & Bridgett's managing partner.

## FIRST CLAIM FOR RELIEF

### (CIVIL RIGHTS - VIOLATION OF FIRST AMENDMENT - All Defendants)

139.   Plaintiff incorporates by reference all the previous allegations of this complaint as if more fully set forth herein.

140.   At all times relevant hereto, Dr. Peterson was a patient advocate for Oakland's indigent and under served patient community.

141.   At all times relevant hereto, Dr. Peterson and members of his medical practice provided non-incidental, truthful, not misleading, and relevant information which directly advanced the states' substantial interest in providing medical care to Oakland's indigent and under served patients. This information includes, but was not limited to: advising those patients to "present" at Sutter's Alta Bates Summit Hospital when needing

emergency care without considering whether related procedures were profitable; how to sign up for MediCal coverage; provided forms and instruction for filling out MediCal documents; and by directly communicating with MediCal to arrange for coverage for those patients.

142.   Sutter's "MediCal Strategy" discouraged and punished "non-compliant" physicians that referred unprofitable MediCal patient procedures to its facilities.

143.   Sutter paid unlawful "kickbacks" and attorney fees to cooperating physicians serving and providing professional consultation to its peer review panel members (Stollman, Perry and Rich) and CMB.  Sutter punished un-cooperating physicians with discipline imposed by it peer review panel members and CMB.

144.   Sutter targeted Dr. Peterson because he  refused to accept kickbacks for steering/overbilling and he educated Oakland's indigent and under served patients about their MediCal rights.

145.   From February 2009 through the date of this complaint, Sutter has used the disciplinary process to stifle Dr. Peterson's patient advocacy and education by initiating unfounded disciplinary actions and spreading false rumors regarding the quality of care provided through  his medical practice.  Those actions include, but are not limited to:

1.   Sutter  Alta  Bates  Peer  Review  Action  date February 2, 2009.

2.   1st "CMB" Case No.: 12-2009-198592.

3.   2ND "CMB"  Case  No.: 12-2010-204708

146.   At all times relevant hereto, Sutter, its peer review panel and the CMB have  acted under "color of law" through its control of public and quasi-public  medical disciplinary peer review panels [committees, boards], including, but not limited to, Alta Bates Summit Peer Review Board,  "CMB", National Practitioner's Data Bank and other similar third party peer review healthcare  organization panels which imposed discipline to suppress Dr. Peterson's right to advocate, educate,  provide medical services and serve as a witness in actions in related matters (e.g., *Bonner v.  CMB*, supra.).

147.  At all times relevant hereto, Sutter controlled the disciplinary process by paying unlawful "kickbacks" and fees to panel/board members and their attorneys, and threatening disciplinary action against other doctors.

148.  Dr. Peterson has diligently pursued and exhausted all legal remedies available to him before filing this action.

149.  At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

150.  As a proximate cause of Sutter's violation of Dr. Peterson's First Amendment Rights, he has suffered damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.

151.  Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this action, the exact amount of which will be determined at the time of trial or by motion thereafter.

152.  At all times relevant hereto, Sutter has acted with reckless and wanton disregard for Dr. Peterson's personal and financial well being mandating an award of punitive and/or exemplary damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>SECOND CLAIM FOR RELIEF</u>

(CIVIL RIGHTS - DUE PROCESS - All Defendants)

153.  Plaintiff incorporates by reference all the previous allegations of this complaint as if more fully set forth herein.

154.  As part of Sutter's MediCal Strategy, it used the medical disciplinary process to

COMPLAINT                                      -20-

threaten, pay "kickbacks"/ fees and discipline non-compliant physicians.

155. At all times relevant hereto, Dr. Peterson's medical licenses and hospital privileges were property rights entitled to constitutionally protected due process.

156. Dr. Peterson was subjected to unfounded discipline by Sutter's peer review panel members and the CMB because he refused to cooperate in the "MediCal Strategy".

<u>PEER REVIEW</u>

157. From February 2, 2009 through May 11, 2009, Dr. Peterson's was subjected to unlawful Peer Review at Sutter's Alta Bates Summit Hospital ("Alta Bates"), consisting of THREE (3) fabricated quality of care complaints allegedly caused by his failure to take "call" from the Alta Bates emergency room. On April 1, 2014, Dr. Peterson was summarily suspended without a formal hearing.

158. On April 6, 2014, Dr. Peterson's privileges were constructively terminated.

159. On April 8, 2009, Sutter posited the false Form 805 with the CMB.

160. Dr. Peterson was denied a formal hearing and notice of the allegations against him.

161. Because Sutter paid "kickbacks" and fees to physicians and the same attorneys representing Sutter, its peer review panel (Stollman, Perry and Rich) and CMB (officers, executive directors and board members), Dr. Peterson was denied due process mandated by the Fifth Amendment of the United States Constitution, and the HCQIA.

<u>1st CMB ACTION</u>

162. On or about, October 3, 2009, CMB Accusation No. 12-2009-1985-92 was filed alleging misconduct described, at least in part, in Sutter's Form 805 (failure to return calls made from Sutter's emergency room).

163. On or about, October 27, 2010, "CMB's" investigation ended.

164. The "CMB" investigation was conducted by Cathy Lozano.

165. The investigation findings were fabricated, as evidence contained and concealed in CMB files showed that no calls were made from Sutter's emergency room on the days in question.

166. At all times relevant hereto, the "CMB" knew that Investigator Lozano was fabricating investigations to substantiate improper conduct against uncooperative physicians (e.g., Dr. Bonner).

167. Because the Lozano investigation was fabricated Dr. Peterson was subjected to unnecessary disciplinary process thereby denying him due process protected under the Fifth Amendment and HCQIA.

<u>2nd CMB ACCUSATION</u>

168. On or about, October 3, 2010, a second "CMB" complaint, Accusation No. 12-2010-204708, was filed by "CMB" against Dr. Peterson claiming substandard care of patient B.E.

169. Accusation No. 12-2010-204708 was assigned to Investigator Lozano.

170. On January 2, 2012, Dr. Peterson complained to "CMB" about Investigator Lozano ignoring pertinent facts.

171. CMB refused to dismiss and/or otherwise investigate Lozano's investigations despite other complaints regarding the same conduct.

