UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RALPH PETERSON,

              Plaintiff,

     v.

SUTTER MEDICAL FOUNDATION, et al.,

              Defendants.

Case No. 3:21-cv-04908-WHO

**ORDER ON MOTION TO DISMISS**

Re: Dkt. Nos. 60, 61

Plaintiff Ralph Peterson is a medical doctor who alleges that various defendants associated with the Sutter network of healthcare facilities unlawfully steer away unprofitable procedures, give kickbacks to physicians who comply, and punish physicians who do not. He contends that the Medical Board of California ("MBC") facilitates these actives by using its disciplinary authority against physicians, like him, who will not comply. He also asserts that it discriminates against African American doctors like him. He alleges that, from 2009 to 2013, the defendants conspired to punish him through investigations and disciplinary proceedings. And in late 2019, he learned through public reporting that the California Attorney General had sued Sutter and entered into a confidential settlement with it regarding Sutter's anti-competitive behavior. Peterson brings numerous claims that fall into three groups: federal civil rights violations, federal antitrust violations, and violations of California state law.

The defendants move to dismiss. The MBC is shielded by sovereign immunity and it is dismissed with prejudice. The state-law claims against individual MBC members are likewise dismissed with prejudice. The federal civil rights claims against those individuals are dismissed as barred by sovereign immunity (in the defendants' official capacities) or absolute immunity (in

their individual capacities), but Peterson has leave to amend to adequately plead that *Ex parte Young* applies or that absolute immunity does not apply.  His federal antitrust claim is time-barred, but Peterson has leave to amend to allege that it should be delayed or tolled.  The private parties' motion is granted with prejudice on a claim under the Health Care Quality Improvement Act ("HCQIA") because Peterson has not shown that it creates a private right of action.

Most remaining claims against the private parties are dismissed as time-barred, but Peterson has leave to amend to adequately allege that their statutes of limitations are delayed or tolled.  And the motion to dismiss is denied when it comes to certain claims that he would not have had notice to bring until the California Attorney General's investigation was made public, because the discovery rule applies to toll the statute of limitation.

## BACKGROUND

### I.    FACTUAL BACKGROUND

#### A.  The Parties

Peterson is a medical doctor who was licensed to practice medicine in California.  First Amended Complaint ("FAC") [Dkt. No. 47] ¶ 2.  He has sued two groups of defendants.

The first I refer to collectively as the "Sutter Defendants."  Sutter Bay Medical Foundation ("Sutter Bay") and Sutter Bay Hospitals d/b/a Alta Bates Summit Medical Center ("Alta Bates") are tax-exempt corporations doing business in Alameda County.[1]  *Id.* ¶¶ 3–5.  These entities are, collectively, "Sutter."  Neil Stollman, Rod Perry, and Phillip Rich are licensed physicians who sat on Sutter's "peer review panels."  *Id.* ¶¶ 7–9, 52.  Rich also was president of Alta Bates's medical staff.  *Id.* ¶ 9.

The second I refer to as the "MBC Defendants."  Cathy Lozano was, during the events of this case, an employee investigator for the Medical Board of California ("MBC"), the agency that regulates the practice of medicine in California.  *Id.* ¶ 11.  Kristina Lawson was a "public member"—that is, a non-physician member—of the MBC from October 2015 onward; in 2020,

---

[1] Sutter East Bay Medical Foundation and Sutter East Bay Hospitals were named as defendants, but the FAC alleges that they merged into, respectively, Sutter Bay in 2017 and Alta Bates in 2018.  FAC ¶¶ 3–4.

United States District Court
Northern District of California

she was elected its president. *Id.* ¶ 12.[2]  Howard Krauss, Randy Hawkins, Dev Gnanadev, Ronald Lewis, Richard Thorp, Felix Yip, Michael Bishop, Sharon Levine, and Asif Mahmood were physician members of the MBC. *Id.* ¶¶ 13–14, 17–18, 20–21, 23, 25–26.  Richard Fantozzi was a physician member of the MBC and served as its secretary, vice president, and president at various times. *Id.* ¶ 15.  Denise Pines was a physician member of the MBC and served as its secretary and president. *Id.* ¶ 24.  Hedy Chang was a board member and its secretary from 2007 to 2011.  *Id.* ¶ 16.  Laurie Lubiano, Eserick Watkins, and Jamie Wright were public members of the MBC.  *Id.* ¶¶ 19, 22, 28.  Evelyn "Gerrie" Schipske was a board member and its secretary.  *Id.* ¶ 27.  Linda Wright is executive director of the MBC.  *Id.* ¶ 29.

### B. Sutter's Allegedly Unlawful Activities

Sutter owns and operates 24 hospitals with 53,000 employees.  *Id.* ¶ 39.  According to Peterson, it "monopolizes" healthcare and medicine in Northern California.  *Id.*  He alleges that Sutter uses "unlawful strategies" to maintain this monopoly, which he refers to as its "MediCal Strategy."  *Id.* ¶ 40.  He claims that it uses "medical discipline" by placing "cooperating or compliant physicians" and attorneys on peer review panels and the MBC.  *Id.* ¶ 42.  It allegedly uses these institutions to control physician referrals and acquisition of physician practices to "punish" physicians that do not "cooperate."  *Id.* ¶ 41.  This "cooperation," Peterson states, is that Sutter only performs profitable procedures and steers unprofitable procedural to county medical facilities.  *Id.* ¶ 43.  Sutter also allegedly manipulates charges and coding to increase revenue, performs unnecessary medical procedures, charges for unused materials, and takes other actions.  *Id.* ¶ 51.  Sutter then uses its revenue to pay kickbacks and acquire medical practices.  *Id.* ¶ 44.  Among other things, Peterson pleads that Stollman (who sits on a peer review panel) received kickbacks from Sutter.  *Id.* ¶ 61.

---

[2] The MBC has 15 members: 13 appointed by the governor and confirmed by the Senate, one appointed by the Senate Committee on Rules and one appointed by the speaker of the Assembly. *See* Cal. Bus. & Prof. Code § 2001.  Seven of the MBC's members are public members—that is, members who are not licensed by the MBC.  *Id.* § 2007.  The remaining members must be licensed physicians or surgeons.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.  Peterson's History with Sutter

Peterson, who is African American, has practiced medicine in California since 1983.  *Id.* ¶¶ 55–57.  He alleges that he serves Oakland's Indigent and . . . MediCal community."  *Id.* ¶ 56.  From 1999 to 2009, he had privileges at Alta Bates to perform endoscopies.  *Id.* ¶ 58.

