1  KEVIN J. MIRCH, ESQ.
   kevinmirch@mirchlaw.com
2  California Bar No. 106973
   MARIE C. MIRCH, ESQ.
3  marie@mirchlaw.com
   California Bar No. 200833
4  1180 Rosecrans St., #104-552
   San Diego, California 92106
5  Telephone: (619) 501-6220

6              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7                  OAKLAND DIVISION

8  RALPH  PETERSON,  M.D.,                    )
                                              )
9          Plaintiff,                         )
                                              )
   v.                                         )
10                                            )
   SUTTER BAY MEDICAL FOUNDATION;             )Case No.: 3:21-cv-04908
11 SUTTER BAY HOSPITALS;                      )
   NEIL STOLLMAN, M.D.,                       )    SECOND AMENDED
12 ROD PERRY, M.D., PHILIP RICH, M.D.         )    COMPLAINT
   CATHY L. LOZANO (Board Investigator),      )
13 KRISTINA LAWSON, (Board Member)            )
   HOWARD KRAUSS, M.D., (Board Member)        )
14 RANDY HAWKINS, M.D., (Board Member)        )
   RICHARD D. FANTOZZI, M.D., (Board Member))
15 DEV GNANADEV, M.D., (Board Member)         )
   RONALD LEWIS, M.D., (Board Member)         )
16 LAURIE ROSE LUBIANO, (Board Member)        )
   ASIF MAHMOOD, M.D.(Board Member)           )
17 RICHARD THORP, M.D., (Board Member)        )
   FELIX YIP, M.D.(Board Member)      & DOES  )
18 1-10.                                       )
                                              )
19         Defendants.                        )
   _____

20

21               SECOND AMENDED COMPLAINT

22 1.   Plaintiff, RALPH PETERSON, M.D.  ("Physician" or "Peterson"),   by and

23      through his  counsel of record, Kevin Mirch and Marie C. Mirch, alleges, avers

24      and complains as follows:

25                         PARTIES

26 2.    At all times relevant hereto,  Ralph Peterson, M.D., was a physician licensed

27      to practice in California,  residing and  practicing  medicine in Oakland,

28

California.

3. At all times relevant hereto, Sutter Bay Medical Foundation, was an IRC §501(c)(3) tax-exempt California Corporation, legally and validly existing and doing business in Alameda County. Sutter East Bay Medical Foundation is a former California corporation that was merged into Sutter Bay Medical Foundation in 2017.

4. At all times relevant hereto, Sutter Bay Hospitals was an IRC §501(c)(3) tax-exempt California Corporation, legally and validly existing and doing business in Alameda County. Sutter East Bay Hospitals is a former California nonprofit corporation that merged into the surviving Sutter Bay Hospitals corporation on or about March 1, 2018.

5. At all times relevant hereto, Alta Bates Summit Medical Center was a dba of Sutter Bay Hospitals .

6. At all times relevant hereto, Sutter Bay Medical Foundation, Sutter Bay Hospital and Sutter Alta Bates Summit Hospital are referred to as "Sutter".

7. At all times relevant hereto, Neil Stollman, M.D. was a physician licensed to practice in the State of California and doing business in Alameda County. At all times relevant hereto, Dr. Stollman acted in his individual capacity and as an agent on behalf of the Sutter defendants.

8. At all times relevant hereto, Rod Perry, M.D. was a physician licensed to practice in the State of California and working for Alta Bates as Chair for it Department of Medicine. At all times relevant hereto, Dr. Perry acted in his individual capacity and as an agent on behalf of the Sutter defendants.

9. At all times relevant hereto, Philip Rich, M.D. was a physician licensed to practice in the State of California and working for Alta Bates as President of its Medical Staff. At all times relevant hereto, Dr. Rich acted in his individual capacity and as an agent on behalf of the Sutter defendants.

10. Defendants Stollman, Perry and Rich are referred to as the peer review panel or peer review panel members.

11. At all times relevant hereto, Cathy Lozano was a former employee investigator for the California Medical Board ("MBC").

12. At all times relevant hereto, Kristina Lawson was a Public Member of the Medical Board of California. Her term as Board Member is set to run from 10/21/15-6/1/22. Ms. Lawson is also an attorney and a Partner at Hanson Bridgett LLP. In 2020, Ms. Lawson was elected President of the "MBC". Hanson & Bridgett is sometimes referred to as the "Sutter attorney or Sutter lawyers", peer review panel attorneys and/or the "MBC attorneys".

13. At all times relevant hereto, Howard Krauss, M.D. was a Physician Member of the Medical Board of California. His term as Board Member ran from 8/20/13-6/1/21.

14. At all times relevant hereto, Randy Hawkins, M.D. was a Physician Member of the Medical Board of California. His term as a Board Member is set to run from 3/4/15-6/1/24.

15. At all times relevant hereto, Dev Gnanadev, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to run from 12/21/11-6/1/22.

16. At all times relevant hereto, Ronald Lewis, M.D. was a Member of the Medical Board of California. His term as Board Member was set to run from 8/20/13-6/1/21.

17. At all times relevant hereto, Laurie Rose Lubiano was a Public Member of the Medical Board of California. Her term as Board Member is set to run from 12/17/18-6/1/24.

18. At all times relevant hereto, Asif Mahmood, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to run from

6/3/19-6/1/23.

19. At all times relevant hereto, Richard Thorp, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to run from 7/26/19-6/1/23.

20. At all times relevant hereto, Felix Yip, M.D. was a Physician Member of the Medical Board of California. His term as Board Member is set to run from 1/30/13-6/1/22.

21. Defendants Lawson, Krause, Hawkins, Fantozzi, Gnanadev, Lewis, Lubiano, Mahmood, Thorp, and Yip are collectively referred to as the "MBC" or "MBC members".

22. "California Medical Board" or "MBC" refers collectively to the individuals, not the California Medical Board as an entity, Members of the Medical Board of California, namely Kristina Lawson, Howard Krauss, M.D., Randy Hawkins, M.D., Richard Fantozzi, Dev Gnanadev, M.D., Ronald Lewis, M.D., Laurie Rose Lubiano, Asif Mahmood, M.D., Richard Thorp, M.D., Felix Yip, M.D..

23. At all times relevant hereto, the California Medical Board was composed of a majority of physicians.

24. Defendant Does 1-10, are individuals, corporations, partnerships, trusts, limited liability companies and/or any other entity that by their specific conduct are responsible for damages alleged herein. At such time as their true names and identities are known, Plaintiff will seek leave to amend this complaint to add the same.

25. Plaintiff has exhausted his administrative remedies prior to filing this suit.

<u>JURISDICTION & VENUE</u>

26. The Jurisdiction of this case is conferred by Sections 28 U.S.C. Section 1331, 1343(3) and (4), and 42 U.S.C. Section 1983, 28 U.S.C. Sections 2201, 2202, and the fifth and fourteenth amendments to the United States Constitution.

Specifically, Plaintiff brings this action to secure equitable relief and damages from actions initiated by defendants under color of law, which are violative of rights, privileges, and immunities guaranteed him by the United States Constitution, and directly under and through Article I, section 10, Clause 1 and the first, fourteenth amendments to the United States Constitution.

27. This action seeks redress for the deprivation of Plaintiff's constitution and civil rights and includes ancillary claims related thereto. Plaintiff's constitutional and civil rights are guaranteed by the Due Process Clause of the First, Fourth, Fifth and Fourteenth amendment to the United States Constitution, Sherman Anti-Trust Act (15 U.S.C. §§ 1 and 2), Clayton Act ( 15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53), AntiKickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS ), and The Stark Law (42 USC §1395nn).

28. Venue is proper pursuant to 28 U.S.C. Section 1391(a) and (b) as the conduct from which this action arises occurred in Alameda County, State of California.

FACTS

SUTTER HEALTHCARE

29. During January 1996, Sutter Healthcare (Sutter) was formed from a merger between Sacramento-based Sutter Health and California Healthcare System. Sutter operates as an IRC §501(c)(3) tax exempt corporation.

30. At all times relevant hereto, Sutter Bay Medical Foundation operated as Sutter Health ("Sutter") and controls and owns a network of 24 hospitals with 53,000 employees, over 5200 physicians, 14,000 clinicians and business professionals. Sutter provides outpatient services, research facilities, home health and hospice care. Sutter monopolizes and controls healthcare and medical discipline in Northern California.

31. At all times relevant hereto, Sutter used a number of unlawful strategies to finance and operate its consolidation and monopoly of Northern California

healthcare.  Sutter's Strategies are hereinafter referred to as "Sutter's MediCal Strategy".

32.   Sutter uses medical discipline to control physician referrals,  acquisition of physician practices and to punish non-cooperating physicians thereby undermining their credibility as a witness and destroying their medical practices.

33.   Sutter controls medical discipline by strategic placement of its "cooperating or compliant physicians" and/or attorneys on institutional peer review panels and the "MBC".  Sutter's peer review panels and the MBC participated in strategic discipline used to divert its own malpractice onto Dr. Peterson and other uncooperative physicians.

34.   As a result of its "MediCal Strategy", Sutter performed only  profitable procedures, steering away unprofitable procedures to county medical facilities.

35.   Revenues generated from Sutter's "MediCal Strategy" were used to pay unlawful "kickbacks" and to acquire  physician medical practices.

36.   At all times relevant hereto, Sutter's "MediCal Strategy"  violated Federal and State Constitutions, HCQIA, Income Tax,  Stark,  Anti-Kickback, Medicare, MediCal and  False  Claims ("anti-kickback") laws and related statutes,  rules and regulations.

37.   The Medicare and Medicaid Patient Protection Act, also known as the AntiKickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS ), prohibits physician "kickbacks" which corrupt competent medical treatment decisions resulting in more expensive,  unnecessary and/or harmful care being provided to vulnerable patients.

## ALTA BATES SUMMIT ACQUISITION

38.   On December 28, 1999, Oakland's Summit Medical Center merged with Berkeley's Alta Bates Medical Center forming Alta Bates Summit Medical

Center (Alta Bates). Shortly thereafter, Alta Bates became a Sutter affiliate.

39.　At all times relevant hereto, Sutter/Alta Bates was a certified Medicare provider. As a Medicare approved entity, Sutter/Alta Bates was prohibited from discriminating against physicians and/or "protected class" patients.

40.　At all times relevant hereto, Alta Bates was the East Bay's (Oakland's) largest private, not-for-profit medical center serving Oakland's indigent and under served MediCal community.

<u>SUTTER's "MEDI-CAL STRATEGY" .</u>

41.　At all times relevant hereto, Sutter's "MediCal Strategy" involved the profitization of MediCal procedures through unlawful steering and illegal billing practices.

42.　At all times relevant hereto, Sutter monopolized and controlled healthcare in Northern California.

43.　At all times relevant hereto, Hanson Bridget (HB) represented Sutter.

44.　At all times relevant hereto, HB health care practice was one of California's largest law firms, and served clients in every segment of the health care industry, including long-term care facilities, senior housing and care communities, federally qualified health centers, hospitals, and hospital systems, integrated delivery systems, physician groups, medical staffs, long-term care facilities, senior housing and care communities, home health agencies, hospices, and trade associations.

45.　At all times relevant hereto, HB advised Sutter with respect to a myriad of laws regulating and restricting its ability to do business with other providers, payers, and vendors. A substantial part of relationship with Sutter involved issues arising from Sutter's operations, including dealing with federal and state regulators and taxing authorities; advising it about reimbursement questions; managing relationships with patients, residents, and vendors; advising on labor,

employment, and executive compensation issues; and performing medical staff credentialing and quality assurance activities. HB also provides litigation and dispute resolution services that were oriented toward the specialized issues with which Sutter dealt as providers of health care. HB knew and approved the unlawful kickback scheme used by Sutter.