172. On or about July 17, 2013, a stipulated settlement was reached after threats of further discipline were made against Dr. Peterson.

173. After the settlement, Sutter convinced B.E.'s conservator to file an unfounded civil lawsuit against Dr. Peterson in order to defer its own malpractice liability.

174. Dr. Peterson was denied his Fifth Amendment Due Process Rights by concealing the evidence of the conspiracy between Sutter, "CMB" and their same attorneys that improperly used the medical disciplinary process.

<u>PETERSON v. PERRY & STOLLMAN</u>

175. On November 19, 2012, Dr. Peterson filed a civil action against Drs. Stollman and Perry as members of Sutter's peer review panel.

176. On or about December 30, 2015, Dr. Peterson's complaint was dismissed based on 3 false and/or misleading declarations that concealed "kickbacks" and attorney fees paid by

Sutter, its peer review panel members and CMB.

177.    On November 11, 2013, Dr. Peterson appealed the Superior Court ruling to the 1st Appellate Court for the State of California.

178.    On December 30, 2015 the Appellate Court dismissed Dr. Peterson's appeal.

179.    On February 8, 2016, Dr. Peterson filed a writ to the California Supreme Court.

180.    On March 23, 2016, the California Supreme Court denied Dr. Peterson's writ for certiorari.

181.    At each litigation stage, the Defendants concealed unlawful "kickbacks" and fees paid to Sutter's peer review panel members, the CMB and/or their attornes.

182.    Sutter's proferring of false declarations violating Dr. Peterson's Fifth Amendment Due Process rights and the HCQIA.

<u>HEALTHCARE PROVIDERS.</u>

183.    From February 2009 through the filing of this action, Dr. Peterson was denied due process  before a number of  the following healthcare Peer Review Panels, including, but not limited to: Cigna, Blue Shield, Hill Physicians Medical Group, and Alta Bates Medical Group.   In each instance, peer review panels referred to Sutter's Peer Review Panel and "CMB" determinations.

184.    At all times relevant hereto, Dr. Petersons current and prospective contracts were terminated or denied medical provider status based on the false Form 805 and 2 CMB accusations.

185.    At all times relevant hereto, Sutter controlled the medical disciplinary process by paying its peer review panel members (Stollman, Perry and Rich) and CMB executive directors, officers, board members or their attorney unlawful "kickbacks"; through threats of discipline; and actual discipline.

186.    Dr. Peterson has diligently pursued and exhausted all legal remedies available to him before filing this action.

187.    Sutter, its peer review panel members and the CMB intentionally violated Dr. Peterson's

due process rights by paying unlawful "kickbacks" and fees to their attorneys, threatening Plaintiff and other witnesses with disciplinary reprisal; and by fabricating investigations and declarations to undermine a fair adjudication of the issues alleged herein.

188.   At all times relevant hereto, Dr. Peterson did  not,  and could not,  have  known  about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process because state investigations, settlements,   Qui Tam actions and false or misleading declarations were regularly used to conceal the same.

189.   As a proximate cause of  Sutter's violation of Dr. Peterson's Fifth Amendement Due Process rights, Dr. Peterson has suffered substantial damage to his person, reputation, medical practice, and endoscopy  business in excess of $100,000.00,  the exact amount of which will be determined at he time of trial. These damages include current and future lost profits.

190.   Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this action,  the  exact amount of  which will be determined at the time of trial or by motion thereafter.

191.   At all times relevant hereto, Sutter  acted with reckless and wanton disregard for Dr. Peterson's Due Process and HCQIA rights which mandates an award of punitive and/or exemplary damages  in an amount to be determined at the time of trial.

WHEREFORE,   Plaintiff prays for relief as set forth below.

<u>THIRD CLAIM FOR RELIEF</u>

(CIVIL RIGHTS - "PROTECTED CLASS"  DISCRIMINATION - All Defendants)

192.   Plaintiff incorporates by reference all the previous allegations of this complaint as if more fully set forth herein.

193.   Dr. Peterson is an African American physician practicing medicine in Oakland, California.

194.   At all times relevant hereto, Dr. Peterson provided medical care to Oakland's indigent and under served medical community a majority of which is a "protected class".

195. At all times relevant hereto,  Sutter's MediCal Strategy discriminated against Dr. Peterson and his "protected class" patients.

196. Sutter's peer review panel and the "CMB" are  psuedo-governmental entities  vested with substantial public responsibility and power to regulate physician medical practices in the State of California.

197. At all times relevant hereto, Sutter, its peer review panel members and the CMB acted under "color of law".

198. At all times relevant hereto, Sutter, its peer review panel members and the CMB  by used  federal Medicare/MediCaid (MediCal) funds to pay unlawful  "kickbacks" and fees to  physicians and attorneys that served on its peer review panels and the "CMB".

199. At all times relevant hereto, unlawful "kickbacks" and fees were paid to manipulate California's medical regulatory process thereby forcing physicians to overbill and unlawfully steer "protected class" patients.

200.  The steering of "protected class" patients resulted in unlawful segregation of physicians and their patients  in violation of the 14th Amendment to the United States Constitution, the HCQIA, Title VII of Civil Rights Act of 1964, the HCQIA, state and federal statutes, rules and regulations related thereto.

201. At all times relevant hereto, Dr. Peterson and his indigent and under served patients were a "protected class" based on their  race, color, religion or creed, national origin or ancestry, sex (including gender, pregnancy, sexual orientation, and gender identity), age, physical or mental disability and/or  veteran status.

202. From February 2009 through the filing of this complaint, Sutter, its Peer Review Panels and the "CMB" discriminated against Dr. Peterson by improperly initiating, perpetuating and prosecuting  unsubstantiated disciplinary proceedings,  including, but are not limited to:

1.  Sutter  Alta  Bates Peer  Review Action  date February 2, 2009.

2.  1st "CMB" Case No.: 12-2009-198592.

3.      2ND "CMB" Case No.: 12-2010-204708.

203.   The above described disciplinary actions were supported by false documentation and evidence, including, but not limited to:  Form 805, fabricated Lozano investigations, concealed evidence (Sutter call records), and Sutter's B.E. medical records for B.E..