In February 2009, Stollman and Perry—who were members of Alta Bates's peer review board—ordered Peterson to "appear . . . without explanation."  *Id.* ¶ 63.  Peterson requested a hearing under the HCQIA and notice of the allegations against him.  *Id.* ¶ 64.  He claims that they never provided either.  *Id.*  Several days later, Perry ordered Peterson to "increase his 'call coverage'" (from context, how much he would cover for Sutter) or pay a fee.  *Id.* ¶ 65.  Peterson requested from Stollman to cover more calls, but Stollman allegedly refused to provide it "without payment of an unreasonable fee."  *Id.* ¶ 67.  In March 2009, Rich (also a member of the peer review panel) ordered Peterson to resign his privileges, but Peterson refused.  *Id.* ¶¶ 68–69.  In April 2009, he claims that his privileges were suspended without a complaint, investigation, or hearing.  *Id.* ¶ 70.  He claims that Alta Bates then "forced" him to resign his privileges under threat of MBC discipline.  *Id.* ¶ 71.  An adverse action report prepared by Sutter states that Peterson "resigned to avoid further investigation into various quality of care complaints."  *Id.* ¶ 72.  Several months later, Peterson opened an independent endoscopy facility.  *Id.* ¶ 74.

### D.  First MBC Investigation

In November 2009, Peterson was notified that the MBC had opened an investigation into the allegations in the Sutter adverse action report.  *Id.* ¶ 76.  Soon after, a formal accusation was filed and Peterson was given a summary of the investigation.  *Id.* ¶¶ 77–78.  Peterson claims that the summary contained false and misleading statements.  *Id.* ¶ 78.  In October 2010, Peterson was informed that a "medical consultant" determined the allegations were not "extreme enough to warrant pursuing administration action."  *Id.* ¶ 80 (internal quotation marks omitted).

### E.  Second MBC Investigation and Patient Suit

In 2010, a longtime patient of Peterson's filed a complaint against Peterson that he calls "unfounded."  *Id.* ¶¶ 81–87.  Peterson alleges that Sutter "encouraged and participated in" filing that complaint.  *Id.* ¶ 87.  Peterson allegedly referred the patient to cardiologists but the patient did

not come to the appointments. *Id.* ¶¶ 82–85.  Instead, the patient eventually went to Sutter, which allegedly discharged her to "steer" her to a county healthcare facility. *Id.* ¶ 83.  In 2009, the patient had a stroke and was treated by Sutter. *Id.* ¶¶ 85–86.

In 2011, the same MBC investigator that carried out the previous investigation looked into this complaint. *Id.* ¶ 88.  According to Peterson, the MBC determined that Sutter had discovered an artery blockage in the patient but "failed, refused and/or neglected to treat her," steering her to a county medical facility. *Id.* ¶ 89.  In October 2011, the MBC's executive director (Whitney) allegedly signed a formal accusation that, according to Peterson, "concealed Sutter's refusal and/or failure to diagnose, treat" the patient. *Id.* ¶ 90.  Peterson asserts that a provider contract he had with Cigna was terminated due to "online accusations" from MBC. *Id.* ¶ 94.  Later, a Health Net provider contract was terminated due to the existence of the MBC case. *Id.* ¶ 95.  In 2013, Peterson was denied provider status with Hill Physicians Medical Group, Alta Bates, and Blue Shield of California; in 2014, he was denied provider status with Aetna. *Id.* ¶¶ 103, 110, 114, 118.  According to him, the MBC refused to provide him a complete file on the investigation and its supporting evidence. *Id.* ¶ 97.  In January 2013, Peterson attempted to testify in front of the MBC as a witness on behalf of another physician but was not allowed to do so. *Id.* ¶ 99.

In April 2013, the estate of the deceased patient sued Peterson in state court. *Id.* ¶ 104.  Peterson claims that the case was "prompted, perpetuated and encouraged by Sutter, [the] peer review panel members and" the MBC for his alleged refusal to cooperate in Sutter's unlawful tactics. *Id.* ¶ 105.  The court eventually entered judgment in Peterson's favor and dismissed the action with prejudice. *Id.* ¶ 113.

In July 2013, the MBC allegedly "determined that there were no quality of care issues" in treating Peterson's patient "but did not disclose that finding" to Peterson. *Id.* ¶ 111.  Yet in December 2013, it found that Peterson had not maintained sufficient records about his treatment of the patient. *Id.* ¶ 115.  He alleges that these accusations were fabricated. *Id.*

### F.  State-Court Suit

In November 2012, Peterson filed an action in California Superior Court against Perry and Stollman for allegedly "misusing the physician disciplinary process." *Id.* ¶ 98.  The law firm

1    Hanson & Bridgett is alleged to have represented Sutter, the peer review panel, and MBC.  *Id.* ¶

2    101.  That is also the firm at which defendant Lawson, president of the MBC, is an attorney.  *Id.* ¶

3    12.  Peterson claims that this representation was a conflict and was not disclosed to him.  *Id.* ¶ 101.

4    In May 2013, the court "issued a tentative order against" Peterson.  *Id.* ¶ 107.  The California

5    Court of Appeal eventually dismissed Peterson's appeal (and the California Supreme Court denied

6    review).  *Id.* ¶¶ 122–23.[3]

7    **G.  California Attorney General Investigations and Suit**

8    In 2013, the California Attorney General's Office was investigating Sutter about the use of

9    kickbacks.  *Id.* ¶ 102.  Peterson also alleges that a separate investigation—apparently also by the

10   California Attorney General—was conducted into MBC discrimination against African American

11   and Hispanic doctors.  *Id.*

12   In March 2018, the California Attorney General sued Sutter for anti-competitive behavior.

13   *Id.* ¶ 127.  Sutter and the state eventually entered a confidential settlement that has been publicly

14   reported to be worth more than $600 million, 10 years of monitoring, and a consent decree barring

15   kickbacks.  *Id.* ¶¶ 129–31, 133.  According to Peterson, the Attorney General asserted that Sutter's

16   physician referral program violated the law and that Sutter gave kickbacks.  *Id.* ¶ 130.

17   The Sacramento Bee allegedly first publicly reported about the kickback lawsuit on

18   November 4, 2019.  *Id.* ¶ 129.  The Attorney General's Office revealed the investigation two

19   weeks later.  *Id.* ¶ 130.

20   **II.    PROCEDURAL BACKGROUND**

21   Peterson filed this suit in June 2021.  Dkt. No. 1.  He moved to enter default against many

22   defendants, some of which the Clerk of Court entered and some of which the Clerk denied.  Dkt.

23   No. 24.  Eventually, after the defendants appeared and moved to set aside their defaults, the parties

24   agreed to moot those motions, withdraw the defaults, and permit Peterson to file the FAC.  Dkt.