46. At all times relevant hereto, Sutter controlled Network Vendors that assembled Healthcare Provider Networks (physicians). The Network Vendors negotiated the prices for medical services and products sold by the Healthcare Providers (physicians) in those networks. The Network Vendors then offered Employers, Healthcare Benefits Trusts and Third Party Administrators (Medicare/MediCal) access to their Provider Networks.   The Network Vendors operating in Northern California include, but were not limited to, Third Party Medicare/ MediCal administrators, including, but not limited to,  Community Health Plan, Blue Shield of California, Anthem Blue Cross, Aetna, CIGNA, and United Healthcare.

47. At all times relevant hereto, medical reimbursement negotiated by the Network Vendors  and paid to Sutter substantially exceeded that paid to other  MediCal providers, including but not limited to, Dr. Peterson.

48. Sutter's unlawful billing practices, included, but were not limited to: chargemaster manipulation, up-coding, requiring the performance of unnecessary medical procedures, charging for unused materials and demanding payment for  physician "on-call" coverage.

49. At all times relevant hereto, Sutter  paid cooperating physicians unlawful "kickbacks" out of MediCal funds to steer  to or away from Sutter depending upon the profitability of the medical procedure.

50. Defendants Stollman, Perry and Rich were members of Sutter's peer review panels and cooperating physicians.

51. Sutter used the physician disciplinary process to secure doctor cooperation in its unlawful steering of "protected class" patients. Sutter secured control over its peer review panel members and the "MBC" by strategically placing its "cooperating physicians", attorneys and allies on its peer review panel and/or the "MBC".

52. Sutter punished non-cooperating physicians by relentless disciplinary actions conducted through its facilities' and Third Party Payer Peer Review Panels and credentialing boards it controlled. As a result of this process, non-cooperating physicians' medical practices were substantially impaired and/or failed, allowing Sutter to purchase the same at substantially reduced amounts.

53. At all times relevant hereto, Sutter interfered with the sale of impaired or failing medical practices by misrepresenting discipline imposed on physicians to potential buyers.

54. Sutter's "MediCal Strategy" directly impacted Oakland's indigent and under served patient community by reducing funds and physician access for medical care.

## DR. PETERSON

55. Dr. Peterson is an African American physician and UC-Berkeley graduate born and raised in Oakland, California ("Oakland").

56. During 1972, Dr. Peterson's brother, Roland Peterson, was shot and killed by a police officer in Long Beach, California. *See*, Peterson v. City of Long Beach, 24 Cal.3d 238 (Cal. 1979). Because of that incident, Dr. Peterson has acted as a mentor and advocate for various individuals and/or organizations, including, but not limited to Oakland's indigent and under served Medical patient community.

57. From 1983, Dr. Peterson has practiced internal and gastroenterology medicine in Census Tract 4093, a Health Manpower Shortage Area (HMSA), pursuant

to 42 U.S.C. §254n, serving Oakland's indigent and under served MediCal community.

58.   From 1999 through 2009, Dr. Peterson's limited his privileges at Sutter's Alta Bates medical center to endoscopy procedures, only using its out-patient facilities.

59.   Prior to February 12, 2009, Dr. Zealous Wylie, the "Big GI Group", took "call" for Dr. Peterson.

60.   After February 12, 2009, Sutter gained control of the "Big GI Group", installing Dr. Stollman as its CEO.

61.   At all times relevant hereto, Dr. Stollman received unlawful "kickbacks" disguised as employment and/or consulting contract payments from Sutter.

62.   At all times relevant hereto, Sutter concealed its payment of unlawful "kickbacks"from Dr. Peterson.

PEER REVIEW SCHEME
"CALL COVERAGE EXCUSE".

63.   On February 2, 2009, Alta Bates Physician Peer Review Board members, Drs. Perry and Stollman, ordered Dr. Peterson to appear at Alta Bates without explanation. That meeting was rescheduled to February 12, 2009.

64.   On February 6, 2009, Dr. Peterson requested a formal HCQIA meeting and notice of allegations from Drs. Perry and Stollman. Drs. Perry and Stollman failed, refused and/or neglected to provide that information.

65.   On February 12, 2009, Dr. Perry ordered Dr. Peterson to increase his "call coverage" because of 3 quality of care patient issues that he allegedly failed to respond to through his answering service. In lieu of additional coverage, Dr. Peterson was told by Dr. Perry that he could pay a fee to Dr. Stollman for the same.

66.   At all times relevant hereto, Sutter controlled all available Alta Bates "call" approved physicians through the payment of unlawful "kickbacks", threats

and/or the medical disciplinary process.

67. On March 25, 2009, Dr. Peterson requested call coverage from Dr. Stollman. Dr. Stollman refused to cover without payment of an unreasonable fee.

68. On March 26, 2009, Dr. Rich ordered Dr. Peterson to resign his Alta Bates privileges due to his failure to obtain additional "call coverage".

69. On March 30, 2009, Dr. Peterson refused to resign or "steer away" his unprofitable indigent and under served MediCal patients to AHS (Alameda Health Services).

70. On April 1, 2009, Dr. Peterson's privileges were summarily suspended without a hearing. There was no patient complaint or investigation.

71. On April 6, 2009, Sutter constructively terminated Dr. Peterson's privileges at Alta Bates by forcing him to resign under threat of Peer Review and "MBC" discipline.

72. On April 8, 2009, Sutter prepared and published to the National Practitioner Data Bank a false Adverse Action Report (Form 805) stating Dr. Peterson had resigned to avoid further investigation into various quality of care complaints.

73. On April 15, 2009, "MBC" received Sutter's Form 805.

74. During August 2009, Dr. Peterson announced the opening of an independent endoscopy suite to compete against Sutter and serving Oakland's indigent and under served MediCal community.

75. On or about November 4, 2009, Dr. Peterson was listed as a percipient and expert witness for Dr. Ernest Bonner, another African American Physician, who also cared for Oakland's indigent and under served community and refused to cooperate with Sutter in its unlawful MediCal strategy.

805 - INVESTIGATION (ACCUSATION #12-2009-1985-92).

76. On November 18, 2009, Dr. Peterson received a notice from "MBC" that its investigator Cathy Lozano was conducting an investigation into the allegations

contained in Sutter's  Form 805 dated April 9, 2009.

77. On or about November 21, 2009, Dr. Peterson was informed by the "Medical Board Enforcement Program/Investigation Group" that a formal ACCUSATION  had been filed by the MBC (#12-2009-1985-92).

78. On December 1, 2009, "MBC" provided Dr. Peterson a "comprehensive summary"  of the "Form 805 Complaint"  without supporting exhibits and/or a complete  investigation. The "comprehensive summary" contained a number of false and/or misleading statements (ACCUSATION #12-2009-1985-92).

79. Sometime during 2010, Lozano /MBC Lozano's investigation showed that no calls were made from Sutter's emergency room to Dr. Peterson.  Lozano concealed her investigation from Dr. Peterson.

80. On October 27, 2010,  Lozano notified Dr. Peterson that Accusation  No. 12-2009-1985-92  was "submitted to a medical consultant" who determined that the allegations were "not  considered extreme  enough to warrant pursuing administrative action" against him.   Neither the  MBC nor Lozano informed Dr. Peterson that Sutter, its peer  review panel and MBC were targeting Peterson because he  refused to steer his "protected class" physicians or the payment of unlawful "kickbacks" to Stollman, Perry and Rich.

<u>B.E. COMPLAINT</u>

81. B. Edwards (B.E.) was an internal medicine  patient of Dr. Peterson's from mid-1980's through September 10, 2009.

82. As part of B.E.'s care, Dr. Peterson arranged appointments on February 18, 2008 March 3, 2008, October 10, 2008 and September 10, 2009 with cardiologists.  B.E. did not present at any of these appointments.

83. On September 9, 2009, B.E. presented at Sutter with after suffering a  transient ischemic attack (TIA).  Sutter  performed a CT Scan  which showed a 92% blockage of B.E.'s  right carotid artery.  Sutter did not disclose to Dr. Peterson

the results of B.E.'s CT Scan, and  discharged her without treatment or additional tests.  Sutter's discharge constituted "steering" B.E. to county healthcare facilities.

84.  On September 10, 2009, Dr. Peterson referred B.E. to another cardiologist. B.E. did not present at that appointment, instead seeking care from Sutter's emergency ward.

85.  On September 21, 2009, BE suffered a stroke and was treated at a Palo Alto Medical Center facility in Dublin, California.

86.  BE's stroke was treated by Sutter.

87.  During 2010, Sutter encouraged and participated with  B.E. in filing an unfounded  medical board complaint against Dr. Peterson (Complaint Control # 12-2010-2407-08). Sutter encouraged and participated in the filing in order to defer its own malpractice in failing to properly treat B.E.

88.  On April 16, 2011, Dr. Peterson was electronically interviewed by Lozano with respect to  B.E. complaint  #12-2010-2407-08 (B.E.).  Lozano knew and concealed from Dr. Peterson Sutter's malpractice in steering away B.E..

89.  During 2010 through September 17, 2013, "MBC"  investigated  Accusation No.  12–2010-2047-08 during which it was determined that  Sutter had discovered BE's   right carotid artery blockage, but, failed, refused and/or neglected to treat her. Instead, she was  steered away to county  medical facilities.

90.  On October 3, 2011, "MBC" Executive Director Linda Whitney signed Accusation #12-2010-2047-08, which concealed Sutter's refusal and/or failure to diagnose, treat and it causing B.E.'s  September 21, 2009 stroke.

91.  On November 11, 2011, River City Medical Group informed Dr. Peterson that because of the "MBC" Accusations,   his GI Specialty agreement was terminated effective November 30, 2011.

92. On January 2, 2012, Dr. Peterson requested that the "MBC's " disciplinary action Accusation  No. 12- 2009-1985-92 (Sutter Alta Bates)  be dismissed based on Investigator  Lozano's letter dated October  27, 2010.

93. MBC failed, refused and/or neglected to timely dismiss or close Complaint/Accusation  No. 12- 2009-1985-92 .

94. On January 12,  2012, Dr. Peterson's Cigna provider contract was terminated due to "MBC" online accusations concerning an "[un]acceptable history relative to all types of investigations / disciplinary actions", unrestricted admitting or surgical privileges within his GI speciality; and, an inability to demonstrate "continuity of care devoted to ambulatory care".

95. On February 15, 2012, Dr. Peterson's Health Net provider contract was terminated due to the allegations in "MBC" Case No.: 12-2010-204708 (B.E).

96. On March 12, 2012, Dr. Peterson's Wells Fargo mortgage loan application was denied.

97. At all times relevant hereto, "MBC" failed, refused and/or neglected to provide Dr. Peterson his complete file and/or any evidence supporting the allegations alleged in "MBC" Accusations  12-2009-1985-92 and/or  12-2010-2047-08 (B.E.).

98. On November 19, 2012, Dr. Peterson filed, in pro per, an action in Superior Court in Oakland, Alameda County against Drs. Perry and Stollman for misusing the physician disciplinary process (Case No. RG12656812).  The action was not against Sutter and did not involve its scheme to pay kickbacks out of MediCal funds to physicians that refused to take MediCal patients.

99. During January of 2013, Dr. Peterson appeared before the "MBC" as a witness for Dr. Bonner, an African American physician, who also treated Oakland's indigent and under served patients.  "MBC" did not allow Dr. Peterson  to testify for Dr. Bonner.

100. On January 28, 2013, Drs. Perry and Stollman filed a Special Motion to Strike Dr. Peterson's Complaint  misstating the facts and existing law which was supported by   THREE (3) fabricated declarations signed by Defendants Stollman,  Perry and Joanne Jell.

101. On January 28, 2013, Hanson & Bridgett represented Sutter, its peer review panel members, other Healthcare Company  Providers and the "MBC". This conflict was not disclosed to Dr. Peterson.

102. Starting at least as early as 2013, Sutter was the subject of a California Attorney General investigation concerning the unlawful payment of "kickbacks" to its compliant physicians.   At the same time, a separate investigation was being conducted into the "MBC" discrimination against African American and Hispanic physicians. Neither the "kickback" nor discrimination investigations were ever disclosed to Dr. Peterson and were concealed from the public.