204.   At all times relevant hereto, Sutter, its peer review panel members and the CMB intentionally discriminated against Dr. Peterson acting as an African American physician treating Oakland's "protected class" patients.

205.   During January 2017, the State of California determined that  the "CMB" discriminated against African American and Hispanic  physicians through a pattern of unfounded complaints, improper/fabricated  investigations and discipline. *See* "Demographics of Disciplinary Action by the Medical Board of California (2003-2013)".   The "CMB" concealed ("buried")  this report refusing to provide the same in discovery in other federal and state discrimination actions.

206.   At all times relevant hereto,  Sutter, its Peer Review Panels, the "CMB" and their common attorneys knew that its manipulation of the medical disciplinary process violated Dr. Peterson and his "protected class" patients' Fourteenth Amendment rights, HCQIA, state and federal anti-kickback laws and various other statutes, rules and regulations.

207.    At all times relevant hereto,  Sutter, its peer review panel members, the "CMB" and their attorneys intended to manipulate the medical disciplinary process thereby  violating Dr. Peterson's constitutionally protected rights.  This manipulation of the disciplinary process was done to force Dr. Peterson to unlawfully steer his "protected class" patients. When Dr. Peterson refused to participate in Sutter's scheme, the disciplinary process was used to undermine his credibility as a witness before regulators and in other state and federal actions, including, but not limited to Bonner v. "CMB", *Bonner v. California Board of Medicine*, et. al., United States District Court for the Eastern District of California Oakland Division,  Case 2:17-cv-00445-KJM-DB.

208. At all times relevant hereto, Dr. Peterson did not know, and could not have discovered, Sutter's misuse of California's Medical Disciplinary process resulting in systemic discrimination of himself and other African American physicians and their "protected class patients" since it concealed the same in fabricated internal investigations, secret qui tam actions, California Attorney General investigations, and confidential settlements.

209. On or about March 30, 2018, California's Attorney General Becerra sued Sutter Health for anti-competitive behavior after completing a six-year investigation into its anti-competitive practices which included paying "kickbacks" and fees to its compliant physicians and attorneys. The six-year investigation has not been released.

210. As a proximate cause of Sutter's manipulation of the medical disciplinary process, Dr. Peterson has suffered losses substantially in excess of $100,000.00, the exact amount of which will be determined at he time of trial.

211. As a proximate cause of Sutter, Sutter's Peer Review Panel's and the "CMB's" discrimination, Dr. Peterson has suffered substantial damage to his personal health, reputation, medical practice and endoscopy business resulting in damages substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.

212. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this action, the exact amount of which will be determined at the time of trial or by motion thereafter.

213. At all times relevant hereto, Sutter, its peer review panel members and the "CMB" have acted with reckless and wanton disregard for Dr. Peterson's personal and financial well being mandating an award of punitive and/or exemplary damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>FOURTH CAUSE OF ACTION</u>

(FAILURE TO PREVENT DISCRIMINATION AND RETALIATION - All Defendants)

214. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set

forth herein.

215. At all times relevant hereto, Sutter, its peer review panel members, the "CMB" and their common attorneys acted under color of law.

216. At all times relevant hereto, Sutter, its peer review panel members, the "CMB" and their attorneys knew that Dr. Peterson was an African American physician, advocate and medical provider for his "protected class" patients.

217. At all times relevant hereto, Sutter paid "kickbacks" to cooperating physicians to unlawfully steer "protected class" patients. When Dr. Peterson, and other African American physicians, refused to take "kickbacks" Sutter manipulated California's medical disciplinary process to undermine their credibility before regulators and courts.

218. As early as January 2017, Sutter, its Peer Review Panels and the "CMB" knew that its manipulation of California's disciplinary process discriminated against Dr. Peterson and other African American physicians resulting in unlawful segregation, limiting medical services and care provided to "protected class" patients.

219. At all times relevant hereto, Sutter, its Peer Review Panels and the "CMB" intentionally failed and refused to take remedial action to prevent the unlawful discrimination against Dr. Peterson and his "protected class" patients.

220. At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

221. As a direct and proximate result of Defendants' failure to prevent this discrimination, Dr. Peterson and his "protected class" patients suffered personal health, reputation, medical practice and endoscopy business damages substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.

COMPLAINT                                   -28-

222.   As a proximate cause of Sutter's conduct, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Plaintiff's damages will be determined at trial.

223.   Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this action,  the  exact amount of  which will be determined at the time of trial or by motion thereafter.

224.   At all times relevant hereto, Sutter, Sutter's Peer Review Panels and the "CMB"  have acted with reckless and wanton disregard for Dr. Peterson's personal and financial well being mandating an award of punitive and/or exemplary damages  in an amount to be determined at the time of trial. .

WHEREFORE, Plaintiffs pray for relief as set forth below.

### FIFTH CAUSE OF ACTION

### (RETALIATION IN VIOLATION OF THE HCQIA - All Defendants)

225.   Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

226.   On or about February 6, 2009, Dr. Peterson requested a formal HCQIA meeting and notice of allegations  from Drs. Perry and Stollman.   Drs. Perry and Stollman failed, refused and/or neglected to provide that information.

227.   From February 6, 2009 through April 14, 2009, Sutter, its Peer Review Panel and "CMB" participated in the preparation and filing of an untruthful Form 805 which stated that Dr. Peterson was resigning to avoid further investigation into quality of care issues incident to his patient treatment.

228.   On April 15, 2009, "CMB" received as "stamp filed" the  Form 805.

229.   Sutter, its Peer Review Panels and the "CMB's"  retaliation against Dr. Peterson included, but is not limited to the following:

1.      Violating  HCQIA meeting and notice requirements.

2.     Initiating  prosecuting unfounded actions against Dr. Peterson initiated by the preparation of a false Form 805 that was used to support subsequent "CMB" actions.  "CMB" Case Nos.: 12-2009-198592 and 12-2010-204708).

3.     Perpetuating the Peer Review and "CMB" actions through the payment of "kickbacks" to Peer Review Panel Members and fees to attorneys concurrently representing Sutter, its Peer Review Panels, the "CMB" and individual members of the "CMB".

4.     Using fabricated "CMB" investigations, false declarations and witness testimony to justify and perpetuate the unlawful  Peer Review and "CMB" proceedings.