25   No. 45.

26   As currently pleaded, the FAC contains 17 causes of action.  The following are against all

27

28   _____
     [3] The parties' unopposed requests for judicial notice of filings in the state-court action are
     GRANTED.  *See* Dkt. Nos. 62, 67.

United States District Court
Northern District of California

defendants: (1) violation of the First Amendment; (2) violation of constitutional due process; (3) discrimination against Peterson and his indigent patients under the Constitution, the HCQIA, Title VII, and other unspecified statutes; (4) failure to prevent discrimination and retaliation (presumably under the same sources); (5) retaliation in violation of the HCQIA; (7) violation of federal antitrust law; (11) negligence; (12) intentional interference with contractual relationships; (13) business disparagement; (14) intentional infliction of emotional distress; (15) negligent infliction of emotional distress; (16) violation of California's Unfair Competition Law ("UCL"); and (17) violation of the Unruh Civil Rights Act.  The following are against Sutter: (6) antitrust interference with business relationships and (8) breach of contract.  Peterson also alleges a breach of contract claim (9) against the MBC.  And he alleges a breach of the covenant of good faith and fair dealing (10) against Sutter and the MBC.

## LEGAL STANDARD

## I.    MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1) is a challenge to the court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).  The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested.  *Id.*

A challenge pursuant to Rule 12(b)(1) may be facial or factual.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction.  *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal.  *See Wolfe*, 392 F.3d at 362.

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by

1    themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039.  To resolve

2    this challenge, the court "need not presume the truthfulness of the plaintiff's allegations." *Id.*

3    (citation omitted).  Instead, the court "may review evidence beyond the complaint without

4    converting the motion to dismiss into a motion for summary judgment." *Id.* (citations omitted).

5    Once the moving party has made a factual challenge by offering affidavits or other evidence to

6    dispute the allegations in the complaint, the party opposing the motion must "present affidavits or

7    any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses

8    subject matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also*

9    *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

10   **II.      MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

11           Under FRCP 12(b)(6), a district court must dismiss a complaint if it fails to state a claim

12   upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must

13   allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v.*

14   *Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts

15   that "allow the court to draw the reasonable inference that the defendant is liable for the

16   misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There

17   must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  While courts

18   do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to

19   "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

20           In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

21   Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

22   plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

23   is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

24   fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

25   2008).

26           If the court dismisses the complaint, it "should grant leave to amend even if no request to

27   amend the pleading was made, unless it determines that the pleading could not possibly be cured

28   by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In

United States District Court
Northern District of California

1  making this determination, the court should consider factors such as "the presence or absence of

2  undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous

3  amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See*

4  *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

5                                              **DISCUSSION**

6  **I.    MBC DEFENDANTS' MOTION TO DISMISS**

7         The MBC Defendants' motion to dismiss states that it is brought by the State of California,

8  through the MBC and the MBC Defendants.  *See* MBC Defendants' Motion to Dismiss ("MBC

9  Mot.") [Dkt. No. 60] 1.  It seeks to dismiss all claims against those entities.

10         **A.    The State of California and MBC**

11         The MBC Defendants move to dismiss the claims to the extent they are against the State of

12  California or MBC based on their sovereign immunity.  MBC Mot. 6–7.

13                  **i.    State of California**

14         The State of California has not been named as a defendant, none of the claims are brought

15  against it, and Peterson's brief does not respond to the argument about it.  Accordingly, there is no

16  dispute between the parties on this point and the case cannot proceed against the State of

17  California itself.

18                  **ii.    MBC**

19         The MBC is not named as a defendant and, as far as the record shows, has not been served

20  with process.  Despite this, two of the substantive claims in the FAC state that they are against it.

21  *See* FAC ¶¶ 288–300 (breach-of-contract claim against MBC), 301–313 (bad-faith claim against

22  Sutter and MBC).  And MBC has appeared in this action, filed a Rule 12 motion, and does not

23  object on service-of-process or personal-jurisdiction grounds, so it has waived those challenges.

24  *See* Fed. R. Civ. P. 12(h).  It also proceeds on "the understanding that MBC is an intended

25  Defendant to this action," so I do as well.  MBC Mot. 2 n.1.

26         I agree with MBC that it is shielded from liability by sovereign immunity.  In general, "an

27  unconsenting State is immune from suits brought in federal courts by her own citizens as well as

28  by citizens of another state."  *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100

9

(1984) (internal quotation marks and citation omitted). That immunity includes suits against states' agencies and departments. *Id.* The Ninth Circuit has held that the MBC's predecessor board was an agency of the state for purposes of sovereign immunity. *Forster v. Cty. of Santa Barbara*, 896 F.2d 1146, 1149 (9th Cir. 1990). The statute it relied on for that conclusion remains the same when it comes to MBC. *See id.*; Cal. Bus. & Prof. Code § 2001. Peterson's brief does not address MBC's argument that it is immune (for instance, to argue that the state consented to suit or that Congress abrogated its immunity).

Accordingly, MBC is immune from suit for the two state-law claims here. *See Pennhurst*, 465 U.S. at 100 (explaining that immunity applies "regardless of the relief sought"); *see also Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006) (holding that the supplemental-jurisdiction statute does not abrogate sovereign immunity for state-law claims). The claims against the MBC are DISMISSED WITH PREJUDICE.

### B. State-Law Claims Against the MBC Defendants

Peterson's brief clarifies that he sues the MBC Defendants in their official and individual capacities. *See* Opposition to the MBC Mot. ("MBC Oppo.") [Dkt. No. 68] 7. The MBC Defendants move to dismiss the claims for both types of liability. The MBC Defendants argue that all of Peterson's claims against them are barred by sovereign immunity. *See* MBC Mot. 7. In response, Peterson contends that the claims may proceed (1) to the extent they are against the MBC Defendants in their official capacities under *Ex parte Young*, 209 U.S. 123 (1908), and (2) to the extent they are in their individual capacities under 42 U.S.C. § 1983 ("Section 1983"). *See* MBC Oppo. 6–8.

I first address the claims brought under California state law. In general, a suit against a state official in her official capacity is a suit against the state for purposes of sovereign immunity. *Pennhurst*, 465 U.S. at 102–103. Under *Ex parte Young*, that immunity does not generally bar suits against state officials that challenge the constitutionality of their action and seek redress through prospective injunctive relief. *Id.* But Peterson's state-law claims do not challenge the constitutionality of the MBC Defendants' actions, they allege violations of California law. The Supreme Court has expressly held that the *Ex parte Young* exception does not apply to state-law

1  claims.  *Id.* at 106.  Accordingly, the state-law claims cannot proceed against the MBC Defendants

2  in their official capacities.