103. On April 2, 2013, Dr. Peterson was denied physician provider status with Hill Physicians Medical Group.

104. On or about April 12, 2013,    Aleshia Coenen-Washington (Plaintiff) as Conservator of the Person and Estate of B. Edwards ("B.E.") filed suit against Dr. Peterson in the Superior Court of California, County of Alameda, Civil - Unlimited Jurisdiction, Case No. RG12650611.  Attached to her complaint was Accusation #12-2010-2407-08.

105. At all times relevant hereto, "B.E.'s" case was prompted, perpetuated  and encouraged by Sutter, its peer review panel members and the MBC in retaliation for Dr. Peterson refusing to cooperate in Sutter's "MediCal Strategy",  for appearing as a percipient and expert witness for Dr. Bonner, and to deflect its B.E. malpractice upon Dr. Peterson.

106. On or about April 23, 2013, a legislative plan was proposed to "strip" the "MBC" of its physician investigative authority due to accountability issues

related to fabricated investigations.  The proposed legislation and reasons for the same were  concealed from Dr. Peterson and the Court.

107.  On May 8, 2013, the Superior Court issued  a tentative order against Dr. Peterson in Peterson v. Drs. Perry & Stollman.

108.  As of  May 8, 2013, Dr. Peterson did not know that Drs. Stollman and Perry were receiving "kickbacks"  and/or that Sutter  and the "MBC" were being investigated by the State of California for discrimination, unlawful kickbacks and/or that it had an irreconcilable conflict existed with it using  Hanson & Bridgett which represented the Sutter, its peer review panel members and the "MBC".

109.  Dr. Peterson did not learn about these investigations until the airing of a December 2020 report by 60 Minutes.  Sutter, its peer review panel members, the "MBC", and Hanson & Bridget had concealed these investigations and conflicts through confidential settlements and false declarations paying "kickbacks" and threatening other witnesses with discipline.

110.  On June 21, 2013, Dr. Peterson was denied physician provider status with Alta Bates Medical Group.

111.  On July 17, 2013,   MBC determined that there were no quality of care issues in B.E.'s treatment, but did not disclose that finding to Dr. Peterson.

112.  On August 31, 2013, Dr. Peterson requested documents from the California Attorney General's Office for "MBC" Case: 12-2010-2047-08 (B.E.).  Dr. Peterson  agreed to pay for all copying charges related to his request.

113.  On September 12, 2013, the Superior Court entered an order of judgment in Aleshia Coenen-Washington as conservator for B. Edwards v.  Dr. Peterson, in favor of Dr. Peterson, M.D. (Defendant), dismissing that action with prejudice.

114.  On October 16, 2013, Dr. Peterson was denied physician provider status with

Blue Shield of California.

115. On October 31, 2013, Sutter returned $46,000,000.00 to the State of California for excessive charges for anesthesia. These charges were up-coded following false diagnosis by Sutter's cooperating physicians.

116. Following Sutter's payment, Dr. Peterson was subjected to continuing and ongoing disciplinary investigations by Peer Review Panels controlled by Sutter which denied Dr. Peterson's physician provider applications and did not renew ongoing contracts.

117. On or about, December 18, 2013, "MBC" stated that its Board investigation revealed that during 2005 to 2009, Dr. Peterson did not "maintain sufficient record keeping regarding your [Dr. Peterson's] care and treatment of B. Edwards' diabetes and hypertension, as more fully described in Accusation No. 12-2010-204798" (B.E.).

118. The December 18, 2013 findings were not alleged in the underlying accusation.

119. Upon information and belief, the Bette Edwards Accusation was fabricated in order prevent Dr. Peterson from questioning Sutter's MediCal Strategy (scheme).

120. On February 20, 2014, the Supreme Court of California decided Fahlen v. Sutter Central Valley Hospital, No. S205568 finding jurisdiction for violations of HCQIA and/or state related actions do not need to be conditioned on prior successful mandamus challenges to a hospital's quasi-judicial decision to restrict or terminate medical staff privileges because a mandamus court could foreclose the physician's statutory right to litigate whistleblower retaliation. HB served as counsel for Sutter in Fahlen, *supra.*

PHYSICIAN PROVIDER STATUS (DENIED / NOT RENEWED)

121. During March of 2014, Drs. Peterson and Bonner agreed to plan and implement a multi-medical professional disciplines clinics to serve more of the

medical needs for Oakland's indigent and under-served patient community. After Sutter became aware of Drs. Peterson and Bonner's plans to open multiple physician discipline clinics, the "MBC" escalated disciplinary actions against the 2 physicians.

122. Starting in 2014, Dr. Peterson's reimbursements from Third Party Payers for medical services provided to his patients started to be reduced.

123. On or about April 18, 2014, "MBC" retaliated against Dr. Bonner by posting a notice on the Internet that his medical license was revoked.

124. At the same time, Medi-Cal terminated Dr. Bonner's provider status because of the "MBC" notice. Dr. Bonner's license was revoked for failing to complete a continuing education course that was not offered locally.

125. On May 16, 2014, Dr. Peterson was denied physician provider status with Aetna. At that time Dr. Peterson did not know that "MBC" and Lozano had informed Aetna credentialing that Drs. Peterson and Bonner were the subject of ongoing investigations.

126. Aetna denied Dr. Peterson's physician provider status after Defendant Lozano informed it about Board problems associated with both Drs. Peterson and Bonner.

127. On or about September 10, 2014, a Qui Tam action was filed under seal against Sutter by a former compliance officer, Laurie Hanvey, for paying unlawful fees to its compliant physicians in violation of the Federal and State Stark Laws, False Claims Act[1] (FCA & CFCA) complaint. The Qui Tam action was not unsealed until **November 18, 2019.**

128. On September 29, 2014, African American CEO Wright Lassiter III was forced to resign from AHS after seeking to restructure a $200 million debt owed to the Alameda County. This debt had accumulated as a result of Sutter steering unprofitable MediCal business to its facilities and keeping profitable procedures

for itself.

129. On October 28, 2015, Hanson & Bridgett Attorney Kristina D. Lawson was appointed to "MBC".

130. From October 2015 through present, HB has represented Sutter and its cooperating physicians in allegations of Medicare/MediCal kickbacks. It has participated in planning and advice regarding the payment of unlawful kickbacks to cooperating physicians.

131. At all times relevant hereto, Lawson knew as a partner at HB, and as a "MBC" member that unlawful kickbacks were being paid by its client, Sutter, to physicians cooperating in the kickback scheme. Lawson benefitted financially from attorney fee payments made by Sutter and its cooperating physicians to HB.

132. From October 2015 through present, MBC has failed, refused and/or otherwise neglected to investigate and/or discipline Sutter physicians that received unlawful kickbacks paid out of MediCal funds. Instead, the MBC investigated and harassed Dr. Peterson in an attempt to suffocate any allegation of Medicare/MediCal fraud.

133. On December 30, 2015, the First Appellate Court of California dismissed, in an Unpublished Opinion, Dr. Peterson's Appeal from the Superior Court Oder dismissing his case against Drs. Perry and Stollman. Drs. Stollman and Perry were represented by Hanson & Bridgett.

134. During 2016, Dr. Peterson's medical reimbursements (per procedure) continued to decline and his current provider contracts were <u>not</u> renewed without cause. At the same time, Sutter's medical reimbursements (per procedure) increased.

135. On February 2016, Dr. Peterson filed a Petition for Review with the California Supreme Court (<u>Peterson v. Perry, Stollman</u>).

136. During 2017, Dr. Peterson's medical reimbursements (per procedure) continued

to decline and his current Provider contracts were <u>not</u> renewed. At the same time, Sutter's medical reimbursements for the same procedures increased.

137. During January 2017, the California Research Bureau (California Library) issued its "Demographics of Disciplinary Action by the Medical Board of California (2003-2013)" Report finding that the "MBC" discriminated against African American and Hispanic physicians in its disciplinary process. This report was concealed ("buried").

138. During June 2017, Dr. Peterson applied for "provider status" with HealthNet.

139. During September of 2017, Dr. Peterson was denied provider status with HealthNet based on statements made by the MBC employees to credentialing committees and online information regarding the same.

140. During June - September 2017, the MBC knew and refused to investigate charges that Sutter's "cooperating physicians" were receiving kickbacks to up-code (mis-diagnose) MediCal patients and charge for services not provided.

141. During 2018, Dr. Peterson's medical reimbursements (per procedure) continued to decline and his current provider contracts were <u>not</u> renewed. At the same time, Sutter's medical reimbursements (per procedure) increased.

142. On or about, January 5, 2018, Dr. Peterson met with Alameda Health Services executives (AHS) regarding the sale of his medical practice and endoscopy suite. Dr. Peterson provided financial data to AHS. During initial negotiations, Dr. Peterson was told that AHS CEO Delvecchio Finley was committed to providing care to Oakland's indigent and under served patient community. Delvecchio Finley is African American.

143. On or about March 26, 2018, the University of California Berkeley released a study done by its Petris Center on Health Care Markets and Consumer Welfare College confirming that Sutter's consolidation of healthcare had substantially increased the cost of care in Northern California without an increase in quality

of care.   That consolidation had decreased available care to Oakland's indigent and under served community.

144.   On or about March 30, 2018,  California's Attorney General Becerra  sued Sutter Health  for anti-competitive behavior after completing a  six-year investigation into its anti-competitive  practices. The six-year investigation has never  been released to the public.

145.   On or about October 21, 2018, Dr. Bonner filed a complaint against the "MBC" after  claiming that Investigator Lozano had been fabricating "MBC" investigations (*Bonner v. California Board of Medicine*, et. al., United States District Court for the Eastern District of California Oakland Division,  Case 2:17-cv-00445-KJM-DB).   The Bonner complaint alleged years of "MBC" abuse, including, but not limited to,  systematic discrimination against him.

146.   During 2019,  Eserick "TJ" Watkins was appointed to the "MBC".

147.    During April 12, 2019, Sutter returned $30 million to Medicare for up-coding (mis-diagnosing) charges associated with services provided at  Palo Alto Medical Foundation.

148.   On or about November 14, 2019, the Sacramento Bee first reported that: "Sutter [had agreed] to pay $30 million to settle secret Kickback lawsuit; whistleblower to get slice".   This article was leaked as Sutter's settlement was confidential with related investigations concealed from the General Public. The kickbacks discussed in the article involved "referral fees" ("kickbacks")  paid to its "compliant physicians", but did not mention Stollman, Perry and/or Rich.

149.   On or about November 18, 2019, the California Attorney General's office issued a statement that from September 1, 2012 through September 30, 2014, Sutter's physician referral payment programs violated "Stark" statutes and that Sutter  had been reimbursed for the physician  "kickbacks" by MediCal.

150.   On or about December 20, 2019,  Sutter agreed to pay out $575 million in

damages and to have its business operations monitored for 10 years as part of a settlement with the State of California in AG Becerra's anti-competitive action against the hospital. The settlement precluded disclosure of the AG investigation report.

151. During November or December of 2019, Dr. Peterson's negotiations with Alameda Health System (Alameda Health) ceased without explanation.

152. Pursuant to a December 20, 2019 consent decree, Sutter agreed not to engage in anti-competitive practices, including, but not limited to, paying physician "kickbacks disguised as salaries or consulting fees.

153. In Mid-December 2019, Sutter agreed to limit its charges for out-of-network services providing public access to its pricing, quality, and cost information. Sutter also agreed to stop measures that denied patients access to lower cost plans and stop all-or-nothing contracting deals, allowing insurers, employers, and self-funded payers to include some of Sutter's hospitals, clinics, or other commercial products in their plans' network. Sutter also agreed to make facilities such as their rural hospitals and Sutter hospitals in San Francisco available to insurers, employers, and self-funded payers that use its system. Prior to this agreement, Sutter had unlawfully steered away unprofitable protected class patients procedures by paying "kickbacks" to cooperating physicians.

154. On or about November 13, 2020, HB partner Kristina Daniel Lawson was elected "MBC" President.

155. On or about November 25, 2020, CEO Delvecchio Finley was forced to resign from AHS after questioning Sutter's anti-competitive and discriminatory policies. Alameda Health serves Oakland's indigent and under served patient community through Highland, Alameda and San Leandro hospitals.