5.     Constructively terminating Dr. Peterson's privileges at Alta Bates under threat of further discipline.

6.     Publishing false information regarding the false Form 805 which perpetuated the unfounded "CMB" actions, culminating in  loss of existing and prospective contracts, including, but not limited to:  Blue Shield, Cigna, Health Net, Aetna, River City Medical Group, Hill Physicians Medical Group, Sutter Alta Bates Hospital privileges, and Alta Bates Medical Group.

7.     Using the false Form 805 and "CMB" disciplinary actions to interfere with and undermine  the sale of Dr. Peterson's medical practice and endoscopy business to Alameda Health Services.

8.     Threatening Dr. Peterson with further discipline if he refused to settle and/or questioned the Peer Review Process or "CMB" proceedings stating that such action would be frivolous while knowing that there was no evidence to support the underlying actions.

9.     Reporting and failing to retract and/or supplement untruthful filings with the Physician National Data Bank.

10.    Refusing to supplement on-line records reporting evidence that the Form 805 was false, encouraged by  unlawful "kickbacks", fabricated investigations and

extortive threats.

230.   Sutter, its Peer Review Panels and the "CMB" anticipated and knew that its intentional violations of the HCQIA would cause the hardships suffered by Dr. Peterson and his "protected class" patients.

231.   Sutter, its Peer Review Panels and the "CMB" intentionally retaliated against Dr. Peterson after he requested compliance with HCQIA statutes, rules and regulations.

232.   At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

233.   As a direct and proximate result of Defendant's HCQIA retaliation, Plaintiff has sustained and continues to suffered damages to his health, business, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. These damages include past and future profits.

234.   As a proximate cause of Defendants' HCQIA retaliation, Dr. Peterson has suffered and physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety, the exact amount of which will be determined at trial.

235.   Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this action the exact amount of which will be determined at the time of trial or by motion thereafter.

236.   At all times relevant hereto, Sutter had advanced knowledge of the damages that would be caused by the conduct alleged herein, and continued to acted with wanton reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described

herein and mandating an award of punitive and/or exemplary damages to prevent the reoccurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

SIXTH CLAIM FOR RELIEF

(ANTI-TRUST INTERFERENCE WITH CURRENT BUSINESS RELATIONSHIPS - Sutter)

237.    Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

238.    At all times relevant hereto, Sutter's business strategy was to monopolize healthcare in Northern California by the acquisition and subsequent control of physician referrals, the nature of services provided and billing related thereto.

239.    As a result if its market consolidation through acquisition, Sutter controlled more than 5,200 physicians in Northern California.

240.    At all times relevant hereto, Sutter's market consolidation increased medical costs without delivering proportionate quality of care. Outpatient costs and insurance premiums are 17 to 55% and 35% higher in Northern California. Medical services available to Oakland's indigent and under served patient community have substantially declined.

241.    At all times relevant hereto, Dr. Peterson refused to accept Sutter's unlawful "kickbacks" in exchange for steering his "protective class" patients.

242.    Dr. Peterson was subjected to the following discipline:

    1.     Sutter Alta Bates Peer Review Action date February 2, 2009.

    2.     1st "CMB" Case No.: 12-2009-198592 (call coverage).

    3.     2ND "CMB" Case No.: 12-2010-204708 (patient "BE").

243.    Defendants Sutter, its peer review panel members and the CMB participated in fabricated investigations (Lozano), concealed evidence favorable to Dr. Peterson, unlawful "kickbacks" paid to its members, and attorney conflicts favoring Sutter, its peer review

panels, and the "CMB".

244. Dr. Peterson's disciplinary proceedings resulted in him losing, or not being eligible for, medical provider contracts, including, but not limited to: Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Sharp Health Plan, Sutter Health Plus and Western Health Advantage, and Alameda Health Services.

245. At all times relevant hereto, Sutter, its peer review panel and "CMB" officers/directors knowingly joined and participated in the unlawful disciplinary scheme against Dr. Peterson.

246. At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

247. At all times relevant hereto, Sutter's peer review panel members, "CMB" officers / directors knew that unlawful "kickbacks" and/or attorney fees were paid to members that improperly perpetuated and/or adjudicated issues against Dr. Peterson.

248. During November or December of 2019, Dr. Peterson's was unable to sell his medical practice and/or endoscopy business to Alameda Health System (Alameda Health) as a result of Sutter's misuse of the disciplinary process.

249. At all times relevant hereto, Sutter's acquisition scheme substantially affected and occurred in interstate commerce.

250. Sutter, its Peer Review Panel and "CMB" officers/directors anticipated and knew that its intentional violations of the Sherman Anti-Trust Act would cause substantial damage to Dr. Peterson's medical practice and endoscopy business thereby undermining competition in the medical industry in Northern California.

251. As a direct and proximate result of Sutter's violation of the Sherman Anti-Trust Act,   Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

252. As a proximate cause of Sutter's violation of the Sherman Anti-Trust Act, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

253. Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of  which will be determined at the time of trial or by motion thereafter.

254. At all times relevant hereto, Sutter had  advanced knowledge of the damages that would be caused by the conduct alleged herein,   and continued to  acted with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the reoccurrence of the same.  The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>SEVENTH CLAIM FOR RELIEF</u>

(ANTI-COMPETITIVE PRACTICES VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1 AND SECTION 4 OF THE CLAYTON ACT,
15 U.S.C. § 15 - CONSPIRACY TO RESTRAIN TRADE - All Defendants)

255. Plaintiff  incorporates by reference all the allegations of this complaint as if more fully set forth herein.

256. At all times relevant hereto,  Sutter's anti-competitive practice included unlawful business and  government intervention by the "CMB" that restricted and reduced the  medical services  and competition related thereto  in Northern California.

257. Sutter, its peer review panel and the "CMB" committed such acts or acts of omission under the color of state law. Those actions were unlawful, unfair, misrepresentations, and outside the scope of authority afforded Defendants, by law or within their official oath, functions, duties , employment, or authorized discretion.

258. At all times relevant hereto, Sutter's anti-competitive practices adversely impacted public health care by reduced medical services available to Oakland's indigent and under served community.