3  　　　Section 1983 provides a cause of action against state officials "who, under color of any

4  statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be

5  subjected, any citizen of the United States or other person within the jurisdiction thereof to the

6  deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42

7  U.S.C. § 1983.  As the Supreme Court has explained, "the Eleventh Amendment does not erect a

8  barrier against suits to impose individual and personal liability on state officials under § 1983."

9  *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991) (internal quotation marks and citation omitted).  But

10  Peterson's state-law claims are not cognizable under Section 1983, which only provides a cause of

11  action to redress violations of *federal* law.  *Lovell By & Through Lovell v. Poway Unified Sch.*

12  *Dist.*, 90 F.3d 367, 370 (9th Cir. 1996).  The state-law claims cannot proceed against the MBC

13  Defendants in their individual capacities on this basis either.[4]

14  　　　Peterson offers no other ground to overcome the MBC Defendants' sovereign immunity

15  for the state-law claims; he does not argue, for instance, that the state has waived sovereign

16  immunity as a matter of state law.  Accordingly, the state-law claims against the MBC Defendants

17  are DISMISSED WITH PREJUDICE.[5]

18  　　　**C.  Federal Claims Against the MBC Defendants**

19  　　　The MBC Defendants move to dismiss the claims based on federal law and the U.S.

20  Constitution.  *See* MBC Mot. 6–17.[6]

21

22

23  [4] Peterson passingly asserts that the state-law claims are not barred by sovereign immunity
   because the FAC alleges that they acted unlawfully, acted outside the scope of their authority, and
24  took ministerial actions.  MBC Oppo. 8.  While these types of allegations may affect whether an
   official is entitled to the separate protection of absolute immunity from Section 1983 damages
25  actions (discussed below), Peterson cites no authority for the position that they overcome
   *sovereign immunity*, and this positions would contradict its fundamental principles.

26  [5] Because the state-law claims are dismissed on this basis, there is no need to address the MBC
27  Defendants' argument that they are also immune under state statute.

28  [6] For the reasons explained below, Peterson has not shown that the HCQIA creates a private right
   of action, so that claim is dismissed with prejudice on this basis.

United States District Court
Northern District of California

### i.    Official Capacity

First, the MBC Defendants argue that they are entitled to sovereign immunity to the extent the federal claims are against them in their official capacities.  MBC Mot. 6–7.  As noted above, suits against state officials in their official capacities are generally suits against the state and barred by sovereign immunity.  *Pennhurst*, 465 U.S. at 102–103.  And as noted, *Ex parte Young* creates an exception to that immunity for suits challenging the constitutionality of officials' actions and seeking prospective injunctive relief.  *Id.*

Peterson has not adequately pleaded that this case falls into *Ex parte Young*'s ambit.  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (internal quotation marks and citations omitted).  The typical example is a complaint that asks that officials be enjoined from violating federal law.  *See id.* (collecting examples).

Here, the complaint is backward-looking.  All of the causes of action are about discrete past events and seek monetary redress for Peterson's past injuries.  There is no indication that the MBC Defendants are currently or are imminently going to carry out another alleged violation of federal law.  Accordingly, *Ex parte Young* is inapplicable.  *See id.*  While the UCL claim *can* lead to prospective relief, it is not cognizable under *Ex parte Young* as a state-law claim.  Future antitrust violations can lead to injunctive relief too, *see* 15 U.S.C. § 26, but that claim is dismissed on other grounds and, in any case, Peterson does not plead anything about future antitrust harm.  Indeed, the complaint references injunctive relief exactly once: in asking that the defendants be enjoined under the UCL.  *See* FAC at 54.  In short, the complaint does not allege any "ongoing violation of federal law" or seek "relief properly characterized as prospective" to halt that violation.  *Verizon*, 535 U.S. at 645.  Peterson has leave to amend if he believes he can satisfy this requirement.

### ii.    Absolute Immunity

The MBC Defendants argue that they are entitled to absolute immunity from damages

1    liability.  *See* MBC Mot. 9–10.

2           As a general matter, state executive officials "are absolutely immune from § 1983 suits if

3    they perform 'special functions' which, because of their similarity to functions that would have

4    been immune when Congress enacted § 1983, deserve absolute protection from damages liability."

5    *Buckwalter v. Nevada Bd. of Med. Examiners*, 678 F.3d 737, 740 (9th Cir. 2012), *as amended*

6    (June 8, 2012) (internal quotation marks and citations omitted).  To determine whether the MBC

7    Defendants are entitled to absolute immunity, I look to the "nature of the function performed, not

8    the identity of the actor who performed it."  *Id.* (internal quotation marks and citation omitted).

9    Judges and prosecutors perform the "paradigmatic" functions entitled to absolute immunity.  *Id.*

10   Accordingly, courts examine whether the defendants' functions are "analogous" to those of a

11   judge or prosecutor.  *Id.*  This immunity can extend to administrative proceedings.  *Butz v.*

12   *Economou*, 438 U.S. 478, 517 (1978).

13          The Ninth Circuit has repeatedly held that certain quasi-prosecutorial and quasi-judicial

14   functions of the members of independent state medical boards are entitled to absolute immunity

15   because they are "functionally comparable to judges."  *See Buckwalter*, 678 F.3d at 740; *Mishler*

16   *v. Clift*, 191 F.3d 998, 1007 (9th Cir. 1999).  Peterson does not dispute that the MBC shares all of

17   the salient features that led the court to extend protection to other states' similar boards.  But, as

18   the Ninth Circuit has also explained, this holding alone does not settle the case because absolute

19   immunity is assessed action-by-action.  *Buckwalter*, 678 F.3d at 740.  Accordingly, the question is

20   whether the challenged actions are "judicial" or "closely associated with the judicial process."  *Id.*

21   (internal quotation marks and citation omitted).

22          Peterson argues that several types of alleged actions are not entitled to immunity: steering

23   certain procedures to county medical facilities, kickbacks, medical billing fraud, threats of

24   physician discipline, actual discipline, price fixing, bid ridding, discrimination, retaliation, Sutter

25   controlling the disciplinary process, and "Due Process violations."  MBC Oppo. 10.