156. On August 3, 2021, Sutter Health and its Affiliates admitted up-coding

violations and  agreed to pay $90 million to Settle False Claims Act allegation of upcoding  various Medicare programs.

157.   On January 10, 2021, "MBC" member Lawson became Hanson & Bridgett's managing partner.

158.   During July of 2021, Dr. Peterson's provider contract with FirstHealth was not reinstated because of statements made by  MBC and false online information related thereto.

159.   On or about August 30, 2021, Sutter Health and its Affiliates (Sutter Bay Medical Foundation (dba Palo Alto Medical Foundation), Sutter East Bay Medical Foundation, Sutter Pacific Medical Foundation, Sutter Valley Medical Foundation (dba Sutter Gould Medical Foundation and Sutter Medical Foundation) (collectively, "Sutter Health") )  agreed to pay $90 million for violations of False Claims Act ( "up-coding", billing for products and services not provided, unbundling, billing for medically unnecessary services, double billing, and billing MediCal for ineligible patients) various Medicare Programs.

160.   On or about November 17, 2021, MBC Member Watkins filed a whistleblower claim with the State of California Auditor's Office  against the "MBC" claiming that "preferred" and/or cooperative physicians were exempt from Board discipline causing substantial harm to patients in California.

161.   From 2019 - November 17, 2021, Watkins was ostracized by other members of the "MBC" for his unrelenting pushback against their decisions regarding physician disciplined for "preferred" and/or "cooperating" physicians.

162.   Defendant Lawson openly undermined Watkins' complaint by stating that his concerns have been investigated at length and that the board is committed to protecting consumers and ensuring access to quality medical care. This is false as "MBC" has not investigated and/or disciplined any physician involved in the "kickback for referral" charges confirmed the State's Attorney General's

Office.

163. During March 2022,   Dr. Peterson requested a copy of the Watkins whistleblower complaint which has  not been provided under the auspice of a "confidential  ongoing investigation" by the State's Auditor's Office.

164. At all times relevant hereto, Dr. Peterson did not know and could not have discovered that the "MBC" preferred "cooperating physicians" exempting them from discipline as meeting regarding the same were taken during "closed door" (confidential) meetings.

<u>FIRST CLAIM FOR RELIEF</u>

(CIVIL RIGHTS - VIOLATION OF FIRST AMENDMENT - All Defendants)

165. Plaintiff incorporates by reference all the previous allegations of this complaint as if more fully set forth herein.

166. At all times relevant hereto,  Dr. Peterson was a patient advocate for Oakland's indigent and under served patient community.

167. At all times relevant hereto, Dr. Peterson and members of his medical practice provided non-incidental, truthful, not misleading, and relevant information which directly  advanced the states' substantial interest in providing medical care to Oakland's indigent and under served patients. This information includes, but was not limited to: advising those patients to "present" at Sutter's Alta Bates Summit Hospital when needing emergency care without considering whether related procedures were profitable; how to sign up for MediCal coverage; provided forms and instruction for filling out MediCal documents; and by directly communicating with MediCal to arrange for coverage for those patients.

168. Sutter's "MediCal Strategy" (conspiracy) discouraged and punished "non-compliant" physicians that referred unprofitable MediCal patient procedures to State and/or County facilities.  AHS (Alameda Health Services) received and

provided medical care for unprofitable procedures resulting in it incurring substantial debt which jeopardized its ongoing business.

169. Sutter paid unlawful "kickbacks" and attorney fees to its cooperating physicians that intentionally misdiagnosed (up-coded) and steered away patients (Stollman, Perry and Rich) and "MBC". Sutter punished un-cooperating physician advocates (Dr. Peterson) for providing correct diagnosis and MediCal information to his qualifying patients.

170. Sutter targeted Dr. Peterson in order to stifle his patient advocacy when  he refused to accept kickbacks for steering/overbilling and educating  Oakland's indigent and under served patients.

171. From February 2009 through the date of this complaint, Sutter and the "MBC" individual Defendants have and continues to  use the disciplinary process (Peer Reviews and "MBC")  to stifle Dr. Peterson's patient advocacy and education by initiating unfounded disciplinary actions and spreading false rumors regarding the quality of care provided through  his medical practice and endoscopy suite business.  The conduct designed to stifle Dr. Peterson's patient advocacy, includes, but is not limited to, the following:

1.    Sutter  Alta  Bates Peer  Review Action  dated February 2, 2009.

2.    1st "MBC" Case No.: 12-2009-198592.

3.    2ND "MBC" Case  No.: 12-2010-204708.

4.    Encouraging BE to file a civil complaint against Dr. Peterson.

5.    From 2014 through 2021, placing false information on its website about Dr. Peterson settling his disciplinary cases to avoid further Board Investigations.

6.    From 2009 through 2021, "warning" various Healthcare companies about Dr. Peterson's ongoing financial, medical malpractice,  "peer review" and "MBC" problems.  Those Healthcare companies falsely advised,

include, but are not limited to:  Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California, United Healthcare and Hill Physicians Medical Group.  The statements were false.

7. From 2009 through 2021, "warning" prospective physician partners and employees about Dr. Peterson's ongoing medical malpractice (BE), "peer review" and "MBC" disciplinary problems.  These statements were false.

8. During January 2018, warning,  threatening and/or otherwise interfering with   AHS's acquisition of Dr. Peterson's medical practice and endoscopy suite.   The warnings, threats and/or other interference included   statements by Sutter, HB and "MBC" employees about ongoing financial, medical malpractice (BE)  and disciplinary problems associated with the "MBC" and Peer Review Panels operating at other Healthcare companies (e.g., Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California,  United Healthcare and Hill Physicians Medical Group).  Those  statements were false.

172. From 2015 to the present,   Lawson, and from 2019 to the present Howard Krause, M.D.  Randy Hawkins, M.D. , Ronald Lewis, M.D. , Dev Gnanadev, M.D.,  Laurie Rose Lubiano,  Asif Mahmood, M.D., Richard Thorp, M.D., and Felix Yip, M.D. were aware of and participated in Sutter's Medical Strategy conspiracy by  failing to investigate and/or impose discipline on the Sutter's cooperating physicians that received unlawful  kickbacks paid from MediCal funds. That conduct resulted in  discrimination  against the Dr. Peterson and other "non-compliant" physicians as well as their MediCal patients.  Because the unlawful kickbacks depleted the MediCal fund pools, those patients were denied proper healthcare.  This denial is discriminatory.

173. Starting in 2015, Lawson knew as a partner in HB and a "MBC" member that

unlawful kickbacks for referrals were being paid to Sutter's cooperating physicians.

174. Starting in 2019,  Krause, Hawkins, Lewis, Gnanadev, Lubiano, Asif Mahmood, Thorp, and Yip knew and participated in the scheme because Board Member Watkins had complained directly to them about preferential "MBC" treatment for Sutter's cooperating physicians.

175. At all times relevant hereto, "MBC" had a duty to investigate and impose discipline on Sutter's "cooperating physicians" that were receiving unlawful kickbacks.

176. At no time did "MBC" or its members  initiate and/or investigate the Medicare/MediCal fraud alleged herein.  Instead, Dr. Peterson and other "non-compliant" physicians were the subject of disciplinary harassment.

177. At all times relevant hereto, Sutter, its peer review panels, including panels it controlled,  and the "MBC" have acted under "color of law" through its control of public and quasi-public  medical disciplinary peer review panels [committees, boards], including, but not limited to, Alta Bates Summit Peer Review Board,  "MBC", National Practitioner's Data Bank and other similar third party peer review healthcare  organization panels which imposed discipline to suppress Dr. Peterson's right to advocate, educate,  provide medical services and serve as a witness in actions in related matters (e.g., *Bonner v.  MBC*, supra.).

178.  The conduct complained of herein occurred under color of law and  exceed these Board Members legitimate managerial duties.  Those duties do not include participating in a scheme to defraud MediCal, thereby stifling Dr. Peterson patient advocacy.

179. At all times relevant hereto, Sutter controlled the disciplinary process by paying unlawful "kickbacks" and fees to panel/board members and their attorneys, and

threatening disciplinary action against other doctors.  Those kickbacks continue and are ongoing resulting in prospective damages to Dr. Peterson and his protected class of patients.

180.   Dr. Peterson has diligently pursued and exhausted all legal remedies available to him before filing this action.

181.   Dr. Peterson could not have discovered and/or otherwise learned about Sutter's MediCal Strategy (conspiracy or  scheme) earlier than November 2019, because Sutter, Peer Review Panels and "MBC" members intentionally concealed the MediCal conspiracy by the following conduct: (1) "MBC" designated Lozano's investigation as "ongoing", refusing to release the findings or her employment file asserting privacy concerns; (2) Qui Tam actions, including but not limited to the Harvey case were filed during 2014, but remained under seal  until after 2018 when the Federal government intervened in the in those cases.  Settlement of Harvey and other Qui Tam actions were subject to confidentiality provisions that prevented disclosure; (3) Various California Attorney General and Federal  investigations have been designated as "ongoing" which prevented disclosure of the same until after November 2019; (4) "MBC" Member Watkins' whistleblower complaint filed in November 2021 with the State Auditors Office  is currently designated as "ongoing" and not  published based on "confidentiality" concerns; (5) Since 2015 "MBC" Member and HB  Partner/CEO Lawson has repeatedly denied any wrongdoing by Sutter or the "MBC" despite complaints by "MBC" Member Watkins and the State's Attorney General's office alleging the payment of kickbacks to various Sutter preferred physicians  from 2012 through November 11, 2021; (6) Sutter, Lawson and the "MBC" members  knew that Federal and State authorities were investigating Sutter for unlawful  patient referral kickbacks; (7) During 2019, "MBC" Member Watkins complained

about "preferred physicians" being protected from Board discipline during closed door meetings. Watkins was ostracized and isolated from other Board Members in order to conceal that misconduct causing him to filing a whistleblower complaint with the State's Auditor's Office. The State's Auditor's Office has refused to release the Watkins' complaint citing confidentiality concerns. Other Board Members including Lawson have publicly denied the "preferential treatment" being afforded Sutter's "cooperating physicians" in order to conceal the same from the public; (8) Lozano threatened Dr. Peterson with "MBC" discipline if he testified in the Bonner action; and, (9) Sutter filed false declarations in Peterson v. Stohlman in order to conceal the above alleged conduct.

182. This unlawful conduct is intentional, reckless, continuing, ongoing and corrupt.

183. The MBC defendants are currently violating federal law by the conduct alleged herein and are imminently going to carry out further violations of federal and state law. Plaintiff seeks injunctive relief to prohibit future conduct that violates federal law.

184. At all times relevant hereto, Dr. Peterson did not and could not have known and/or discovered Sutter's MediCal scheme to control physician referrals through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, and confidential settlement and attorney-client communications concealed the same from Dr. Peterson. The attorney-client communications were by and between HB employees/ partners at HB and Sutter, its Peer Review Panels and other Healthcare credentialing employees. Moreover, "MBC" used "closed door" sessions to secrete these abuses from Dr. Peterson and the general public.

185. As a proximate cause of Sutter's violation of Dr. Peterson's First Amendment Rights, he has suffered damages to his person, reputation, medical practice and

endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.

186. Dr. Peterson requests and order from this Court precluding the ongoing and/or prospective retaliation against Dr. Peterson.

187. Dr. Peterson has no other remedy at law against Sutter, its Peer Review panels and the current "MBC" members to prevent prospective violations of his First Amendment rights.

188. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this action, the exact amount of which will be determined at the time of trial or by motion thereafter.

189. At all times relevant hereto, these Defendants have acted with reckless, corrupt and wanton disregard for Dr. Peterson's personal, financial well being and civil rights mandating an award of punitive and/or exemplary damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

### (CIVIL RIGHTS - DUE PROCESS - All Defendants)

190. Plaintiff incorporates by reference all the previous allegations of this complaint as if more fully set forth herein.