259. At all times relevant hereto, Sutter's anti-competitive practices included, but were not limited to price fixing, bid rigging, and boycotts of non-compliant physicians.

260. At all times relevant hereto, Sutter paid unlawful "kickbacks" to its cooperating physicians and attorneys that served on or worked for its peer review panels and the "CMB" as follows:

    1.    Price Fixing: Sutter artificially inflated medical costs by manipulating chargemaster compendiums; up-coding medical services provided; requiring that additional and unnecessary medical procedures be performed; charging for unused materials; and demanding payment for physician "on-call" coverage.

    2.    Boycotts: Sutter used its peer review and the "CMB" medical license disciplinary process to undermine the professional reputation of Dr. Peterson and other physicians that refused to participate in its unlawful "MediCal Strategy". As a result of the medical disciplinary process, Dr. Peterson was boycotted by patients and other healthcare providers including, but not limited to: Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Sharp Health Plan, Sutter Health Plus and Western Health Advantage.

    3.    Tying: Sutter required its cooperating physicians to provide or tie unnecessary medical services to basic endoscopy services. In order to increase the cost of basic endoscopy procedures, Sutter required physicians to use additional anesthesia physicians even when unnecessary and not normally provided. This

was referred a "Total Colonoscopy".

261. Sutter's conduct violated Sectin 1 of the Sherman Act, 15 U.S.C. §1 and Section 4 of the Clayton Act; 15 U.S.C. § 15 - Conspiracy to Restrain Trade.

262. Sutter, its peer review panels and the "CMB" knew and intended that its conduct would violate the Sherman Anti-trust and Clayton acts knowing the same would substantially impacted Dr. Peterson's medical practice and endoscopy businesses. Sutter's violation violated public policy as it reduced medical care available to Oakland's indigent and under served patient community, and was discriminatory.

263. Sutter, its peer review panel and the "CMB" deliberately restrained competition by using the medical disciplinary processes to force Dr. Peterson to steer "protected class" patients, over bill, and imposed unfounded discipline upon Dr. Peterson after he refused to participate in the same. This restraint violated public policy as its reduced care available to Oakland's indigent and under served medical community, and was discriminatory.

264. Sutter, its peer review panel and the "CMB's" unlawful conduct constitutes an ongoing anti-competitive restraint of trade.

265. As a result of the Defendants' anti-competitive conduct, Dr. Peterson's has been damaged by Sutter's restaint of trade, resulting in damage to his person, reputation, medical practice, endoscopy business and "protected class" patients.

266. The effect of Sutter's conspiracy with its peer review panel and the "CMB" is a reduction in and access to, competent healthcare in Oakland's indigent and under served patient community.

267. Sutter engaged in this unlawful conduct intending reduced and/or summarily eliminate competition from Dr. Peterson's medical practice and endoscopy business.

268. Dr. Peterson has suffered the type of damages that the antitrust laws were intended to prevent and that would normally arise from similar anti-competitive conduct.

269. Defendants acted in concert and joint action with each other and their acts or acts of

COMPLAINT                                    -36-

omission described herein deprived Dr. Peterson of his statutory and constitutional rights causing him substantial damages.

270. Sutter, its peer review panels and "CMB's conduct deprived Dr. Peterson of his rights to basic ministerial protection which is not entitled to be protected under the 11th amendment, including but not limited to: a competent investigation before initiating disciplinary action; fair disclosure of actual investigation findings, "kickbacks" paid to disciplinary review panel and "CMB" officers/directors; and, accurate reporting of investigation reports and findings on-line.

271. At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

272. As a direct and proximate result of Sutter's anti-competetive practices, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

273. As a proximate cause of Sutter's anti-competetive practices, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety. The exact amount of Dr. Peterson's damages will be determined at trial.

274. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

275. At all times relevant hereto, Sutter had advanced knowledge of the damages that would

be caused by the conduct alleged herein,   and continued to  acted with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the reoccurrence of the same.  The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>EIGHTH CAUSE OF ACTION</u>

(Breach of Contract -Sutter)

276.  Plaintiff  incorporates by reference all the allegations of this complaint as if more fully set forth herein.

277.  Dr. Peterson had an implied contract for diagnostic privileges at Sutter Alta Bates  to provide outpatient endoscopy procedures using Sutter's out-patient facilities.

278.  The contract was evidenced by adequate legal consideration.

279.  Dr.  Peterson reasonably relied and performed under his agreements with Sutter.

280.  Defendant Sutter  was required under the terms of the contract  to act reasonably and follow the laws and statutes of the State of California and the United States of America.

281.  Defendant breached the contract by violating the HCQIA, paying unlawful "kickbacks" and attorney fees to members of its peer review panel and members of the "CMB" in exchange for unsupported findings against Dr. Peterson.

282.  The breaches are material.

283.   At all times relevant hereto, Dr. Peterson has  requested that Sutter cure these breaches.

284.  At all times relevant hereto, Sutter  has failed, refused, denied  and/or unreasonably neglected to cure these breaches.

285.  At all times relevant hereto, Dr. Peterson did  not,  and could not have  known,  about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process,  as ongoing investigations,  qui tam actions,  related settlements and attorney-client communications  were confidential, and, therefore, concealed from Dr.

Peterson.  Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

286. As a direct and proximate result of Sutter's breach of contract,   Dr. Peterson has sustained and continues to suffer damages to his medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

287. Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of  which will be determined at the time of trial or by motion thereafter.

WHEREFORE, Plaintiff prays for relief as set forth below.

NINTH CAUSE OF ACTION

(Breach of Contract - CMB)

288. Plaintiff  incorporates by reference all the allegations of this complaint as if more fully set forth herein.

289. Dr. Peterson had an implied contract with the California Medical Board  wherein Dr. Peterson acquired a property interest in a medical license which he renews on an annual basis.

290. Pursuant to California Business and Professions Code § 2004 the contractual  duties of the members of the medical board include, but are not limited to, enforcement of the disciplinary and criminal provisions of the Medical Practice Act ... and... administration and hearing of disciplinary actions". The members of the medical board have also adopted and routinely publish, in the board's quarterly Newsletter, a mission statement which states in relevant part that the "mission of the Board is...the... objective enforcement of the Medical Practice Act".