26          Peterson's allegations and argument on this issue are not sufficient to state a claim that

27   survives an immunity challenge.  The relevant portion of Peterson's brief cites more than one-

28   hundred paragraphs from the FAC with virtually no elaboration.  *See id.*  But he never attempts to

United States District Court
Northern District of California

show what behavior each MBC Defendant did to expose him to liability.  The MBC Defendants sat on the board or were officers of it at different times, some of which appear not to be connected to the events of this case.  The paragraphs that Peterson cites often refer to *Sutter's* actions, not the actions of MBC members.  *See, e.g.*, FAC ¶ 43 ("As a result of its "MediCal Strategy", Sutter performed only profitable procedures, steering away unprofitable procedures to county medical facilities.").  Indeed, Peterson's core theories about steering, kickbacks, billing fraud, and price fixing are that *Sutter* carried them out.  Other allegations that Peterson cites simply refer vaguely to things that MBC *as an institution* did.  *See, e.g.*, *id.* ¶ 124 (alleging that MBC engages in race discrimination in the disciplinary process).  Yet MBC cannot itself be held liable, and each MBC Defendant can only be held liable for his or her own actions, not actions attributed only generally to the agency.  *Buckwalter*, 678 F.3d at 737.  Further, at least some of this behavior, even if properly pleaded, appears to be shielded by absolute immunity, such as that involved in the disciplinary process—even if it were discriminatory.  *See Mishler*, 191 F.3d at 1008 ("There is no question that acts occurring during the disciplinary hearing process fall within the scope of absolute immunity."); *Cleavinger v. Saxner*, 474 U.S. 193, 199–200 (1985) ("Such immunity applies however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." (internal quotation marks and citation omitted)).

As far as I can tell, and as far as Peterson argues in his brief, *see* MBC Oppo. 23, the only MBC Defendants about whom there are specific allegations are Lozano (the employee who investigated the accusations against Peterson) and Whitney (the executive director who signed the second accusation).  *See* FAC ¶¶ 90, 169.  But it is unclear which of the actual claims, if any, are premised on these allegations, as opposed to the actions of the MBC members; Peterson's brief does not clarify this.  And while it is not entirely possible to determine because of the state of the allegations, there is a colorable argument that these acts are entitled to absolute immunity too.  *See Mishler*, 191 F.3d at 1008 (holding that "signing the disciplinary complaint under penalty of perjury is entitled to absolute immunity").

I will grant leave to amend so that Peterson can make clear which defendants took which alleged actions that allegedly violated specific rights.  In drafting the amended complaint, Peterson

1   should be mindful of the principles of immunity discussed above.[7]

2      **iii.**  **Antitrust Claim**

3     The MBC Defendants move to dismiss the antitrust claim against them.[8]  *See* MBC Mot.

4   12–13.

5         1. <u>State-Action Immunity</u>

6     Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the

7   form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

8   States."  15 U.S.C. § 1.  To state a claim under the Act, a plaintiff must plead: "(1) a contract,

9   combination or conspiracy among two or more persons or distinct business entities; (2) by which

10  the persons or entities intended to harm or restrain trade or commerce among the several States, or

11  with foreign nations; (3) which actually injures competition."  *Kendall v. Visa U.S.A., Inc.*, 518

12  F.3d 1042, 1047 (9th Cir. 2008).

13    In *Parker v. Brown*, 317 U.S. 341 (1943), the Supreme Court established an exception to

14  the Sherman Act:  It does "not apply to anticompetitive restraints imposed by the States as an act

15  of government."  *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 370 (1991)

16  (internal quotation marks and citation omitted).  To determine whether a state's actions are

17  immune from Sherman-Act liability, courts employ a two-step test:  "First, the challenged restraint

18  must be one clearly articulated and affirmatively expressed as state policy; second, the policy must

19  be actively supervised by the State itself."  *California Retail Liquor Dealers Ass'n v. Midcal*

20  *Aluminum, Inc.*, 445 U.S. 97, 105 (1980) (internal quotation marks and citations omitted).

21    The MBC Defendants have not shown that the alleged antitrust violations here fall within

22  *Parker*'s exception.  Peterson alleges that the MBC Defendants engaged in anticompetitive

23  behavior by using their authority to give unlawful preference to Sutter and punish physicians that

24  did not adequately comply with its demands.  *See* FAC ¶¶ 225–36.  The MBC Defendants have

---

[7] Because the state of the claims is unclear, I do not address the MBC Defendants' alternative argument that the claims are time-barred.

[8] The antitrust claim is not brought under Section 1983, so that statute's immunity doctrines do not apply.

United States District Court
Northern District of California

1   pointed to no "clearly articulated and affirmatively expressed . . . state policy" in favor of that type

2   of behavior. *Midcal*, 445 U.S. at 105. The MBC Defendants' argument is, instead, that "MBC

3   investigatory, charging, and reprimand procedures which Plaintiff complains form part of the

4   State's comprehensive disciplinary structure for its medical profession." MBC Mot. 13. That is

5   correct, but that a state has generally given the MBC regulatory authority over this broad area does

6   not mean that it has affirmatively chosen a policy of pursuing the *specific* alleged anti-competitive

7   behavior at issue.

8                                          2. Statute of Limitations

9        The MBC Defendants also argue that the antitrust claim is time-barred.[9] As the parties

10  agree, the statute of limitations on the antitrust claim is four years after the cause of action accrues.

11  *See* 15 U.S.C. § 15b. An antirust claim accrues "each time a plaintiff is injured by an act of the

12  defendants." *Program Eng'g, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1194 (9th Cir.

13  1980). A motion to dismiss based on a statute of limitations can only be granted when its running

14  "is apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997

15  (9th Cir. 2006) (internal quotation marks and citation omitted). The MBC Defendants argue that

16  "[b]ecause Plaintiff's claims under the Sherman Act ran no later than sometime in 2017, his

17  attempt to pursue those claims in this 2021 lawsuit are time barred." MBC Mot. 14. It contends

18  that "the complaint lists the last overt act by MBC and its board members toward Plaintiff as

19  occurring in 2013, when Plaintiff entered a stipulated settlement." *Id.*

20       Peterson first responds that the discovery rule postpones the running of the statute, because

21  he did not know of the alleged anti-competitive behavior until late 2019, when the California

22  Attorney General's investigation was publicized. MBC Oppo. 20. The problem for Peterson is

23  that, in this Circuit, accrual of antitrust claims is governed by an injury rule, not the discovery rule.

24  *See Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274 (9th Cir. 1988); *In re*

25  *Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1209 (N.D. Cal. 2015) (Koh, J.)

26  (extensively surveying authorities). The Ninth Circuit has explicitly contrasted a discovery rule

27

28  [9] The Sutter Defendants also make this argument, and the reasons stated in this section apply
    equally to them.

United States District Court
Northern District of California

for accrual with the "accrual rule applicable to antitrust suits." *Beneficial Standard*, 851 F.2d at 274–75. Under that antitrust-specific rule, "the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs." *Id.* Peterson cites no contrary authority.

In the section of his brief on the antitrust claim's statute of limitations, Peterson relies solely on the discovery rule. *See* MBC Oppo. 20. Other sections of his brief do, however, refer to several other tolling doctrines. I will assume that he contends that those doctrines toll this claim as well.