191. As part of Sutter's MediCal Strategy, it used the medical disciplinary process to threaten, discipline and impugn Dr. Peterson and other non-compliant physicians that refused to take unlawful kickbacks.

192. At all times relevant hereto, Dr. Peterson's medical licenses and hospital privileges were property rights entitled to constitutionally protected due process.

193. Dr. Peterson was subjected to unfounded discipline by Sutter's peer review panels, various healthcare peer review panels it controlled and members and

the "MBC" because he refused to cooperate in the "MediCal Strategy" conspiracy.

## PEER REVIEW

194. From February 2, 2009 through May 11, 2009, Dr. Peterson's was subjected to unlawful Peer Review at Sutter's Alta Bates Summit Hospital ("Alta Bates"), consisting of THREE (3) fabricated quality of care complaints allegedly caused by his failure to take "call" from the Alta Bates emergency room.

195. On April 1, 2014, Dr. Peterson was summarily suspended without a formal hearing.

196. On April 6, 2014, Dr. Peterson's privileges were constructively terminated.

197. On April 8, 2009, Sutter posited the false Form 805 with the "MBC".

198. Dr. Peterson was denied a formal hearing and notice of the allegations against him.

199. Because Sutter paid "kickbacks" and fees to its cooperating physicians and attorneys representing Sutter, its peer review panels (Stollman, Perry and Rich) and "MBC" (officers, executive directors and board members), Dr. Peterson suffered fabricated discipline denying him due process mandated by the Fifth Amendment of the United States Constitution, and the HCQIA.

## 1st "MBC" ACTION

200. On or about, October 3, 2009, MBC Accusation No. 12-2009-1985-92 was filed alleging misconduct described, at least in part, in Sutter's Form 805 (failure to return calls made from Sutter's emergency room).

201. On or about, October 27, 2010, "MBC's" investigation ended.

202. The "MBC" investigation was conducted by Cathy Lozano.

203. The investigation findings were fabricated, as evidence contained and concealed in MBC files showed that no calls were made from Sutter's emergency room on the days in question.

204. At all times relevant hereto, the "MBC" knew that Investigator Lozano was fabricating investigations to substantiate improper conduct against uncooperative physicians (e.g., Dr. Bonner).

205. Because the Lozano investigation was fabricated Dr. Peterson was subjected to unnecessary disciplinary process thereby denying him due process protected under the Fifth Amendment and HCQIA.

2nd MBC ACCUSATION

206. On or about, October 3, 2010, a second "MBC" complaint, Accusation No. 12-2010-204708, was filed by "MBC" against Dr. Peterson claiming substandard care of patient B.E.

207. Accusation No. 12-2010-204708 was assigned to Investigator Lozano.

208. On January 2, 2012, Dr. Peterson complained to "MBC" about Investigator Lozano ignoring pertinent facts.

209. MBC refused to dismiss and/or otherwise investigate Lozano's investigations despite other complaints regarding the same conduct.

210. On or about July 17, 2013, a stipulated settlement was reached after threats of further discipline were made against Dr. Peterson.

211. After the settlement, Sutter convinced B.E.'s conservator to file an unfounded civil lawsuit against Dr. Peterson in order to defer its own malpractice liability.

212. Dr. Peterson was denied his Fifth Amendment Due Process Rights by concealing the evidence of the conspiracy between Sutter, "MBC" and their same attorneys that improperly used the medical disciplinary process.

PETERSON v. PERRY & STOLLMAN

213. On November 19, 2012, Dr. Peterson filed a civil action against Drs. Stollman and Perry as members of Sutter's peer review panel.

214. On or about December 30, 2015, Dr. Peterson's complaint was dismissed based on 3 false and/or misleading declarations that concealed "kickbacks" and

attorney fees  paid by Sutter, its peer review panel members and MBC.

215. On November 11, 2013, Dr. Peterson appealed the Superior Court ruling to the 1st Appellate Court for the State of California.

216. On December 30, 2015 the Appellate Court dismissed Dr. Peterson's appeal.

217. On February 8, 2016, Dr. Peterson filed a writ to the California Supreme Court.

218. On March 23, 2016, the California Supreme Court denied Dr. Peterson's writ for certiorari.

219. At each litigation stage, the Defendants concealed unlawful "kickbacks" and fees paid to Sutter's peer review panel members, the MBC and/or their attorneys.

220. Sutter's proffering of false declarations violating Dr. Peterson's Fifth Amendment Due Process rights and the HCQIA.

<u>HEALTHCARE PROVIDERS "PRETEXT".</u>

221. From February 2009 through the filing of this complaint, Dr. Peterson was denied due process by a number of healthcare Peer Review and Credentialing Panels, including, but not limited to: Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California, United Healthcare and Hill Physicians Medical Group.

222. In each instance, the Peer Review Panels used as Pretext for denial prior and ongoing investigations by Sutter's Peer Review Panels and "MBC".

223. At all times relevant hereto, Dr. Peterson's current and prospective contracts were terminated or denied medical provider status based on the false Form 805, 2 MBC accusations, the BE malpractice filing, and statements that ongoing and/or prospective investigations were "on-going".

224. At all times relevant hereto, Sutter controlled the medical disciplinary process by paying its peer review panel members and MBC physicians/attorneys unlawful "kickbacks" from MediCal pools.

225. After 2015 to the present, Lawson, and from 2019 thereafter, Krause, Hawkins, Lewis, Gnanadev, Lubiano, Asif Mahmood, Thorp and Yip were aware of and participated in Sutter's Medical Strategy conspiracy by not correcting the false allegations against Dr. Peterson, and failing to investigate or impose discipline on Sutter's cooperating physicians. That conduct resulted in Dr. Peterson being subject false and exaggerated discipline by Sutter's Peer Review Panels and "MBC". The false and exaggerated findings escalated from 2009 through the filing of this complaint. The underlying findings escalated as Lawson and the "MBC" Defendants attempted to conceal the unlawful referral kickbacks paid to Sutter's "preferred physicians".

226. Starting in 2019, Krause, Hawkins, Lewis, Gnanadev, Lubiano, Mahmood, Thorp, and Yip knew and participated in the scheme even after Watkins had complained about preferential disciplinary treatment afforded to Sutter's cooperating physicians.

227. At all times relevant hereto, "MBC" had a duty to investigate and impose discipline on Sutter's "cooperating physicians".

228. At no time did "MBC" or its members initiate and/or investigate the Medicare/MediCal fraud allegations. Instead, they contrived and/or exaggerated ongoing investigations and findings against Dr. Peterson.

229. The contrived findings and investigations related thereto violated Dr. Peterson's due process rights as he was not afforded notice and an opportunity to contest the same.

230. At all times relevant hereto, Sutter, its peer review panels, including panels it controlled, and the "MBC" Defendants have acted under "color of law" through its control of public and quasi-public medical disciplinary peer review panels [committees, boards], including, but not limited to, Alta Bates Summit Peer Review Board, "MBC", National Practitioner's Data Bank and other

similar third party peer review healthcare organization panels which published false disciplinary findings in violation of Dr. Peterson's due process rights.

231.   The conduct complained of herein occurred under color of law and exceeded "MBC" Members' managerial duties. Those duties do not include participating in a scheme to defraud MediCal and conceal and conceal that conduct by impugning Dr. Peterson's credibility.

232.   At all times relevant hereto, Sutter controlled the disciplinary process by paying unlawful "kickbacks" and fees to panel/board members while threatening further disciplinary action. Those kickbacks continue and are ongoing resulting in prospective damages to Dr. Peterson and his protected class of patients.

233.   Dr. Peterson has diligently pursued and exhausted all legal remedies available to him before filing this action.

234.   Dr. Peterson could not have discovered and/or otherwise learned about Sutter's MediCal Strategy (conspiracy or scheme) earlier than November 2019, because Sutter, its Peer Review Panels and "MBC" Defendants intentionally concealed the MediCal conspiracy by the following conduct: (1) "MBC" designated Lozano's investigation as "ongoing", refusing to release the findings or her employment file asserting privacy concerns; (2) Qui Tam actions, including but not limited to the Harvey case were filed during 2014, but remained under seal until after 2018 when the Federal government intervened in the in those cases. Settlement of Harvey and other Qui Tam actions were subject to confidentiality provisions that prevented disclosure; (3) Various California Attorney General and Federal investigations have been designated as "ongoing" which prevented disclosure of the same until after November 2019; (4) "MBC" Member Watkins' whistleblower complaint filed in November 2021 with the State Auditors Office is currently designated as

"ongoing" and not published based on "confidentiality" concerns; (5) Since 2015 "MBC" Member and HB Partner/CEO Lawson has repeatedly denied any wrongdoing by Sutter or the "MBC" despite complaints by "MBC" Member Watkins and the State's Attorney General's office alleging the payment of kickbacks to various Sutter preferred physicians from 2012 through November 11, 2021; (6) Sutter, Lawson and the "MBC" members knew that Federal and State authorities were investigating Sutter for unlawful patient referral kickbacks; (7) During 2019, "MBC" Member Watkins complained about "preferred physicians" being protected from Board discipline during closed door meetings. Watkins was ostracized and isolated from other Board Members in order to conceal that misconduct causing him to filing a whistleblower complaint with the State's Auditor's Office. The State's Auditor's Office has refused to release the Watkins' complaint citing confidentiality concerns. Other Board Members including Lawson have publicly denied the "preferential treatment" being afforded Sutter's "cooperating physicians" in order to conceal the same from the public; (8) Lozano threatened Dr. Peterson with "MBC" discipline if he testified in the Bonner action; and, (9) Sutter filed false declarations in Peterson v. Stohlman in order to conceal the above alleged conduct.

235. This unlawful conduct is intentional, reckless, continuing, ongoing and corrupt.

236. The MBC defendants are currently violating federal law by the conduct alleged herein and are imminently going to carry out further violations of federal and state law. Plaintiff seeks injunctive relief to prohibit future conduct that violates federal and state law.

237. At all times relevant hereto, Dr. Peterson did not and could not have known and/or discovered Sutter's MediCal scheme to control physician referrals through the systematic misuse of the disciplinary process, as ongoing

investigations,  qui tam actions, and confidential settlement and attorney-client protected communications   concealed the same from Dr. Peterson. The attorney-client communications were by and between HB employees/ partners at HB and Sutter, its Peer Review Panels and other Healthcare credentialing employees.  Moreover, "MBC" used "closed door" sessions to secrete these abuses from Dr. Peterson and the general public.

238.   These contrived disciplinary findings resulted in Dr. Peterson's applications for provider status being denied and/or ongoing contracts not being renewed with Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California, United Healthcare and Hill Physicians Medical Group.  The dates of the applications and denied renewals are alleged above.

239.   Sutter, its peer review panel members and the "MBC" Defendants intentionally violated Dr. Peterson's due process rights fabricating and disseminating investigations, findings and declarations to undermine a fair adjudication of the issues alleged herein.

240.   As a proximate cause of Sutter's violation of Dr. Peterson's Fifth Amendment Due Process rights, he has suffered substantial damage to his person, reputation, medical practice, and endoscopy business in excess of $100,000.00, the exact amount of which will be determined at the time of trial. These damages include current and future lost profits. Dr. Peterson requests and order from this Court precluding the ongoing and/or prospective retaliation against Dr. Peterson.

241.   Dr. Peterson has no other remedy at law to prevent Defendants continued violations of his due process rights and is seeking injunctive relief to prevent prospective damages related thereto.

242.   Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this action,  the  exact

amount of which will be determined at the time of trial or by motion thereafter.

243.  At all times relevant hereto, Sutter acted with reckless and wanton disregard for Dr. Peterson's Due Process rights which mandate an award of punitive and/or exemplary damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## THIRD CLAIM FOR RELIEF

(CIVIL RIGHTS - "PROTECTED CLASS" DISCRIMINATION - All Defendants)

244.  Plaintiff incorporates by reference all the previous allegations of this complaint as if more fully set forth herein.