291. The contract was evidenced by adequate legal consideration.

292. Dr.  Peterson reasonably relied and performed under his agreements with CMB.

293. Defendant CMB   was required under the terms of the contract  to act reasonably and

COMPLAINT                                        -39-

follow the laws and statutes of the State of California and the United States of America and other governing documents in its treatment of Plaintiff's legal rights and property interests.

294. Defendant breached the contract by failing to follow the procedures set forth in laws and statutes of the State of California and the United States of America by engaging in the acts described herein.

295. The breaches are material.

296. At all times relevant hereto, Dr. Peterson has requested that CMB cure these breaches.

297. At all times relevant hereto, "CMB" has failed, refused, denied and/or unreasonably neglected to cure these breaches.

298. At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

299. As a direct and proximate result of "CMB's" breach of contract, Dr. Peterson has sustained and continues to suffer damages to his medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

300. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>TENTH CAUSE OF ACTION</u>

(Breach of Covenant of Good Faith & Fair Dealing - Sutter and CMB)

301. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set

forth herein.

302.  In every contract there is an implied covenant of good faith and fair dealing.

303.  At all times relevant hereto, Sutter, its peer review panel members, the "CMB" and Dr. Peterson had a special relationship that required reliance upon the good faith representations and conduct of each other.

304.  Dr. Peterson reasonably relied and performed under his contractual agreements with Sutter, its peer review panel and the "CMB".

305.  Sutter and the "CMB" intentionally breached the covenant of good faith and fair dealing by violating the HCQIA, Sherman Anti-Trust and Clayton Acts; filing a false From 805; conspiring to unlawfully pay and/or receive "kickbacks" in exchange for favorable disciplinary rulings; using the medical disciplinary process to force Dr. Peterson to steer his "protected class" patients; and, by using the medical disciplinary process to undermine his credibility as a witness.

306.  These breaches are material and intentional.

307.  At all times relevant hereto, Dr. Peterson has requested that Sutter, its peer review panel and the "CMB" cure the same.

308.  At all times relevant hereto, Sutter has failed, refused, denied and/or unreasonably neglected to cure these breaches.

309.  At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

310.  As a direct and proximate result of Defendants' Breach of the Covenant of Good Faith and Fair Dealing, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of

COMPLAINT                                                -41-

$100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

311.   As a proximate cause of  Defendants' Breach of the Covenant of Good Faith and Fair Dealing, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

312.   Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of  which will be determined at the time of trial or by motion thereafter.

313.   At all times relevant hereto, Defendants had  advanced knowledge of the damages that would be caused by the conduct alleged herein,   and continued to  acted with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the reoccurrence of the same.  The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>ELEVENTH  CAUSE OF ACTION</u>

(Negligence - All Defendants)

314.   Plaintiff  incorporates by reference all the allegations of this complaint as if more fully set forth herein.

315.   Sutter, its peer review panel members and the "CMB" filed, pursued and perpetuated the following unfounded actions against Dr. Peterson:

1.   Sutter  Alta Bates Peer  Review Action  date February 2, 2009.

2.   1st "CMB" Case No.: 12-2009-198592 (call coverage).

3.   2ND "CMB" Case  No.: 12-2010-204708 (patient "BE").

316.   Sutter, its peer review panel members and the "CMB" used fabricated investigations,

false declarations and paid unlawful "kickbacks"/attorney fees  to perpetuate these unfounded actions.

317.  At all times relevant hereto,   Sutter, its peer review panel members and the "CMB" had a duty to conduct a reasonable investigation before filing Form 805 and related disciplinary actions, disclose conflicts of interest, correct false findings on-line data bases (Physicians' National Data Bank), supervise its investigators/officers/directors,  and not accept unlawful "kickbacks"/attorney fees in exchange for favorable findings.

318.  Sutter, its peer review members and the "CMB" breached each of these duties.

319.  Each of these breaches were material.

320.  At all times relevant hereto, Dr. Peterson did  not,  and could not have  known,  about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process,  as ongoing investigations,  qui tam actions,  related settlements and attorney-client communications  were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

321.  As a direct and proximate result of Defendants' negligence,   Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

322.  As a proximate cause of  Defendants' negligence, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

323.  Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of  which will be determined at the time of trial or by motion thereafter.

COMPLAINT                                          -43-

324.   At all times relevant hereto, Defendants had advanced knowledge of the damages that would be caused by the conduct alleged herein, and continued to acted with wanton reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary damages to prevent the reoccurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## TWELFTH CLAIM FOR RELIEF

(Intentional Interference with Current and Prospective Contractual Relationships - All Defendants)

325.   Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

326.   From August 2009 through present, Sutter, its peer review panel members, and the "CMB" participated and perpetuated a "MediCal Strategy" which involved paying unlawful "kickbacks" to cooperating physicians. Uncooperating physicians were subjected to medical discipline at the peer review and board levels.

327.   Dr. Peterson refused to cooperate in Sutter's "MediCal Strategy" and was subjected to improper peer review and board discipline causing patient BE to file an unwarranted civil action against Plaintiff.

328.   Because of the disciplinary actions, Dr. Peterson's actual contractual relationships with current and prospective contractual relationships with a number of healthcare providers, including, but not limited to: Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Sharp Health Plan, Sutter Health Plus and Western Health Advantage.

329.   Sutter, its peer review panel and the "CMB's" interference was intentional.

330.   At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-

client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

331.   As a direct and proximate result of Defendants' intentional interference,  Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

332.   As a proximate cause of  Defendants' intentional interference, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

333.   Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of  which will be determined at the time of trial or by motion thereafter.

334.   At all times relevant hereto, Defendants had  advanced knowledge of the damages that would be caused by the conduct alleged herein,   and continued to  acted with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the reoccurrence of the same.  The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

### THIRTEENTH CAUSE OF ACTION

(Business Disparagement - All Defendants)

335.    Plaintiff  incorporates by reference all the previous paragraphs of this complaint as if more  fully set forth herein.

336.   As part of its "MediCal Strategy" Sutter, its peer review panel members and the "CMB"

COMPLAINT                                    -45-

intentionally published a number of false statements about Dr. Peterson designed to force him to unlawfully steer his "protected class" patients and to undermine his credibility as a witness.