One is the continuing violations doctrine. *Id.* 14–15. "Antitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks and citations omitted). "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Id.*

Peterson has identified no overt act within the limitations period. The allegation he relies on is that "Sutter, its peer review panel and the "CMB's" [sic] unlawful conduct constitutes an ongoing anti-competitive restraint of trade." FAC ¶ 264. That allegation is threadbare and conclusory, so it fails to satisfy Peterson's burden to plead that the claim is tolled. The allegation, moreover, does not identify any injury to Peterson, but the continuing violation doctrine "is one in which the *plaintiff's interests* are repeatedly invaded and a cause of action arises each time *the plaintiff is injured*." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (emphasis added). Peterson identifies no injury to him that occurred within the limitations period. Peterson also appears to rely on the allegation that he continues to suffer damages to his reputation and business, *see* FAC ¶ 341, but the doctrine only tolls the claim for continuing *violations*, not simply when the *harm happens to last* into the limitations period. *See Klehr*, 521 U.S. at 189 (explaining that the doctrine requires a new "act" that "injures" the plaintiff).

Next is the fraudulent concealment doctrine. Antitrust statutes of limitations "may be

tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). Peterson must "plead facts showing that [the defendants] affirmatively misled [him], and that [he] had neither actual nor constructive knowledge of the facts giving rise to its claim despite [his] diligence in trying to uncover those facts." *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988). A plaintiff has constructive knowledge if he "had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Hexcel*, 681 F.3d at 1060. And the plaintiff must plead facts supporting its showing of diligence. *Id.* Because it sounds in fraud, fraudulent concealment must be pleaded with particularity under FRCP 9(b). *See Vanella v. Ford Motor Co.*, No. 3:19-CV-07956-WHO, 2020 WL 887975, at *5 (N.D. Cal. Feb. 24, 2020). That means that Peterson must plead with "particularity the circumstances constituting the fraud," and the allegations must "be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted). "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted).

Peterson has failed to adequately allege that the doctrine applies. First, much of what he discusses is simply that he was never told the relevant information, but that is insufficient to constitute fraudulent concealment. *Conmar*, 858 F.2d at 502. Second, his pleading does not satisfy Rule 9(b). He vaguely discusses that the Sutter Defendants hid their actions in closed meetings and by using attorney client privilege. *See* Opposition to the Sutter Mot. ("Sutter Oppo.") [Dkt. No. 66] 12–13. Even assuming that this would be sufficient to constitute fraudulent concealment, Peterson must plead the "who, what, when, where, and how" of these alleged acts. *Vess*, 317 F.3d at 1106. He has leave to amend to do so.

Another is the "overt act" doctrine from conspiracy law. But it does not toll the claim because, as explained above when discussing the continuing violation doctrine, Peterson has

identified no overt act against him in the limitations period.  *See People ex rel. Kennedy v. Beaumont Inv.*, Ltd., 111 Cal. App. 4th 102, 111 (2003), *as modified on denial of reh'g* (Sept. 9, 2003).

The final tolling doctrine referenced in Peterson's brief is equitable tolling.  But the high bar for it is not met for largely the same reasons that fraudulent concealment is not:  Peterson has not, as he must, pointed to some "extraordinary" external event beyond his control that prevented him from discovering this information.  *See Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016).

Because I cannot say that leave to amend is futile, Peterson has leave to amend if he wishes to more clearly plead why these doctrines apply.

### D.  MBC Defendants Conclusion

The State of California is not a party to this case.  The MBC is dismissed with prejudice due to sovereign immunity.  The state-law claims against the MBC Defendants are dismissed with prejudice due to sovereign immunity.  The federal claims against the MBC Defendants are dismissed with leave to amend so that Peterson can adequately plead that *Ex parte Young* applies and that the MBC Defendants are not entitled to absolute immunity for damages.  The antitrust claim is dismissed with leave to amend so that Peterson can plead that it is tolled.

## II.   SUTTER DEFENDANTS' MOTION TO DISMISS

The Sutter Defendants move to dismiss all of the claims against them as time-barred, barred by claim preclusion, and for failing to state a claim.  *See* Sutter Defendants' Motion to Dismiss ("Sutter Mot.") [Dkt. No. 61].

### A.  Statute of Limitations on Federal Civil Rights Claims

As noted, a motion to dismiss based on a statute of limitations can only be granted when its running "is apparent on the face of the complaint."  *Huynh*, 465 F.3d at 997 (internal quotation marks and citation omitted).  Section 1983, the basis for Peterson's federal civil rights claims, borrows the "personal injury statute of limitations of the state in which the cause of action arose."  *Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031, 1041 (9th Cir. 2011).  As the parties agree, California's personal injury statute of limitations is two years from when the claim accrues.

United States District Court
Northern District of California

*See* Cal. Civ. P. Code § 335.1.  But "federal law controls the question of when a claim *accrues*." *Johnson v. State of Cal.*, 207 F.3d 650, 653 (9th Cir. 2000) (emphasis added).  Absent a rule delaying accrual or tolling the statute, "a claim accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of action."  *Id.*

 The events that make up the core of this case occurred from 2009 to 2013, so the defendants argue that the claims are time-barred no matter which of them triggered the limitations period.  Peterson relies on a number of doctrines to delay accrual or toll the statute.  For the reasons that follow, I agree with him that it is not established on the face of the complaint that he did know or should have known of the facts underlying two of his federal civil rights claims until November 2019, when the kickbacks were made public.  But I agree with the Sutter Defendants that the other two claims are time-barred.

 Peterson frames the first of his arguments in terms of the discovery rule.  The federal accrual standard is essentially the same as the discovery rule.  *See Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008).  And California law's discovery rule (which some courts appear to have applied in Section 1983 cases) is identical in substance:  It "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  *Fox v. Ethicon Endo-Surgery*, Inc., 35 Cal. 4th 797, 807 (2005).  A reason to discover exists when the plaintiff has reason "at least to suspect a factual basis for its elements."  *Id.* (internal quotation marks and citation omitted).  Both rules require the plaintiff to adequately show his diligence.  *See id.*; *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 940 (9th Cir. 2009).

 Peterson's first claim alleges that the Sutter Defendants violated his First Amendment rights by "punishing" him with the peer review process when he "refused" to accept kickbacks.  FAC ¶¶ 142–45.  The second claim alleges that he was denied constitutional due process because the peer review and MBC accusation processes were tainted.  *Id.* ¶¶ 153–88.  The third claim alleges discrimination based on the fact that he his African American and, it seems, based on the "protected class" of his patients who were indigent or on MediCal.  *Id.* ¶¶ 200–11.  The fourth claim alleges failure to prevent discrimination and retaliation premised on this.  *Id.* ¶¶ 214–24.