245.  During January 2017, the California Research Bureau (California Library) issued a report entitled "Demographics of Disciplinary Action by the Medical Board of California (2003-2013)" which found that the "MBC" discriminated against African American and Hispanic physicians in its disciplinary process. This report was concealed ("buried").

246.   As early as November 18, 2018, the California Attorney General's office confirmed that Sutter's physician referral payment programs violated "Stark" statutes and that Sutter had been reimbursed for the physician "kickbacks" out of MediCal funds. This conduct constituted MediCal fraud which continued after June 19, 2019 through 2021.

247.   From June 20, 2019 through the present, the "MBC" Defendants failed to initiate investigations or discipline into the MediCal fraud because the doctors involved were Sutter's preferred physicians represented by HB. Board Member Lawson was a partner of HB and later elected to president of the "MBC".

248.  June 20, 2019 through the present, Dr. Peterson treated indigent and under served patients that were part of a "protected class" based on their race, color, religion or creed, national origin or ancestry, sex (including gender, pregnancy,

sexual orientation, and gender identity), age, physical or mental disability and/or veteran status.   Those individuals were MediCal patients.

249. From June 20, 2019 through the present,  Sutter's MediCal conspiracy discriminated against Dr. Peterson and his "protected class" patients by converting MediCal funds available for protected class patient care and segregating those patients by profitability of procedures.

250. From June 20, 2019 through the present, Sutter, its physician peer review panel members and the "MBC" Defendants  acted  under "color of law" outside the scope of their authority in violation of state and federal statutes, rules and regulations by failing to investigate and discipline known MediCal physician fraud.

251. During 2019, Watkins complained about Sutter's preferred physicians not being properly disciplined for improper care.

252.  From June 20, 2019 through the present,  Krause, Hawkins, Lewis, Gnanadev, Lubiano,  Asif Mahmood,  Thorp  and  Yip were aware of and participated in Sutter's Medical Strategy conspiracy by failing to investigate and/or impose discipline on physicians that they knew participated in the MediCal fraud.

253. In furtherance of that scheme, Defendants exaggerated, contrived and disseminated false disciplinary findings about Dr. Peterson  to healthcare administrators in order to impugn his professional reputation and  conceal the unlawful conduct from the public.

254. As alleged above, Sutter's Medical conspiracy involved the  steering of "protected class" patients resulted in unlawful segregation of minority physicians (Dr. Peterson) and their protected class  patients  in violation of the 14th Amendment to the United States Constitution,  Title VII of Civil Rights Act of 1964, and other related state and federal statutes, rules and regulations related thereto.  This steering continued after June 20, 2019 through 2021.

255.  At all times relevant hereto,  Sutter, its Peer Review Panels and the "MBC" Defendants  knew that Defendants' conduct reduced MediCal funds available for "protected class patients" and  segregated  the same away from Dr. Peterson and other African American Hispanic physicians.  This resulted in the loss of otherwise available medical care for those protected class patients.

256.  As a proximate cause of Defendants' discrimination, Dr. Peterson has suffered substantial damage to his personal health,  reputation, medical practice and endoscopy business resulting in damages substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.

257.  Dr. Peterson has no other remedy at law to prevent Defendants continued violations of his constitutionally protected right and is seeking injunctive relief to prevent prospective damages related thereto.

258.  Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this action,  the  exact amount of  which will be determined at the time of trial or by motion thereafter.

259.  At all times relevant hereto, Defendants  have acted with reckless and wanton disregard for Dr. Peterson's personal and financial well being mandating an award of punitive and/or exemplary damages  in an amount to be determined at the time of trial.

WHEREFORE,   Plaintiff prays for relief as set forth below.

<u>FOURTH CAUSE OF ACTION</u>

(FAILURE TO PREVENT DISCRIMINATION AND RETALIATION - All Defendants)

260.   Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

261.  At all times relevant hereto, Sutter, its peer review panel members, the "MBC" and their common attorneys acted under color of law.

262.  At all times relevant hereto, Sutter, its peer review panel members, the "MBC" and their attorneys knew that Dr. Peterson was an African American physician, advocate and medical provider for his "protected class" patients.

263.  At all times relevant hereto, Sutter paid "kickbacks" to cooperating physicians to unlawfully steer "protected class" patients.  When Dr. Peterson, and other African American physicians, refused to take "kickbacks" Sutter manipulated California's medical disciplinary process to undermine their credibility before regulators and courts.

264.  As early as January 2017, Sutter, its Peer Review Panels and the "MBC" knew that its manipulation of California's disciplinary process discriminated against Dr. Peterson and other African American physicians resulting in unlawful segregation, limiting medical services and care provided to "protected class" patients.

265.  From June 20, 2019 to the present, Defendants intentionally failed and refused to take remedial action to prevent the unlawful discrimination against Dr. Peterson and his "protected class" patients.

266.  As a direct and proximate result of Defendants' failure to prevent this discrimination, Dr. Peterson and his "protected class" patients suffered personal health, reputation, medical practice and endoscopy business damages substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.

267.  As a proximate cause of Defendants' misconduct, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Plaintiff's damages will be determined at trial.

268.  Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this action, the exact

amount of which will be determined at the time of trial or by motion thereafter.

269.  At all times relevant hereto, Defendants  acted with reckless and wanton disregard for Dr. Peterson's personal and financial well being mandating an award of punitive and/or exemplary damages  in an amount to be determined at the time of trial.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

(ANTI-TRUST INTERFERENCE WITH CURRENT BUSINESS RELATIONSHIPS - Sutter)

270.   Plaintiff  incorporates by reference all the allegations of this complaint as if more fully set forth herein.

271.  From June 20, 2017 to the present, Sutter used its  MediCal strategy to monopolize and control  healthcare in Northern California through the acquisition and subsequent control of physician referrals, the nature of services provided and billing related thereto.

272.  From June 20, 2017 to the present, Sutter used  market consolidation through acquisition, to control  more than 5,200 physicians in Northern California.

273.  From June 20, 2017 to the present,  Sutter's market consolidation increased medical costs without delivering  proportionate  quality of care.  During the same time, outpatient costs and insurance premiums increased from 17 to 55%  and now are  35% higher in Northern California.   During the same time, Medical services available to Oakland's indigent and under served patient community substantially declined.

274.  From June 20, 2017 to the present, Sutter used unlawful patient referral kickbacks and up-coding to steer profitable MediCal procedures to it and unprofitable ones to county facilities such as Alameda Health Services (AHS).

275.  From June 20, 2017 through the present, the steering of unprofitable procedures to AHS caused that entity to incur substantial debt thus impairing its viability

and care available for its protected class patients.

276. From June 20, 2017 through the present, Sutter's steering and payment of kickbacks reduced MediCal funds available for legitimate procedures.

277. From June 20, 2017 through the present, Dr. Peterson's MediCal reimbursements substantially declined thus impairing the viability of his medical practice and endoscopy business. As a result, Dr. Peterson's protected class patients have suffered a decline in available medical care.

278. From June 20, 2017 through the present, Sutter retaliated against Dr. Peterson by representing to other healthcare companies that his ongoing disciplinary problems made him a potential liability.

279. From June 20, 2017 through the present, Dr. Peterson's applications for provider status were denied, reduced and/or not renewed with Aetna, Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Sharp Health Plan, Sutter Health Plus, Western Health Advantage, Covered California and/or Alameda Health Services (AHS).

280. Starting during 2018, Dr. Peterson was solicited by AHS to sell his practice and endoscopy suite.

281. During December of 2019, Sutter interfered with the AHS sale pointing to ongoing problems with the "MBC" and financial difficulties caused by healthcare companies reducing his medical reimbursements, not approving his applications for provider status and failing to renew his ongoing contracts. After which, AHS refused to continue with negotiations for the purchase of his medical practice and endoscopy suite.

282. At all times relevant hereto, Sutter's scheme substantially affected and occurred in interstate commerce.

283. Sutter's conduct was an intentional violation of the Sherman Anti-Trust Act causing substantial damage to Dr. Peterson's medical practice and endoscopy

business.  This conduct  undermining competition in Northern California's medical industry.

284.  As a direct and proximate result of Sutter's violation of the Sherman Anti-Trust Act,  Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business. The damages related thereto  substantially exceed  $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

285.  As a proximate cause of Sutter's violation of the Sherman Anti-Trust Act, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

286.  Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of which will be determined at the time of trial or by motion thereafter.

287.  At all times relevant hereto, Sutter had  advanced knowledge of the damages that would be caused by the  conduct alleged herein, but nonetheless,  continued to  act with wanton and reckless disregard,  oppression, fraud, and/or malice mandating an award of punitive and/or exemplary  damages to prevent the recurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

### SIXTH  CLAIM FOR RELIEF

(ANTI-COMPETITIVE PRACTICES VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1 AND SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15 - CONSPIRACY TO RESTRAIN TRADE - SUTTER)

288.  Plaintiff  incorporates by reference all the allegations of this complaint as if

more fully set forth herein.

289. From June 20, 2017 through present,  Sutter's anti-competitive practice included unlawful business and  government intervention by the "MBC" that restricted and reduced the  medical services  and competition related thereto in Northern California.

290. From June 20, 2017 through the present, Sutter's anti-competitive practices adversely impacted public health care by reduced medical services available to Oakland's indigent and under served patient community.

291. From June 20, 2017, Sutter's anti-competitive practices  included,  but were not limited to price fixing, bid rigging, and  boycotts of  non-compliant physicians, such as Dr. Peterson.

292. From June 20, 2017 through the present, Sutter paid unlawful "kickbacks" to its cooperating physicians and attorneys that served on or worked for its peer review panels and the "MBC" as follows:

    1.   Price Fixing: Sutter artificially inflated medical costs by manipulating chargemaster  compendiums; up-coding medical services provided; requiring that additional and unnecessary medical procedures be performed;  charging for unused materials;  and demanding payment for physician "on-call" coverage.

    2.   Boycotts: Sutter used its peer review and the "MBC" medical license disciplinary process  to undermine the professional reputation of Dr. Peterson and other physicians  that refused to participate in its unlawful "MediCal Strategy".  As a result of the medical disciplinary process, Dr. Peterson was boycotted by patients and other healthcare providers including, but not limited to: Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Sharp Health Plan,  Sutter Health Plus and Western Health Advantage.

3.   <u>Tying</u>: Sutter required its cooperating physicians to provide or tie unnecessary medical services to basic endoscopy services.  In order to increase the cost of basic endoscopy procedures,  Sutter required physicians to use additional anesthesia physicians even when unnecessary and not normally provided.  This was referred a "Total Colonoscopy".

293.   Sutter's conduct violated Section 1 of the Sherman Act, 15 U.S.C. §1 and Section 4 of the Clayton Act; 15 U.S.C. § 15 - Conspiracy to Restrain Trade.

294.   Sutter, its peer review panels and preferred physicians it placed on the "MBC" knew and intended that its conduct would violate  the Sherman Anti-trust and Clayton acts knowing the same would  substantially impact  Dr. Peterson's medical practice and endoscopy business.  Sutter's conduct violated public policy as it  reduced medical care available  to Oakland's indigent and under served patient community,  and was discriminatory.

295.   Sutter, its peer review panel and its preferred physicians it placed on the "MBC" deliberately restrained competition by using the medical disciplinary processes to force Dr. Peterson to   steer "protected class" patients, over bill, and imposed unfounded discipline upon him after he refused to participate in the same.  This restraint violated public policy as its reduced care available to Oakland's indigent and under served medical patient community, and was discriminatory.

296.   As a result of the Sutter's anti-competitive conduct, Dr. Peterson's has been damaged by through its  restraint of trade, resulting in damage to his person, reputation,  medical practice, endoscopy business and  "protected class" patients.

297.   The effect of Sutter's  conspiracy with its peer review panels and the members it placed on "MBC" has caused  a reduction in access to,  competent

healthcare in Oakland's indigent and under served patient community.

298.   Sutter engaged in this unlawful conduct intending to reduce and/or summarily eliminate competition from Dr. Peterson's medical practice and endoscopy business.