337.   The Sutter Defendants intentionally made the following defamatory statements about Dr. Peterson:

a.   Dr. Peterson's failure to return telephone calls to the Sutter Alta Bates Summit Emergency Room.   The 3 quality of care issues were published orally and online from February 2009 through the present. The following individuals published and continue to republish those statements: Drs. Stollman, Perry, Rich and other members of Sutter's peer review panel patients, physicians at the Alta Bates Summit Hospital, "CMB", the National Practitioner's Data Bank and to other Healthcare Providers in Northern California.

b.   The false statements were written on a "Form 805" which then triggered a "CMB" investigation.  An investigation was fabricated by "CMB" investigator Cathy Lozano and contains false, fabricated and defamatory statements stating that Dr. Peterson had not returned calls to the Alta Bates hospital.

c.   That Dr. Peterson had resigned to prevent further investigation.  This statement is false.

d.   That other physicians would not cover for Dr. Peterson because of quality of care patient complaints.

e.   That Dr. Peterson had misdiagnosed BE's stroke.

f.   That Dr. Peterson had a number of unresolved patient issues which were pending in various civil and disciplinary actions.

338.   At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson.

Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

339. Defendants published the defamatory statements on or about the following dates: throughout 2009 through the date of this complaint and as alleged above.

340. The Sutter and CMB Defendants intentionally made these defamatory statements in order to cause continuing harm to Plaintiff's medical practice and endoscopy business specifically to cause the same to fail.

341. As a direct and proximate result of Defendants' disparaging statements, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

342. As a proximate cause of Defendants' disparaging statements, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety. The exact amount of Dr. Peterson's damages will be determined at trial.

343. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

344. At all times relevant hereto, Defendants had advanced knowledge of the damages that would be caused by the conduct alleged herein, and continued to acted with wanton reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary damages to prevent the reoccurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

FOURTEENTH  CAUSE OF ACTION

(Intentional Infliction of Emotional Distress - All Defendants)

345.   Plaintiff  incorporates by reference all the previous paragraphs of this complaint as if more fully set forth herein.

346.   At all times relevant hereto,  Sutter, it peer review panel members and the "CMB" devised a scheme to control medical services in Northern California.

347.   Sutter paid unlawful "kickbacks" and used the medical disciplinary process to force physicians to participate and/or cooperate in its "MediCal Strategy".  Uncooperative physicians were subjected to unfounded discipline.

348.   Dr. Peterson refused to cooperate with Sutter and was subjected to relentless discipline, including, but not limited to:

    1.    Sutter  Alta  Bates Peer  Review Action  date February 2, 2009.

    2.    1st "CMB" Case No.: 12-2009-198592 (call coverage).

    3.    2ND "CMB" Case  No.: 12-2010-204708 (patient "BE").

    4.    Civil Action: BE v. Ralph Peterson.

349.   At all times relevant hereto, Sutter knew that the medical discipline it initiated through its peer review panel members and the "CMB" was unfounded, but perpetuated to conceal unlawful "kickbacks".  Sutter knew that that by filing those actions and perpetuating the same would cause Dr. Peterson substantial emotional distress.

350.   The conduct complained of herein was outside acceptable behavior in any Physician/Health Care setting.

351.   Sutter, its peer review panel and the "CMB" was intentional, malicious and designed to cause Dr. Peterson substantial humiliation, mental anguish, and emotional and physical distress.

352.   The Sutter and CMB Defendants, by participating in,  confirming, encouraging,  and ratifying the same misconduct, have  done so with the knowledge that Dr. Peterson's emotional and physical distress damages would escalate to a point that Dr. Peterson

would quit and/or retire from the practice of medicine thereby leaving his patients without a patient advocate and/or medical care.

353.   Under threat of discipline, Dr. Peterson was forced to resign his privileges at Sutter's Alta Bates Medical Center.  Despite resigning, Sutter, its peer review panel members and the "CMB" caused a false Form 805 to be filed and pursued discipline against Dr. Peterson.

354.   At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "CMB" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

355.   Defendants' actions constitute extreme and outrageous conduct.

356.   As a direct and proximate result of Defendants' outrageous conduct,  Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

357.   As a proximate cause of Defendants' outrageous conduct, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

358.   Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

359.   At all times relevant hereto, Defendants had advanced knowledge of the damages that would be caused by the conduct alleged herein,  and continued to acted with wanton

reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary damages to prevent the reoccurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

### FIFTEENTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress - All Defendants)

360. Plaintiff incorporates by reference all the previous paragraphs of this complaint as if more fully set forth herein.

361. In the alternative, if the conduct alleged herein is determined <u>not</u> to be intentional, but instead, negligent, then Dr. Peterson is entitled to damages related to that negligence for the negligent infliction of his emotional distress.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

### EIGHTEENTH CAUSE OF ACTION

(Violation of Business and Professions Code Sections 17200 et. seq. - All Defendants)

362. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

363. Plaintiff brings this claim in his individual capacity, and as provided in the Unfair Competition Act, on behalf of himself and the general public as it pertains to Doctors of Color.

364. By engaging in the conduct described herein, Defendants have committed acts of unlawful, unfair, and fraudulent business practices within the meaning of the Unfair Competition Act resulting ongoing harm to Plaintiff.

365. The unlawful, unfair, and fraudulent business practices conducted by Defendants are ongoing and present a threat and likelihood of continuing discrimination against Plaintiff and other minority doctors.

366. Defendants committed such acts or acts of omission, including ministerial acts and

ministerial acts of omission, under the color of state law. Those actions were unlawful, unfair, misrepresentations, and outside the scope of authority afforded Defendants by law or within their official oath, functions, duties , employment, or authorized discretion.

367. Defendants acted in concert and joint action with each other and their acts or acts of omission described herein deprived Plaintiff of his constitutional and statutory rights and caused him other damages. Defendants' actions to deprive Plaintiff of his rights include ministerial acts not entitled to 11th amendment protection or immunity from suit in Federal Court.

368. Sutter, its peer review panel members, and the "CMB"  Defendants acted in concert and joint action with each other and at no time during the complained of actions or activities were the Defendants performing their Judicial Function for which they were established.