 Peterson has plausibly alleged that the discovery rule saves the First Amendment and due

process claims.  He alleges that the Sutter Defendants maintained a *secret* policy of providing kickbacks to compliant doctors and punishing uncompliant ones.  *See* Sutter Oppo. 11.  He has adequately pleaded that he could not reasonably have discovered that information until it was made public in November 2019, when the previously confidential California Attorney General investigation was publicized.  *See Lukovsky*, 535 F.3d at 1048 (holding that a claim accrues when the plaintiff knows or has reason to know the "underlying facts" and the "cause" of the injury); *Bibeau v. Pac. Nw. Rsch. Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999), opinion amended on denial of reh'g, 208 F.3d 831 (9th Cir. 2000) ("[T]he statute only begins to run once a plaintiff has knowledge of the 'critical facts' of his injury, which are that he has been hurt and who has inflicted the injury." (emphasis added)).  Because of the nature of the alleged violation here, "what [Peterson] knew and when [he] knew it are questions of fact."  *Bibeau*, 188 F.3d at 1108.

The two discrimination-based claims are not saved by the discovery rule.  The Ninth Circuit has expressly held that, in an employment discrimination case, the claim accrues when the plaintiff is subject to an adverse employment action, not when the plaintiff suspects it was discriminatory.  *Lukovsky*, 535 F.3d at 1050.  Though Peterson does not allege *employment* discrimination, he alleges discrimination in supervision by medical authorities.  The Ninth Circuit's decision emphasized that the federal accrual standard applies across disparate case types.  *Id.* at 1049.  In fact, in an on-point case about discipline from a state medical board that alleged religious discrimination, the Ninth Circuit held that the claim accrued when the plaintiff was denied license reinstatement—that is, when the adverse action was taken.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 927 (9th Cir. 2004).  Accordingly, the discrimination claims accrued when Sutter took the allegedly unlawful acts.

Nor are the discrimination claims saved by the other miscellaneous doctrines that Peterson invokes.  He has not shown any "continuing violation" because he has not pointed to a way he was discriminated against within the limitations period.  *See Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir. 1982), *opinion modified on denial of reh'g*, No. 79-4110, 1982 WL 308873 (9th Cir. June 11, 1982) (federal doctrine); *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (2013) (state doctrine).  He cannot rely on equitable tolling because he has not shown that he

diligently pursued investigating this issue after the allegedly discriminatory events, that any "extraordinary" external circumstance stood in the way of filing the claim, or that there is a "technical forfeiture" of his rights that would be unjust to enforce.  *Menominee*, 577 U.S. t 255 (federal standard); *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 370 (2003), *as modified* (Aug. 27, 2003) (state standard).  He cannot rely on the fraudulent concealment doctrine because he does not allege an affirmative act that kept him from discovering the information, as opposed to merely not revealing it.  *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007).  And he cannot rely on the "overt act" doctrine from conspiracy liability because he alleges no "overt act" contributing to a civil conspiracy to discriminate that occurred within the limitations period. *Kennedy*, 111 Cal. App. 4th at 111.

I cannot say that it would be futile to grant leave to amend to plead that the discrimination claims are tolled.  Peterson has leave to amend.

### B.  Statute of Limitations on Antitrust Claims

As discussed in section I.C.iii.2 above concerning the MBC Defendants, the federal antitrust claims are subject to a somewhat different analysis based on antitrust-specific accrual rules.  And for the reasons explained there, the antitrust claims against the Sutter Defendants are also dismissed as time-barred.

### C.  Statute of Limitations on State-Law Claims

Each of Peterson's state-law claims has a specific statute of limitations, but the parties agree that they range between one and four years; because the challenged events ended in 2013 and the lawsuit was filed in 2021, neither has pointed to anything that turns on these differences. Instead, just as with the federal civil rights claims, the parties' dispute is whether accrual is delayed by the discovery rule or otherwise tolled.  The heart of all of the state-law claims is that the Sutter Defendants' peer review process was unlawfully tainted by retaliatory animus and that the Sutter Defendants "used" the MBC discipline process to punish Peterson for not complying with their alleged kickback scheme.

Peterson first argues that the discovery rule saves the claims.  As noted, California's discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to

discover, the cause of action." *Fox*, 35 Cal. 4th at 807.  Again, a reason to discover exists when the plaintiff has reason "at least to suspect a factual basis for [the cause of action's] elements." *Id.* (internal quotation marks and citation omitted).

For the reasons explained above, Peterson has adequately alleged that he could not reasonably have discovered the facts underlying and cause of *some* of these injuries earlier than when the California Attorney General investigation was made public.  He was certainly aware of the actions taken that injured him, but it is plausible he did not and could not have known that those actions were part of a larger unlawful scheme—so he would not have been on notice to bring his action.   In particular, he plausibly would not have been on notice sufficient to bring the breach of contract, breach of the covenant of good faith and fair dealing, negligence, intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress, and UCL claims.  Having knowledge of the elements of those claims depends on having knowledge of the kickbacks.  To take one example, Peterson alleges that the *violation* of the covenant of good faith and fair dealing was precisely that the treatment of him was pretextual and part of this scheme.  To take another example, what is "outrageous" for purposes of the IIED claim, he alleges, is the secret rationale of the Sutter Defendants' actions.

Not all of the claims qualify under this doctrine.  Knowing the facts underpinning the interference with contractual relationships and business disparagement claims does not depend on knowing the allegedly unlawful motivation.  Put another way, Peterson had an entire claim for both of these when his professional prospects were allegedly harmed by the Sutter Defendants' actions.  *See Fox*, 35 Cal. 4th at 807.  He may not have known the internal motive for those actions, but that is not relevant because he was aware of all pertinent facts.  In another vein, the Unruh Act claim does not survive because it is for discrimination.  As explained above, the federal accrual standard *is* the discovery rule, and Ninth Circuit precedent holds that the discovery rule is satisfied when the adverse discriminatory event occurs, regardless of actual knowledge of discriminatory motive.  Peterson has cited no contrary authority from the California courts applying their discovery rule differently.