299.   Dr. Peterson has suffered the type of damages that the antitrust laws were intended to prevent and that would normally arise from similar anti-competitive conduct.

300.   Defendants acted in concert and joint action with each other and their acts or acts of omission described herein depriving Dr. Peterson of his statutory and constitutional rights thereby causing him substantial damages.

301.   As a direct and proximate result of Sutter's anti-competitive practices, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

302.   As a proximate cause of Sutter's anti-competitive practices, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety. The exact amount of Dr. Peterson's damages will be determined at trial.

303.   Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

304.   At all times relevant hereto, Sutter had advanced knowledge of the damages that would be caused by the conduct alleged herein, and continued to act with wanton reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or

exemplary damages to prevent the recurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### (Breach of Contract -Sutter)

305. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

306. Dr. Peterson had an implied contract for diagnostic privileges at Sutter Alta Bates to provide outpatient endoscopy procedures using Sutter's out-patient facilities.

307. The contract was evidenced by adequate legal consideration.

308. Dr. Peterson reasonably relied and performed under his agreements with Sutter.

309. Defendant Sutter was required under the terms of the contract to act reasonably and follow the laws and statutes of the State of California and the United States of America.

310. Defendant breached the contract by violating the HCQIA, paying unlawful "kickbacks" and attorney fees to members of its peer review panel and members of the "MBC" in exchange for unsupported findings against Dr. Peterson.

311. The breaches are material.

312. At all times relevant hereto, Dr. Peterson has requested that Sutter cure these breaches.

313. At all times relevant hereto, Sutter has failed, refused, denied and/or unreasonably neglected to cure these breaches.

314. At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related

settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "MBC" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

315. As a direct and proximate result of Sutter's breach of contract, Dr. Peterson has sustained and continues to suffer damages to his medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

316. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

WHEREFORE, Plaintiff prays for relief as set forth below.

## EIGHTH CAUSE OF ACTION

### (Breach of Covenant of Good Faith & Fair Dealing - Sutter)

317. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

318. In every contract there is an implied covenant of good faith and fair dealing.

319. At all times relevant hereto, Sutter and Dr. Peterson had a special relationship that required reliance upon the good faith representations and the conduct of each other.

320. Dr. Peterson reasonably relied and performed under his contractual agreements with Sutter.

321. Sutter intentionally breached the covenant of good faith and fair dealing by violating the Sherman Anti-Trust and Clayton Acts; causing the filing a false Form 805; conspiring to unlawfully pay and/or receive "kickbacks" in exchange for favorable disciplinary rulings; using the medical disciplinary process to force Dr. Peterson to steer his "protected class" patients; making

false statements to other healthcare companies about his disciplinary problems thereby causing denial and renewal of his provider status; and, by using the medical disciplinary process to undermine his credibility as a witness.

322. These breaches are material and intentional.

323. At all times relevant hereto, Dr. Peterson has requested that Sutter cure the same.

324. At all times relevant hereto, Sutter has failed, refused, denied and/or unreasonably neglected to cure these breaches.

325. At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "MBC" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

326. As a direct and proximate result of Sutter's Breach of the Covenant of Good Faith and Fair Dealing, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

327. As a proximate cause of Sutter's Breach of the Covenant of Good Faith and Fair Dealing, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety. The exact amount of Dr. Peterson's damages will be determined at trial.

328. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact

amount of which will be determined at the time of trial or by motion thereafter.

329. At all times relevant hereto, Sutter had advanced knowledge of the damages that would be caused by the conduct alleged herein, and continued to act with wanton reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary damages to prevent the recurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>NINTH CAUSE OF ACTION</u>

(Negligence - Sutter)

330. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

331. Sutter, its peer review panel members and the "MBC" filed, pursued and perpetuated the following unfounded actions against Dr. Peterson:

1. Sutter Alta Bates Peer Review Action dated February 2, 2009.

2. 1st "MBC" Case No.: 12-2009-198592.

3. 2ND "MBC" Case No.: 12-2010-204708.

4. Encouraging BE to file a civil complaint against Dr. Peterson.

5. From 2014 through 2021, placing false information on its website about Dr. Peterson settling his disciplinary cases to avoid further Board Investigations.

6. From 2009 through 2021, "warning" various Healthcare companies about Dr. Peterson's ongoing financial, medical malpractice, "peer review" and "MBC" problems. Those Healthcare companies falsely advised, include, but are not limited to: Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California, United Healthcare and Hill Physicians Medical Group. The statements were false.

7.    From 2009 through 2021, "warning" prospective physician partners and employees about Dr. Peterson's ongoing medical malpractice (BE), "peer review" and "MBC" disciplinary problems.  These statements were false.

8.    During January 2018, warning,  threatening and/or otherwise interfering with   AHS's acquisition of Dr. Peterson's medical practice and endoscopy suite.   The warnings, threats and/or other interference included   statements by Sutter, HB and "MBC" employees about ongoing financial, medical malpractice (BE)  and disciplinary problems associated with the "MBC" and Peer Review Panels operating at other Healthcare companies (e.g., Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California,  United Healthcare and Hill Physicians Medical Group).  Those  statements were false.

332.  Sutter, its peer review panel members and the "MBC" used fabricated investigations, false declarations and paid unlawful "kickbacks"/attorney fees to perpetuate these unfounded actions.

333.  At all times relevant hereto,   Sutter, its peer review panel members and the "MBC" had a duty to conduct a reasonable investigation before filing Form 805 and related disciplinary actions, disclose conflicts of interest, correct false findings on-line data bases (Physicians' National Data Bank), supervise its investigators/officers/directors,  and not accept unlawful "kickbacks"/attorney fees in exchange for favorable findings.

334.  Sutter, its peer review members and the "MBC" breached each of these duties.

335.  Each of these breaches were material.

336.  At all times relevant hereto, Dr. Peterson did  not,  and could not have  known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process,  as ongoing investigations,  qui tam actions,  related

settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "MBC" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

337. As a direct and proximate result of Defendants' negligence, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

338. As a proximate cause of Defendants' negligence, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety. The exact amount of Dr. Peterson's damages will be determined at trial.

339. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

340. At all times relevant hereto, Defendants had advanced knowledge of the damages that would be caused by the conduct alleged herein, and continued to act with wanton reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary damages to prevent the recurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>TENTH CLAIM FOR RELIEF</u>

(Intentional Interference with Current and Prospective Contractual Relationships -Sutter)

341. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

342. From June 20, 2019 through the present, Sutter, its peer review panel members, and individuals it placed on the "MBC" participated and perpetuated an unlawful MediCal scheme which involved paying "kickbacks" to cooperating physicians.

343. From June 20, 2019 to the present, Sutter used unlawful patient referral kickbacks and upcoding to steer profitable MediCal procedures to it and unprofitable ones to county facilities such as Alameda Health Services (AHS).

344. From June 20, 2019 through the present, Sutter's steering and payment of kickbacks reduced MediCal funds available for legitimate procedures.

345. From June 20, 2019 through the present, Dr. Peterson's MediCal reimbursements have substantially declined thus impairing the viability of his medical practice and endoscopy business. As a result, Dr. Peterson's protected class patients have suffered a decline in available medical care and funds to pay for the same.

346. From June 20, 2019 through the present, Sutter retaliated against Dr. Peterson by representing to other healthcare companies that his ongoing disciplinary problems made him a potential liability.

347. From June 20, 2019 through the present, Dr. Peterson's applications for provider status were denied, reduced and/or not renewed with Aetna, Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Sharp Health Plan, Sutter Health Plus, Western Health Advantage, Covered California and Alameda Health Services. Sutter knew Dr. Peterson had these contractual relationships with these entities.

348. Starting during 2018, Dr. Peterson was solicited by AHS to sell his practice and endoscopy suite.

349. During December of 2019, Sutter interfered with the AHS sale by pointing out ongoing problems with the "MBC" and financial difficulties caused by

healthcare companies reducing his medical reimbursements, not approving his applications for provider status and failing to renew ongoing provider contracts. After which, AHS refused to continue negotiations with Dr. Peterson.

350. Because of Sutter's interference alleged herein, Dr. Peterson's actual contractual relationships with current and prospective healthcare providers, including, but not limited to: Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Covered California, Sharp Health Plan, Sutter Health Plus and Western Health Advantage.

351. Sutters' interference was intentional.

352. As a direct and proximate result of Sutter's intentional interference, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

353. As a proximate cause of Sutter's intentional interference, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety. The exact amount of Dr. Peterson's damages will be determined at trial.

354. Plaintiff has incurred and is entitled to reimbursement for the legal expenses, costs and attorney fees related to the prosecution of this claim the exact amount of which will be determined at the time of trial or by motion thereafter.

355. At all times relevant hereto, Sutter had advanced knowledge of the damages that would be caused by the conduct alleged herein, and continued to act with wanton reckless disregard, oppression, fraud, and/or malice, ratifying the wrongful conduct described herein thereby mandating an award of punitive

and/or exemplary damages to prevent the recurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>ELEVENTH CAUSE OF ACTION</u>

(Business Disparagement - Sutter)

356.   Plaintiff incorporates by reference all the previous paragraphs of this complaint as if more fully set forth herein.

357.   From June 20, 2019 through the present, Sutter, its peer review panel members and its agents on the "MBC" intentionally published a number of false statements about Dr. Peterson designed to force him to unlawfully steer his "protected class" patients and to undermine his credibility as a witness.

358.   From June 20, 2019 through the present, Sutter and/or its agents serving on the "MBC" intentionally made the following false statements.

That Dr. Peterson had a number of unresolved disciplinary issues with various healthcare company peer review panels and the "MBC" which made him a liability to approve for provider status.

That statement is false.

359.   These statements were made to AHS during December 2019 and/or January 2020 and to credentialing agents for Anthem Blue Cross, Cigna, Blue Shield of California, Kaiser Permanente of CA, Oscar Health Plan of California, Covered California, Sharp Health Plan, Sutter Health Plus and Western Health Advantage.

360.   The Sutter intentionally made the defamatory statement in order to cause continuing harm to Plaintiff's medical practice and endoscopy business specifically to cause the same to fail.

361.   As a direct and proximate result of Sutter's disparaging statement, Dr. Peterson has sustained and continues to suffer damages to his person,

reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

362.  As a proximate cause of  Sutter's disparaging statements, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

363.  Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of  which will be determined at the time of trial or by motion thereafter.

364.  At all times relevant hereto, Sutter had  advanced knowledge of the damages that would be caused by the disparaging statement  alleged herein,  and continues to  act with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the recurrence of the same. The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>TWELFTH  CAUSE OF ACTION</u>

(Intentional Infliction of Emotional Distress - Sutter)

365.  Plaintiff  incorporates by reference all the previous paragraphs of this complaint as if more fully set forth herein.

366.  At all times relevant hereto,  Sutter devised a scheme to control medical services in Northern California.

367.  Sutter paid unlawful "kickbacks" and used the medical disciplinary process to force physicians to participate and/or cooperate in its "MediCal Strategy". Uncooperative physicians were subjected to unfounded discipline.

368. Dr. Peterson refused to cooperate with Sutter and was subjected to relentless discipline, including, but not limited to:

1. Sutter Alta Bates Peer Review Action dated February 2, 2009.

2. 1st "MBC" Case No.: 12-2009-198592.

3. 2ND "MBC" Case No.: 12-2010-204708.

4. Encouraging BE to file a civil complaint against Dr. Peterson.

5. Placing false information on its website about Dr. Peterson settling his disciplinary cases to avoid further Board Investigations.

6. "Warning" various Healthcare companies about Dr. Peterson's ongoing financial, medical malpractice, "peer review" and "MBC" problems. Those Healthcare companies falsely advised, include, but are not limited to: Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California, United Healthcare and Hill Physicians Medical Group. The statements were false.

7. "Warning" prospective physician partners and employees about Dr. Peterson's ongoing medical malpractice (BE), "peer review" and "MBC" disciplinary problems. These statements were false.