369. Further there is no Judicial Remedy for the complained of conduct, therefore  Sutter, its peer review panel members and the "CMB" Defendants are not entitled to qualified immunity for the complained of conduct. CMB Defendants are not entitled to qualified or absolute immunity for the complained of conduct, as such conduct was outside the scope of Defendant's authority and not authorized by the Medical Practice Act .

370. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover damages , reasonable attorneys' fees and costs from Defendants in an amount to be determined at trial.

371. As a direct and proximate result of Defendants' violation of California Business and Professions Code §17200,   Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

372. As a proximate cause of Defendants' violation of California Business and Professions Code §17200, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock,

pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

373.  As a proximate cause of Defendants' violation of California Business and Professions Code §17200, Dr. Peterson has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of  which will be determined at the time of trial or by motion thereafter.

374.  At all times relevant hereto, Defendants had  advanced knowledge of the damages that would be caused by the conduct alleged herein,   and continued to  acted with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the reoccurrence of the same.  The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

<u>NINETEENTH  CAUSE OF ACTION</u>

(Violation of Unruh Civil Rights Act - All Defendants)

375.  Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

376.  Plaintiff was subjected to the conduct alleged herein,  including,  but not limited to, harassment and/or discrimination on the basis of his race, age, as an advocate for "protected class" patients and a whistleblower  by the Defendants. This conduct resulted subsequent and continuing damage to Plaintiff.

377.  Plaintiff is informed and believes, and therefore  alleges that he was targeted for harassment and/or discrimination on the basis of his race, age, as an advocate for his "protected class" patients, and whistleblower by Defendants.

378.  Plaintiff is informed and believes, and thereupon alleges, that it was the routine practice and/or defacto policy of Defendants to target, deny services and/or access to legitimate services promised and approved by the "CMB" because of his color, age, as an advocate

for a "protected class",  and other minorities that challenged Sutter's scheme.

379. Defendants denied, aided or incited a denial of/discriminated or made a distinction that denied full an equal accommodations, advantages, privileges, and services to Plaintiff and his "protected class.

380. CMB Defendants committed such acts or acts of omission, including ministerial acts and ministerial acts of omission, under the color of state law. Those actions were unlawful, unfair, misrepresentations, and outside the scope of authority afforded Defendants by law or within their official oath, functions, duties , employment, or authorized discretion.

381. Defendants acted in concert and joint action with each other and their acts or acts of omission described herein deprived Plaintiff of his constitutional and statutory rights and caused him other damages. Defendants' actions to deprive Plaintiff of his rights include ministerial acts not entitled to 11th amendment protection or immunity from suit in Federal Court.

382. The acts or acts of omission of all individual Defendants were moving forces behind Plaintiff's injuries and done because of the Plaintiff's Race

383. These individual Defendants acted in concert and joint action with each other and at no time during the complained of actions or activities were the Defendants performing their Judicial Function for which they were established.

384. CMB  Defendants are not entitled to qualified or absolute immunity for the complained of conduct, as such conduct was outside the scope of Defendant's authority and not authorized by the Medical Practice Act.

385. As a direct and proximate result of Sutter's breaches of the covenant of good faith and fair dealing, Dr. Peterson has sustained damages including, but not limited to,   lost profits from his medical practice and endoscopy business, loss of value of those businesses and personal injuries related thereto. The exact amount of those damages will be proven at the time of trial.

386. As a proximate cause of Defendants' conduct,  Dr. Peterson  has suffered  physical and

emotional injuries, including humiliation, distress,  depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Plaintiff's damages will be determined at trial.

387.   As a result of  Defendants' conduct,   Dr. Peterson has retained counsel to prosecute this action, and accordingly,  is entitled to reimbursement for reasonable fees and costs related thereto. The  exact amount of attorney fees and costs  will be determined at the time of trial or by motion thereafter.

388.   At all times relevant hereto, Defendants  acted with reckless and wanton disregard for Dr. Peterson's personal and financial well being,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein  which mandates an award of punitive and/or exemplary  damages  the exact amount of which will be determined at the time of trial. WHEREFORE, Plaintiff prays for relief as set forth below.

<u>PRAYER FOR RELIEF</u>

With respect to the preceding claims for relief, Plaintiff  prays for relief as set forth below:

1.   That Defendants be ordered to pay to Plaintiff  a sum in excess of $100,000.00, the exact amount of which will be proven at the time of trial;

2.   That Defendants be ordered to pay to Plaintiff  a sum, the exact amount of which will be proven at the time of trial, for Plaintiff's lost earnings, both past and future;

3.   That Defendants be ordered to pay Plaintiff  a sum in excess of $100,000.00, the exact amount of which will be proven at the time of trial, for Plaintiff's physical and mental pain, and for Plaintiff's personal property damage;

5.   That Plaintiffs  be awarded exemplary damages, as permitted by law, as a result of Defendant willful and wanton misconduct in a sum in excess of $100,000.00;

6.   That Plaintiffs  be awarded the attorney's fees and court costs that Plaintiff  incurred in the prosecution of this Complaint; and

7.   Pursuant to Business and Professions Code section 17203, that defendants, their

successors, agents, representatives, employees and all persons acting in concert with defendants be enjoined from committing acts of unfair competition as alleged in this complaint;

8. Pursuant to Business and Professions Code section 17203, that defendants make full restitution, or disgorgement of money or property unfairly obtained, to Plaintiff to restore all monies owing Plaintiff as a result of the violations of Business and Professions Code section 17200 et seq. alleged in complaint.  This amount is in excess of $100,000.00 and will be established according to proof at trial;

9. Pursuant to Business and Professions Code section 17206, that the Court assess a civil penalty in the amount proven at the time of trial against Defendants and each of them for each violation of Business and Professions Code section 17200 et seq., as proved at trial;

10. Plaintiff recover its costs of suit and attorneys fees; and

11. For an award of interest, including prejudgment interest, at the legal rate.

12. Such other and further relief as the court may deem just and equitable in this matter.

## JURY DEMAND

Plaintiff demands a Jury.

Dated this   26   th  day of June, 2021.

Mirch Law Firm LLP

By   /s/ Kevin Mirch
       Kevin Mirch

COMPLAINT                                  -55-