I therefore turn to whether the grab-bag of tolling doctrines saves these three claims.  They

23

do not.  The Unruh Act claim does not qualify for the same reasons the federal discrimination claims do not, as explained above.  There, I applied California's doctrine (and the federal one) to each of the theories Peterson puts forward, but none save the discrimination claim.  The interference with contractual relations and business disparagement claims also do not qualify. Even assuming that the continuing violation doctrine applies to claims like these, Peterson has pointed to no invasion of his rights of this kind within the limitations period that is part of a broader course of unlawful conduct.  *See Aryeh*, 55 Cal. 4th at 1192.  He cannot rely on equitable tolling because he had full knowledge of the basis of these claims since they accrued, as explained above; nothing turned on the newly discovered kickbacks.  *See Lantzy*, 31 Cal. 4th at 370. Because he had full knowledge—not just constructive knowledge—at the time of injury, the fraudulent concealment doctrine has no role to play here.  *See Grisham*, 40 Cal. 4th at 637.  And again, he has not pointed to any "overt act" within the limitations period that is part of a civil conspiracy to commit these torts.  *Kennedy*, 111 Cal. App. 4th at 111.

Again, I cannot rule out that there might be some allegation that saves the claims, so leave to amend is granted.

### D.  HCQIA Claim

The Sutter Defendants move to dismiss the claim for retaliation in violation of the HCQIA. *See* Sutter Mot. 10.  As a general matter, the HCQIA establishes national standards for professional review of physicians.  *See* 42 U.S.C. §§ 1101 *et seq*.  The courts of appeals that have addressed the question have unanimously held that the HCQIA "does not create a private right of action against hospitals, physicians, or other entities involved in peer review activities for failure to comply with HCQIA standards."  *Rowell v. Valleycare Health Sys.*, No. C 10-02816 CRB, 2010 WL 4236797, at *2 (N.D. Cal. Oct. 21, 2010) (collecting authorities).  Peterson has pointed to no provision that explicitly creates a private right of action and does not argue that there is any indication that Congress implicitly intended to create one.  *See Scalia v. Emp. Sols. Staffing Grp., LLC*, 951 F.3d 1097, 1103 (9th Cir. 2020) (discussing this private-right-of-action standard).

1    Accordingly, Peterson has not shown that his claim is cognizable in a private civil suit.[10]  It is

2    DISMISSED WITH PREJUDICE against all defendants.

3        **E.  Claim Preclusion**

4        In the alternative, the Sutter Defendants argue that all of these matters are subject to claim

5    preclusion from the 2012 lawsuit that Peterson brought against Stollman and Perry.  I address only

6    the claims that survive the analysis so far: the First Amendment, due process, and specific state-

7    law claims discussed above.

8        In a federal-question case like this, "federal courts participate in developing uniform

9    federal rules of res judicata."  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (internal quotation

10   marks, alteration, and citation omitted).  "The preclusive effect of a judgment is defined by claim

11   preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  *Id.* at 892  In

12   claim preclusion, "a final judgment forecloses successive litigation of the very same claim,

13   whether or not relitigation of the claim raises the same issues as the earlier suit."  *Id.* (internal

14   quotation marks and citation omitted).  To apply, there must be "(1) an identity of claims in the

15   two actions; (2) a final judgment on the merits in the first action; and (3) identity or privity

16   between the parties in the two actions."  *Frank v. United Airlines, Inc.*, 216 F.3d 845, 850 (9th Cir.

17   2000).  "[I]dentity of claims exists when two suits arise from 'the same transactional nucleus of

18   facts.'"  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1078 (9th

19   Cir. 2003) (internal quotation marks and citation omitted).

20       The parties argue over several aspects of the doctrine, such as identity of the claims,

21   whether the parties are in privity, and even whether the previous judgment was procured by fraud.

22   The Sutter Defendants' argument that the claims are precluded fails for a more fundamental

23   reason:  Claim preclusion applies only to claims that were or *could have been* brought in the first

24   action.  *See, e.g.*, *Frank*, 216 F.3d at 850; *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d

25

26   _____

27   [10] The two state-court cases that Peterson cites do not hold or suggest that the HCQIA creates a
     private right of action for his claim.  *See Fahlen v. Sutter Cent. Valley Hosps.*, 58 Cal. 4th 655,
28   685 (2014); *Clark v. Columbia/HCA Info. Servs., Inc.*, 117 Nev. 468, 480 (2001).

United States District Court
Northern District of California

708, 713 (9th Cir. 2001). Said otherwise, it only applies when the party had a "full and fair opportunity" to litigate the claim earlier. *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (internal quotation marks and citation omitted). But, as I have explained, at this point it is plausible that the claims I address here could not have been brought in the 2012 suit because a reasonable person would not have known he could bring them until late 2019 at the earliest.[11] As the Ninth Circuit has explained, "[t]he rule that a judgment is conclusive as to every matter that might have been litigated does not apply to new rights acquired pending the action which might have been, but which were not, required to be litigated." *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*, 750 F.2d 731, 739 (9th Cir. 1984) (internal quotation marks and citation omitted). Or as the Second Circuit put it, "[i]f significant new evidence is uncovered subsequent to the proceeding said to result in an estoppel of the present action, then it cannot be found that a party was afforded a full and fair opportunity to present his case in the absence of that evidence." *Khandhar v. Elfenbein*, 943 F.2d 244, 249 (2d Cir. 1991). The claims are not precluded on the face of the complaint. This issue may be re-raised once the record is developed and it is established what Peterson knew (or should have known) and when he knew it.

### F. UCL Standing

The Sutter Defendants argue that Peterson has not alleged that he possesses statutory standing under the UCL. To possess statutory standing, a party must have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (2011) (internal quotation marks and citation omitted). The Sutter Defendants argue only that Peterson does not *allege* any losses, but the FAC alleges that his client pool was shrunk by the kickback scheme. FAC ¶ 371. While that allegation appears to be relatively speculative and perhaps will not be cognizable, it is an allegation of loss and so is sufficient to defeat the Sutter Defendants' cursory argument. Whether it is too speculative or attenuated can be answered at a later stage and has not been challenged today.

---

[11] There is no evidence that Peterson took discovery in the earlier suit that would have turned up this information.

### G.  Sutter Defendants Conclusion

The claims for federal discrimination, violation of the Unruh Act, intentional interference with contractual relations, and business disparagement are dismissed with leave to amend.  The motion to dismiss is otherwise denied.

**CONCLUSION**

The MBC Defendants' motion is GRANTED WITH PREJUDICE to the extent the FAC is against the State of California and the MBC and on the state-law claims against the MBC Defendants.  It is GRANTED WITH LEAVE TO AMEND on the federal claims against the MBC Defendants.  The Sutter Defendants' motion is GRANTED WITH PREJUDICE on the HCQIA claim.  It is GRANTED WITH LEAVE TO AMEND on the federal discrimination, Unruh Act, intentional interference with contractual relations, and business disparagement claims.  It is DENIED IN PART on the other claims.

**IT IS SO ORDERED.**

Dated: February 2, 2022



William H. Orrick
United States District Judge