8. Warning, threatening and/or otherwise interfering with AHS's acquisition of Dr. Peterson's medical practice and endoscopy suite. The warnings, threats and/or other interference included statements by Sutter, HB and "MBC" employees about ongoing financial, medical malpractice (BE) and disciplinary problems associated with the "MBC" and Peer Review Panels operating at other Healthcare companies (e.g., Aetna, Blue Shield, HealthNet, Cigna, Community Health Plan, Covered California, United Healthcare and Hill Physicians Medical Group). Those statements were false.

369. At all times relevant hereto, Sutter knew that the medical discipline it initiated

through its peer review panel members and the "MBC" was unfounded, but perpetuated to conceal unlawful "kickbacks". Sutter knew that by filing those actions and perpetuating the same would cause Dr. Peterson substantial emotional distress.

370. The conduct complained of herein was outside acceptable behavior in any Physician/Health Care setting.

371. Sutter's conduct was intentional, malicious and designed to cause Dr. Peterson substantial humiliation, mental anguish, and emotional and physical distress.

372. Sutter by participating in, confirming, encouraging, and ratifying the same misconduct, has done so with the knowledge that Dr. Peterson's emotional and physical distress damages would escalate to a point that he would quit and/or retire from the practice of medicine thereby leaving his patients without an advocate and/or medical care.

373. At all times relevant hereto, Dr. Peterson did not, and could not have known, about Sutter's scheme to control physicians through the systematic misuse of the disciplinary process, as ongoing investigations, qui tam actions, related settlements and attorney-client communications were confidential, and, therefore, concealed from Dr. Peterson. Moreover, "MBC" used "close door" sessions to secrete these abuses from Dr. Peterson and the general public.

374. Defendants' actions constitute extreme and outrageous conduct.

375. As a direct and proximate result of Sutter's outrageous conduct, Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial. Those damages include actual and prospective lost profits.

376. As a proximate cause of Sutter's outrageous conduct, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including

humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

377.  Plaintiff has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to  the  prosecution of this claim the  exact amount of which will be determined at the time of trial or by motion thereafter.

378.  At all times relevant hereto, Sutter has  advanced knowledge of the damages that would be caused by the conduct alleged herein,  and continued to  act with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the recurrence of the same.  The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## THIRTEENTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress -Sutter)

379.  Plaintiff incorporates by reference all the previous paragraphs of this complaint as if more fully set forth herein.

380.  In the alternative, if the  conduct alleged herein is determined <u>not</u> to be intentional, but instead, negligent, then Dr. Peterson is entitled to damages related to that negligence for the negligent infliction of his emotional distress.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## FOURTEENTH CAUSE OF ACTION

(Violation of Business and Professions Code Sections 17200 et. seq. - Sutter)

381.  Plaintiff  incorporates by reference all the allegations of this complaint as if more fully set forth herein.

382.  Plaintiff brings this claim in his individual capacity, and as provided in the Unfair Competition Act, on behalf of himself and  the  general public as it

pertains to Doctors of Color.

383. By engaging in the conduct described herein, Sutter has committed acts of unlawful, unfair, and fraudulent business practices within the meaning of the Unfair Competition Act resulting ongoing harm to Plaintiff.

384. The unlawful, unfair, and fraudulent business practices conducted by Sutter are ongoing and presents a threat and likelihood of continuing discrimination against Plaintiff and other minority doctors.

385. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover damages, reasonable attorneys' fees and costs from Sutter in an amount to be determined at trial.

386. As a direct and proximate result of Sutter's violation of California Business and Professions Code §17200,  Dr. Peterson has sustained and continues to suffer damages to his person, reputation, medical practice and endoscopy business substantially in excess of $100,000.00, the exact amount of which will be determined at the time of trial.  Those damages include actual and prospective lost profits.

387. As a proximate cause of Sutter's  violation of California Business and Professions Code §17200, Dr. Peterson has suffered and will continue to suffer physical and emotional injuries, including humiliation, depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety.  The exact amount of Dr. Peterson's damages will be determined at trial.

388. As a proximate cause of Sutter's violation of California Business and Professions Code §17200, Dr. Peterson has incurred and is entitled to reimbursement for the  legal expenses, costs  and attorney fees related to the prosecution of this claim the  exact amount of which will be determined at the time of trial or by motion thereafter.

389. At all times relevant hereto, Sutter had  advanced knowledge of the damages

that would be caused by the conduct alleged herein,  and continued to act with wanton reckless disregard,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein and mandating an award of punitive and/or exemplary  damages to prevent the recurrence of the same.  The exact amount of damages will be determined at the time of trial.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

<u>FIFTEENTH CAUSE OF ACTION</u>

(Violation of Unruh Civil Rights Act - Sutter)

390. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

391. During January 2017, the California Research Bureau (California Library) issued a report entitled "Demographics of Disciplinary Action by the Medical Board of California (2003-2013)" which found that the "MBC" discriminated against African American and Hispanic physicians in its disciplinary process. This report was concealed ("buried").

392. June 20, 2018 through the present, Dr. Peterson treated indigent and under served patients that were part of a  "protected class" based on their race, color, religion or creed, national origin or ancestry, sex (including gender, pregnancy, sexual orientation, and gender identity), age, physical or mental disability and/or veteran status.   Those individuals were MediCal patients.

393. From June 20, 2018 through the present,  Sutter's MediCal conspiracy discriminated against Dr. Peterson and his "protected class" patients by converting MediCal funds available for protected class patient care and segregating those patients by profitability of procedures.

394. In furtherance of its MediCal scheme, Sutter exaggerated, contrived and disseminated false disciplinary findings about Dr. Peterson  to healthcare administrators in order to impugn his professional reputation and  conceal the

unlawful conduct from the public.

395. As alleged above, Sutter's Medical conspiracy involved the  steering of "protected class" patients resulted in unlawful segregation of minority physicians (Dr. Peterson) and their protected class  patients  in violation of the Unruh Civil Rights Act.

396. At all times relevant hereto,  Sutter, knew that its conduct reduced MediCal funds available for "protected class patients" and  segregated  the same away from Dr. Peterson and other African American Hispanic physicians.  This resulted in the loss of otherwise available medical care for those protected class patients and was discriminatory.

397. Plaintiff was subjected to the conduct alleged herein,  including,  but not limited to,  harassment and/or discrimination on the basis of his race, age, as an advocate for "protected class" patients and a whistleblower  by Sutter. This conduct resulted prospective and continuing damage to Plaintiff.

398. Plaintiff is informed and believes, and therefore alleges that he was targeted for harassment and/or discrimination on the basis of his race, age, as an advocate for his "protected class" patients, and whistleblower by Defendants.

399. Plaintiff is informed and believes, and thereupon alleges, that it was the routine practice and/or defacto policy of Sutter to target, deny services and/or access to legitimate services promised and approved by Sutter because of his color, age, as an advocate for a "protected class",  and other minorities that challenged Sutter's scheme.

400. Sutter denied, aided or incited a denial of/discriminated or made a distinction that denied full an equal accommodations, advantages, privileges, and services to Plaintiff and his "protected class patients".

401. The acts or acts of omission of Sutter were a moving force causing Plaintiff's injuries and done because of the Plaintiff's Race.

402.  As a direct and proximate result of Sutter's discriminatory conduct, Dr. Peterson has sustained damages including, but not limited to,  lost profits from his medical practice and endoscopy business, loss of value of those businesses and personal injuries related thereto. The exact amount of those damages will be proven at the time of trial.

403.  As a proximate cause of Sutter's conduct, Dr. Peterson has suffered  physical and emotional injuries, including humiliation, distress,  depression, anguish, embarrassment, shock, pain, discomfort, fatigue and anxiety. The exact amount of Plaintiff's damages will be determined at trial.

404.  As a result of Sutter's  conduct,  Dr. Peterson has retained counsel to prosecute this action, and accordingly,  is entitled to reimbursement for reasonable fees and costs related thereto. The  exact amount of attorney fees and costs  will be determined at the time of trial or by motion thereafter.

405.  At all times relevant hereto, Sutter's  acted with reckless and wanton disregard for Dr. Peterson's personal and financial well being,  oppression, fraud, and/or malice, ratifying the wrongful conduct described herein  which mandates an award of punitive and/or exemplary  damages  the exact amount of which will be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

With respect to the preceding claims for relief, Plaintiff  prays for relief as set forth below:

1.  That Defendants be ordered to pay to Plaintiff  a sum in excess of $100,000.00, the exact amount of which will be proven at the time of trial;

2.  That Defendants be ordered to pay to Plaintiff  a sum, the exact amount of which will be proven at the time of trial, for Plaintiff's lost earnings, both past

and future;

3.   That Defendants be ordered to pay Plaintiff a sum in excess of $100,000.00, the exact amount of which will be proven at the time of trial, for Plaintiff's physical and mental pain, and for Plaintiff's personal property damage;

5.   That Plaintiffs be awarded exemplary damages, as permitted by law, as a result of Defendant willful and wanton misconduct in a sum in excess of $100,000.00;

6.   That Court enjoin these Defendants from prospective violations of state and federal law.

7.   That Plaintiffs be awarded the attorney's fees and court costs that Plaintiff incurred in the prosecution of this Complaint; and

8.   Pursuant to Business and Professions Code section 17203, that defendants, their successors, agents, representatives, employees and all persons acting in concert with defendants be enjoined from committing acts of unfair competition as alleged in this complaint;

9.   Pursuant to Business and Professions Code section 17203, that defendants make full restitution, or disgorgement of money or property unfairly obtained, to Plaintiff to restore all monies owing Plaintiff as a result of the violations of Business and Professions Code section 17200 et seq. alleged in complaint. This amount is in excess of $100,000.00 and will be established according to proof at trial;

10.  Pursuant to Business and Professions Code section 17206, that the Court assess a civil penalty in the amount proven at the time of trial against Defendants and each of them for each violation of Business and Professions Code section 17200 et seq., as proved at trial;

11.  Plaintiff recover its costs of suit and attorneys fees; and

12.  For an award of interest, including prejudgment interest, at the legal rate.

13.  Such other and further relief as the court may deem just and equitable in this

matter.

JURY DEMAND

Plaintiff demands a Jury.

Respectfully submitted this 14th  day of March 2022.

Mirch Law Firm LLP

By   /s/ Kevin Mirch
        Kevin Mirch

# CERTIFICATE OF SERVICE

I certify that I am an employee of MIRCH LAW FIRM LLP over the age of EIGHTEEN (18) and that on this date I personally mailed a true and correct copy of the foregoing:

SECOND AMENDED COMPLAINT

[]      by placing [ ] the original [ ] true copies thereof enclosed in sealed envelopes addressed as follows:

[ ]   **BY MAIL**

[ ]      I deposited such envelope in the mail at San Diego, California. The envelope was mailed with postage thereon fully prepaid.

[ ]      As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Diego, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]      **By Overnight Delivery:** I enclosed the foregoing documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons set forth above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier or I arranged for the courier to pick the package up at my location.

[ ]   **BY FACSIMILE TRANSMISSION:** I sent the foregoing document via Facsimile transmission to opposing counsel at his facsimile telephone number listed above.

[ ]   **BY ELECTRONIC MAIL TRANSMISSION:** I sent the foregoing document via electronic mail to opposing counsel at his email address listed below:

Michael Abraham
mabraham@bzbm.com
Stephen C, Steinberg
ssteinberg@bzbm.com
Ian Michael Ellis
 ian.ellis@doj.ca.gov
Jeffrey Vincent
Jeffrey.Vincent@doj.ca.gov

[X]   **BY ELECTRONIC FILING** I submitted the document through the Court's ECF filing system which served the following electronically.

Michael Abraham

SECOND AMENDED COMPLAINT                    -67-          Case No.: 3:21-cv-04908

mabraham@bzbm.com
Stephen C, Steinberg
ssteinberg@bzbm.com
Ian Michael Ellis
 ian.ellis@doj.ca.gov
Jeffrey Vincent
Jeffrey.Vincent@doj.ca.gov


 I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.

**DATED:** March 14, 2022


                       /s/ Kevin Mirch
                       Kevin Mirch