1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RALPH PETERSON,

Plaintiff,

v.

SUTTER MEDICAL FOUNDATION, et al.,

Defendants.

Case No. 3:21-cv-04908-WHO

**ORDER ON MOTIONS TO DISMISS AND STRIKE, AND SETTING CASE MANAGEMENT CONFERENCE**

Re: Dkt. Nos. 79, 80, 81, 82

Plaintiff Ralph Peterson alleges that various defendants associated with the Medical Board of California ("MBC") and Sutter network of healthcare providers took several unlawful acts against him, including subjecting him to a peer-review and disciplinary proceeding. The remaining defendants move to dismiss or strike the claims. The MBC board members are dismissed from the suit due to personal immunity doctrines, the suit may proceed against the Sutter-associated defendants and doctors who carried out the peer-review only on claims for First Amendment and due process violations, and the anti-SLAPP motion is granted.

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

**A.  The Parties**

Peterson is a medical doctor who lives and works in Oakland, California. Second Amended Complaint ("SAC") [Dkt. No. 78] ¶ 2. He has practiced medicine since 1983. *Id.* ¶ 57.

Three groups of defendants are relevant to the current motions. The "MBC Defendants" are Kristina Lawson, Howard Krauss, Randy Hawkins, Richard Fantozzi, Dev Gnanadev, Ronald Lewis, Laurie Rose Lubiano, Asif Mahmood, Richard Thorp, and Felix Yip. All were or are

members of the MBC, the state's medical licensure agency.  *Id.* ¶¶ 11–22.  The "Sutter Defendants" are Sutter Bay Medical Foundation ("Sutter Bay") and Sutter Bay Hospitals d/b/a Alta Bates Summit Medical Center ("Alta Bates").  *Id.* ¶¶ 3–5.  The "Doctor Defendants" are Neil Stollman, Rod Perry, and Philip Rich, physicians associated with the Sutter Defendants.  *See id.* ¶¶ 7–10.

From 1999 to 2009, Peterson had endoscopy privileges at Alta Bates.  *Id.* ¶ 58.

**B.  The MediCal Strategy**

Peterson alleges that Sutter employs something called the MediCal Strategy.  According to him, Sutter Bay "monopolizes and controls healthcare and medical discipline in Northern California."  *Id.* ¶ 30.  It does this in part, he alleges, through having 24 hospitals with tens of thousands of employees.  *Id.*  But, he claims, it also uses "unlawful strategies" to maintain its position.  *Id.* ¶ 31.  The MediCal Strategy, he alleges, has several parts.  First, the Sutter Defendants perform only "profitable procedures" while "steering" less profitable ones to county medical facilities.  *Id.* ¶ 34.  Then, it uses the revenue to pay kickbacks and acquire new medical practices.  *Id.* ¶ 35.  He alleges that it uses "medical discipline" to control referrals and acquisitions of medical practices by other practices to punish non-cooperating physicians.  *Id.* ¶ 32.  And, he says, it is able to do so by placing cooperating physicians and attorneys on the MBC and on the panels that review other physicians.  *Id.* ¶ 33.

One way by which the Sutter Defendants carry out this alleged strategy is through connections between the MBC and the law firm Hanson Bridgett LLP.  Hanson Bridgett allegedly represents Sutter in some matters and Lawson is an attorney there.  *See id.* ¶ 43.  Later, Hanson Bridgett would represent Sutter and other defendants in a state-court suit that Peterson filed.  *Id.* ¶ 101.

**C.  The Peer Review and MBC Proceeding**

In February 2009, Doctor Defendants Perry and Stollman "ordered" Peterson to "appear at Alta Bates without explanation."  *Id.* ¶ 63.  Despite Peterson's demands, they refused to grant him a "formal" meeting under the Health Care Quality Improvements Act about any allegations against him and refused to provide him a notice of the allegations.  *Id.* ¶ 64.  Ten days after that first

1    "order," Perry "ordered" Peterson to increase his "call coverage" or pay a fee to Stollman.  *Id.* ¶

2    65.  The next month, Peterson requested more call coverage from Stollman, but Stollman refused

3    unless he was paid an "unreasonable fee."  *Id.* ¶ 67.  The next day, Doctor Defendant Rich ordered

4    Peterson to resign his privileges at Alta Bates due to "failure to obtain additional call coverage."

5    *Id.* ¶ 68 (internal quotation marks omitted).

6        Peterson refused.  *Id.* ¶ 69.  He also refused to "steer" unprofitable indigent clients and

7    MediCal patients to the county medical facility.  *Id.*  He alleges that his privileges were summarily

8    suspended without a complaint, investigation, or hearing.  *Id.* ¶ 70.  He says that, five days later,

9    the privileges were "constructively terminated" because he was forced to resign under threat of a

10   peer review proceeding and MBC discipline.  *Id.*

11       Two days later, Sutter Bay transmitted a "form 805," also called an "adverse action

12   report," to a national database of medical practitioners and the MBC.  *Id.* ¶ 72.  In November

13   2009, the MBC opened an investigation into the allegations of the form 805.  *Id.* ¶ 76.

14       In 2010, a longtime patient of Peterson's (referred to in the complaint as "B.E.") filed a

15   complaint against Peterson with the MBC that he calls "unfounded."  *Id.* ¶ 87.  According to

16   Peterson, Sutter "encouraged and participated in the filing."  *Id.*  On his telling, the complaint

17   resulted from B.E. not attending a series of cardiologist appointments that Peterson arranged for

18   her.  *See id.* ¶¶ 81–82.  She then had an "ischemic attack" resulting from blockage in an artery for

19   which she went to Sutter Bay for care.  *Id.* ¶ 83.  Peterson alleges that Sutter "steered" B.E. to a

20   county facility in line with the MediCal Strategy and failed to treat her.  *Id.*  She later suffered a

21   stroke, treated by Sutter, and complaint about Peterson.  *Id.* ¶¶ 85–97.  MBC ultimately

22   determined that there were "no quality of care issues" in Peterson's treatment of B.E. in July 2013.

23   *Id.* ¶ 111.  But it did not disclose that to Peterson at the time.  *Id.*  A state-court suit brought by

24   B.E.'s conservator was also determined in Peterson's favor.  *Id.* ¶ 113.  In December 2013,

25   however, Peterson was told by the MBC that he did not maintain adequate records regarding B.E.

26   *Id.* ¶ 117.

27       In November 2012, Peterson filed an action in California state court against Perry and

28   Stollman for alleged misuse of the disciplinary process.  *Id.* ¶ 98.  The trial court and Court of

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   Appeal found against Peterson. *Id.* ¶ 133. In July 2013, Peterson (represented by counsel) agreed

2   to a settlement with the MBC under which he surrendered his medical privileges and license. *See*

3   *id.* ¶ 210.

4        Peterson alleges that, as a result of all this, he was repeatedly denied provider status at

5   various healthcare facilities and that others declined to partner with him to provide care, in part

6   because various defendants communicated that he had been disciplined. *See, e.g.*, *id.* ¶¶ 103, 110,

7   114, 136.

8        **D. Attorney General Investigations**

9        Starting in 2013, Sutter was investigated by the California Attorney General for, as the

10  complaint characterizes it, paying kickbacks to compliant physicians in line with the MediCal

11  Strategy. *Id.* ¶ 102. Peterson learned of this from a television program in December 2020. *Id.* ¶

12  109. Public reporting indicates that Sutter paid $30 million to settle a resulting lawsuit. *Id.* ¶ 148.

13  The Attorney General's office stated that Sutter had been giving physicians kickbacks. *Id.* ¶ 149.

14       The California Attorney General also at some point investigated the MBC for—again, as

15  the complaint puts it—discrimination against Black and Hispanic physicians. *Id.* ¶ 102.

16  **II.   PROCEDURAL BACKGROUND**

17       Peterson filed this suit in June 2021. *See* Dkt. No. 1. In February 2022, I granted in part

18  and denied in part motions to dismiss the complaint. *See* Dkt. No. 75. I dismissed the State of

19  California and the MBC itself from suit. I also dismissed all of the state-law claims against the

20  MBC Defendants with prejudice. Some other claims survived and some claims were dismissed

21  with leave to amend, as discussed in more detail in the body of this Order.

22       Now, the SAC includes the following claims against all defendants: (1) violation of the

23  First Amendment, (2) violation of the Due Process Clause, (3) what Peterson labels "protected

24  class" discrimination under federal law, and (4) failure to prevent discrimination and retaliation

25  under federal law. Peterson alleges the following claims only against the Sutter Defendants: (5)

26  federal antitrust interference, (6) violation of federal antitrust laws, (7) breach of contract, (8)

27  breach of the covenant of good faith and fair dealing, (9) negligence, (10) intentional interference

28  with current and prospective contractual relationships, (11) business disparagement, (12)

1    intentional infliction of emotional distress, (13) negligent infliction of emotional distress, (14)

2    violation of the Unfair Competition Law, and (15) violation of the Unruh Civil Rights Act.

3                                    **LEGAL STANDARD**

4    **I.    MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

5          A motion to dismiss filed pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1)

6    is a challenge to the court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "Federal

7    courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited

8    jurisdiction."  *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).  The party

9    invoking the jurisdiction of the federal court bears the burden of establishing that the court has the

10   requisite subject matter jurisdiction to grant the relief requested.  *Id.*

11         A challenge pursuant to Rule 12(b)(1) may be facial or factual.  *See White v. Lee*, 227 F.3d

12   1214, 1242 (9th Cir. 2000).  In a facial attack, the jurisdictional challenge is confined to the

13   allegations pled in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

14   The challenger asserts that the allegations in the complaint are insufficient "on their face" to

15   invoke federal jurisdiction.  *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th

16   Cir. 2004).  To resolve this challenge, the court assumes that the allegations in the complaint are

17   true and draws all reasonable inference in favor of the party opposing dismissal.  *See Wolfe*, 392

18   F.3d at 362.

19         "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by

20   themselves, would otherwise invoke federal jurisdiction."  *Safe Air*, 373 F.3d at 1039.  To resolve

21   this challenge, the court "need not presume the truthfulness of the plaintiff's allegations."  *Id.*

22   (citation omitted).  Instead, the court "may review evidence beyond the complaint without

23   converting the motion to dismiss into a motion for summary judgment."  *Id.* (citations omitted).

24   Once the moving party has made a factual challenge by offering affidavits or other evidence to

25   dispute the allegations in the complaint, the party opposing the motion must "present affidavits or

26   any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses

27   subject matter jurisdiction."  *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also*

28   *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

United States District Court
Northern District of California

5

United States District Court
Northern District of California

## II.      MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Under FRCP 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment."  *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## III.     ANTI-SLAPP MOTION

California Code of Civil Procedure § 425.16 "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation."  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). These lawsuits are also known as "Strategic Lawsuits Against Public Participation," or "SLAPPs."  *Makaeff v.*

1    *Trump Univ.*, LLC, 715 F.3d 254, 261 (9th Cir. 2013).  Under Section 425.16, a party may file an

2    "anti-SLAPP motion" to strike "a cause of action based on an act in furtherance of [the] right to

3    petition or free speech."  *Metabolife*, 264 F.3d at 840 (internal quotations omitted).

4           In ruling on an anti-SLAPP motion, a court engages in a two-step process.  *Equilon*

5    *Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002).  At step one, the court assesses

6    whether the moving party has made "a prima facie showing that the lawsuit arises from an act in

7    furtherance of its First Amendment right to free speech."  *Nat'l Abortion Federation v. Center for*

8    *Medical Progress*, Case No. 15-cv-03522-WHO, 2015 WL 5071977, at *3 (N.D. Cal. Aug. 27,

9    2015).  At the first step, the moving defendant bears the burden of identifying all allegations of

10   protected activity, and the claims for relief supported by them. When relief is sought based on

11   allegations of both protected and unprotected activity, the unprotected activity is disregarded at

12   this stage. I f the court determines that relief is sought based on allegations arising from activity

13   protected by the statute, the second step is reached.  *Baral v. Schnitt*, 1 Cal. 5th 376, 398 (2016).

14          If the moving party can establish step one, the burden shifts to the non-moving party which

15   must then show a reasonable probability that it will prevail on its claim.  *Makaeff*, 715 F.3d at 261.

16   "For a plaintiff to establish a probability of prevailing on a claim, he must satisfy a standard

17   comparable to that used on a motion for judgment as a matter of law."  *Price v. Stossel*, 620 F.3d

18   992, 1000 (9th Cir. 2010).  This standard requires that a claim be dismissed if the plaintiff presents

19   an insufficient legal basis, or if no reasonable jury would find in its favor.  *Metabolife*, 264 F.3d at

20   840; *see also Price*, 620 F.3d at 1000 (an anti-SLAPP motion will be granted if the plaintiff

21   "presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality

22   exists to support a judgment for the plaintiff") (internal quotations omitted).  But when the step-

23   two analysis depends on the defendant's assertion that a privilege applies, the defendant bears the

24   burden of establishing it.  *See Mandel v. Hafermann*, 503 F. Supp. 3d 946, 963–64 (N.D. Cal.

25   2020) (collecting authorities).

26                                        **DISCUSSION**

27   **I.    MBC DEFENDANTS' MOTION**

28          The MBC Defendants move to dismiss the claims against them because (1) they are

1   entitled to absolute personal immunity and (2) the claims are inadequately pleaded.  *See* Dkt. No.

2   79 ("MBC Mot.").[1]  I agree with them that they are entitled to prosecutorial or quasi-judicial

3   immunity (so there is no need to address the adequacy of the claims).

4       All of the claims against the MBC Defendants in the SAC are brought under 42 U.S.C. §

5   1983 for alleged violations of Peterson's federal constitutional or statutory rights.  *See* SAC ¶¶

6   165–269.  As a general matter, Section 1983 imposes tort-like liability on individuals acting under

7   color of state law who deprive others of federal constitutional or statutory rights.  The Supreme

8   Court has held that state officials are absolutely immune from suit "if they perform 'special

9   functions' which, because of their similarity to functions that would have been immune when

10  Congress enacted § 1983, deserve absolute protection from damages liability."  *Buckwalter v.*

11  *Nevada Bd. of Med. Examiners*, 678 F.3d 737, 740 (9th Cir. 2012*), as amended* (June 8, 2012)

12  (internal quotation marks and citations omitted).  Relevant here, "[t]he paradigmatic functions

13  giving rise to absolute immunity are those of judges and prosecutors."  *Id.*  The Supreme Court

14  and Ninth Circuit have extended these immunities to certain administrative proceedings and

15  regulatory agencies.  *See Butz v. Economou*, 438 U.S. 478,  515 (1978) (extending prosecutorial

16  immunity to agency enforcement action); *Mishler v. Clift*, 191 F.3d 998, 1007 (9th Cir. 1999)

17  (extending quasi-judicial immunity to state medical board).

18      "[I]mmunity decisions are based on the nature of the function performed, not the identity

19  of the actor who performed it."  *Milstein v. Cooley*, 257 F.3d 1004, 1008 (9th Cir. 2001) (internal

20  quotation marks and citations omitted).  Accordingly, the Ninth Circuit has "held that members of

21  state medical boards are functionally comparable to judges and thus entitled to absolute immunity

22  for their quasi-judicial acts."  *Buckwalter*, 678 F.3d at 740 (internal quotation marks and citation

23  omitted).  But, as with all such decisions, "immunity reaches only those actions that are judicial or

24  closely associated with the judicial process."  *Id.*  To make that determination, courts examine a

25  set of factors:

26  _____

27  [1] The MBC Defendants also argued that any claims for damages against them in their official
    capacities are barred by sovereign immunity.  MBC Mot. 8–9.  Peterson clarified in his Opposition

28  that the damages claims are against them in their individual capacities, *see* Dkt. No. 94 at 10, and
    the MBC Defendants accept that characterization in their Reply, *see* Dkt. No. 98 at 1 n.1.

United States District Court
Northern District of California

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985).  And prosecutorial immunity is based on the "same considerations."  *Imbler v. Pachtman*, 424 U.S. 409, 422–23 (1976).

All of the alleged acts for which Peterson seeks to impose liability are quasi-judicial or prosecutorial in nature.  To start, the MBC is a quasi-judicial organ; if its judicial and prosecutorial acts fall within the scope of the immunity, they are protected.  The Ninth Circuit has reached this conclusion about similar medical boards in other states.  *See Buckwalter*, 678 F.3d at 740; *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 925 (9th Cir. 2004).  Neither party has pointed to any feature of the MBC that would meaningfully distinguish it from these boards, so the relevant factors point in that direction.  And federal district courts in California have repeatedly found that the MBC can qualify; I am unaware of any decision to the contrary (and Peterson does not point to any).  *See Bonner v. Med. Bd. of California*, No. 2:17-CV-00445-KJM-DB, 2019 WL 3767480, at *7 (E.D. Cal. Aug. 9, 2019) (collecting cases).

As explained, however, the question is whether a particular act qualifies for immunity.  Here, the alleged acts do.  Peterson's First Amendment claim is based on the MBC's investigation into him, its evaluation of the complaint against him, the resulting official cases opened against him, and the public record created of the result of those cases.  *See* SAC ¶¶ 165–89.  The due process claim is based on the same things.  *See id.* ¶¶ 190–243.  The third claim is for, as Peterson puts it, "protected class discrimination" and appears to actually be predicated on multiple causes of action: the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, and unnamed "other related state and federal statutes, rules and regulations."  *Id.* ¶ 254.[2]  Those claims are a little more difficult to parse.  But, when it comes to liability against the MBC Defendants, the claim appears to be limited to several of them allegedly "failing to investigate and/or impose

---

[2] Of course, Peterson is required to actually state the legal basis of his claims, so I treat this one as being based on the Fourteenth Amendment and Title VII as no others are listed with specificity.

United States District Court
Northern District of California

discipline on physicians that they knew participated in the MediCal fraud." *Id.* ¶ 252.  And the failure-to-prevent-discrimination and -retaliation claim is likewise somewhat unclear but could either be read to be based on manipulation of the MBC disciplinary process resulting in discrimination against Peterson or on the "protected class" of his low-income patients.

As the Ninth Circuit has explained when evaluating claims against medical board members, "[t]here is no question that acts occurring during the disciplinary hearing process fall within the scope of absolute immunity." *Mishler*, 191 F.3d at 1008.  Similarly, "[f]iling charges and initiating" a disciplinary complaint are protected. *Id.*  Here, all of the alleged acts that harmed Peterson and would create liability are sufficiently closely associated with the judicial and prosecutorial process to be entitled to immunity.  Those acts, boiled down, are either carrying out investigations in response to complaints, carrying out adjudicatory disciplinary proceedings, creating the required public record of these proceedings, or (reading the complaint liberally) declining to carry out disciplinary proceedings.  None of these are merely "ministerial" or are separate from the quasi-judicial process.

Peterson's curt response to this argument is somewhat difficult to parse.  It appears that he first argues that "fraud" is not entitled to immunity, by which he appears to mean the MediCal Strategy itself.  *See* Dkt. No. 94 ("MBC Oppo.") 12.  There are several layers of problems.  To start, this is not a criminal prosecution or a citizen-suit in which Peterson is seeking to vindicate the public's interest in preventing these alleged activities.  This is a suit about specific alleged violations of rights; those violations are, no doubt, alleged to be related to the MediCal strategy, but one is not the other.  This aside, paying kickbacks and steering procedures—the MediCal Strategy—are not alleged to have been done by the MBC Defendants.  The MBC Defendants' role, Peterson alleges, was in using its official disciplinary process.  And even if Peterson's argument is that the MBC disciplinary process was tainted, the question for purposes of immunity is not whether they are alleged to have behaved wrongly in that disciplinary process—if it were, the immunity doctrines would mean nothing because the inquiry would always be on the merits.  The point of the immunity doctrines is, instead, that there are other avenues to ensure proper process in the MBC aside from private damages actions.  Finally, I note that this is not a case in

which Peterson has pointed to some discrete act, such as filing a false probable cause statement, that plausibly falls outside of the grant of immunity.  *See Kalina v. Fletcher*, 522 U.S. 118, 123 (1997).  Though one sentence of his opposition references "false declarations, fraudulent settlements, [and] fabricated investigations," it appears that is just a rhetorical way of discussing the allegations just addressed.  MBC Oppo. 13.

At the hearing, for the first time, Peterson's counsel offered a series of aspects of the MBC that, he argues, mean its members cannot receive immunity for their judicial or prosecutorial acts. Peterson first points to allegations by a former MBC member of preferential treatment, *see, e.g.*, SAC ¶ 161, but those are far from allegations, as Peterson characterized them at the hearing, of "harassment" or "intimidation" sufficient to allege that the MBC does not operate in a quasi-judicial way.  He also argued that there were insufficient safeguards and insulation in place, but it is undisputed that half of the MBC are non-physician members, that the attorney general must bring enforcement actions, and that the MBC's acts are subject to judicial review, so it is unclear what sort of additional structural safeguards Peterson believes are necessary to confer judicial immunity.  *See Bonner*, 2019 WL 3767480, at *7 (discussing these and other structural features of the MBC); *cf. Olsen*, 363 F.3d at 925 (discussing similar features of the Idaho medical board conferring immunity).

The motion to dismiss the claims against the MBC Defendants is GRANTED WITH PREJUDICE.  Any attempt to amend these claims would be futile.

## II.     SUTTER DEFENDANTS' MOTIONS

The Sutter Defendants move to dismiss all claims against them and move to strike the state-law claims under California's anti-SLAPP law.  They argue that (1) the federal civil rights claims fail because they were not acting under color of state law, (2) the due process claim fails because there is no cognizable loss of a property interest as Peterson voluntarily resigned his medical license, (3) most of the claims are time-barred, (4) the antitrust claims are not actionable, and (5) the state-law claims are protected by the litigation privilege.  *See* Dkt. No. 80 ("Sutter Mot."); Dkt. No. 82 ("Strike Mot.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1

**A.  Under Color of Law**

2    Section 1983 applies only to those who deprive others of federal rights "under color of

3 law."  The Sutter Defendants argue that they were not acting under color of law and, so, cannot be

4 liable.  *See id.* 9–12.

5    As an initial matter, Peterson argues that I cannot consider this argument under Federal

6 Rule of Civil Procedure 12(g)(2), which states that, "[e]xcept as provided in Rule 12(h)(2) or (3), a

7 party that makes a motion under this rule must not make another motion under this rule raising a

8 defense or objection that was available to the party but omitted from its earlier motion."  While it

9 is true that the Sutter Defendants failed to raise this argument in their first motion to dismiss (and

10 were able to do so) and this rule generally would bar them from raising it now, I will still consider

11 it.  If I did not, they would be able to file an answer and then immediately move for judgment on

12 the pleadings on this basis under Rule 12(c).  In these circumstances, the Ninth Circuit has

13 explained that district courts have discretion to address the issue to avoid this unnecessary burden

14 and delay, which I exercise here.  *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318–19 (9th

15 Cir. 2017).

16    Generally, private (that is, non-governmental) actors are not subject to Section 1983

17 liability.  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  But "[w]hat is fairly attributable

18 as State action is a matter of normative judgment, and the criteria lack rigid simplicity."  *Lee v.*

19 *Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (internal quotation marks and citation omitted).  There are

20 "at least four" different criteria that can establish state action by private actors.  *Kirtley*, 326 F.3d

21 at 1092.  The parties here argue over all of them, but there is no need to assess all four because I

22 conclude that Peterson has plausibly alleged—which is all he needs to do that this stage—that the

23 "joint action" doctrine applies.

24    "Under the joint action test, we consider whether the state has so far insinuated itself into a

25 position of interdependence with the private entity that it must be recognized as a joint participant

26 in the challenged activity.  This occurs when the state knowingly accepts the benefits derived from

27 unconstitutional behavior."  *Id.* at 1093.  Here, Peterson alleges that Sutter improperly influenced

28 the MBC such that the two worked in concert to help carry out the MediCal Strategy—in

1    particular that the MBC used its disciplinary powers as one of the ways that Sutter could enforce

2    compliance from physicians.  That is sufficient to connect Sutter to state action.

3          To resist this, the Sutter Defendants primarily rely on *Pinhas v. Summit Health, Ltd.*, 894

4    F.2d 1024 (9th Cir. 1989), *aff'd*, 500 U.S. 322 (1991).  There, the Ninth Circuit held that the

5    doctors who carried out peer-review proceedings were not joint actors with the state merely

6    because they did so under tight regulations from the state.  *Pinhas*, 894 F.2d at 1034.  The

7    allegations here, however, draw a much closer nexus between the state and the Sutter Defendants

8    because they allege that the MBC (a state agency) engaged in an illicit or improper strategy with

9    the private entities using its governmental powers.

10          **B.  Loss of Property Interest**

11          The Sutter Defendants argue that Peterson has not alleged that he was deprived of a

12    cognizable property interest and, so, has not adequately alleged a due-process violation.  Sutter

13    Mot. 12–13.[3]  I disagree.

14          The Due Process Clause of the Fourteenth Amendment provides that no state shall

15    "deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amdt.

16    14 § 1.  The alleged deprivation here, Peterson argues, is his "medical privileges and license to

17    practice medicine."  Sutter Oppo. 16.  To successfully plead a due-process claim, he would need to

18    adequately allege that (1) these qualified as a property interest protected by the Constitution, (2)

19    there was a deprivation by the government, and (3) there was a lack of required process.  *Ulrich v.*

20    *City & Cnty. of San Francisco*, 308 F.3d 968, 974 (9th Cir. 2002).  But there was no deprivation

21    here, the Sutter Defendants assert, because Peterson voluntarily resigned his medical privileges

22    and license while represented by counsel and after admitting the MBC could prove a prima facie

23    case against him.

24          I find there is a plausible deprivation of a property interest here.  Neither party has pointed

25    to any caselaw on this issue—that is, on whether a voluntary agreement to give up an interest in

26    these circumstances can count as a deprivation.  But even though Peterson's actions were

27

28    _____
[3] Peterson again argues that this argument should be ignored under Rule 12(g)(2).  Sutter Oppo.
16.  For the reasons stated earlier, I will consider it now.  *See supra* Section II.A.

United States District Court
Northern District of California

apparently voluntary, he alleges that they were not knowing.   When the MBC was carrying out its investigation and adjudication, he claims, it did so with improper motives that were concealed from him.  In other areas of law, including those involving constitutional rights and property interests, important relinquishments of rights must often be done knowingly.  *See, e.g.*, *Oum v. Lewis*, 166 F.3d 343 (9th Cir. 1998) (*Miranda* rights); *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620 (9th Cir. 2006) (agreement to accept voluntary departure in removal proceedings); *Colaco v. Asic Advantage Simplified Emp. Pension Plan*, No. 5:13-CV-00972-PSG, 2015 WL 5655465, at *6 (N.D. Cal. Sept. 24, 2015) (ERISA waivers).  It would be a strange outcome for the government to be able to conceal facts during an investigation, for the subject of that investigation choosing to give up a property interest due to that unknowingly tainted investigation, and for that subject to then be barred from challenging it because he did so unknowingly but voluntarily.  In the absence of any authority from the Sutter Defendants, I will not so hold today.  This issue may be reexamined with more complete briefing.

### C.  Statute of Limitations

I previously found that the discrimination-based federal claims, the antitrust claims, and some of the state-law claims were time-barred but that the First Amendment, due process, and several state law claims were not.  *Peterson v. Sutter Med. Found.*, No. 3:21-CV-04908-WHO, 2022 WL 316677, at *13–*14 (N.D. Cal. Feb. 2, 2022) ("Prior Order").  But I granted leave to amend so that Peterson could add allegations about whether accrual was delayed or the statute of limitations tolled.  *See id.*

#### i.      Discrimination Claims

I previously held that the two federal discrimination claims and the Unruh Act were time-barred on the face of the complaint and not saved by the discovery rule or a tolling doctrine.  As I explained, "the events that make up the core of this case occurred from 2009 to 2013" and the relevant statute of limitations was two years from "when the plaintiff knows, or should know, of the injury which is the basis of the cause of action."  *Id.*, at *11 (internal quotation marks and citations omitted); *see also id.*, at *14 (addressing Unruh Act claim).  But I gave Peterson leave to amend.

United States District Court
Northern District of California

14

1    Now, Peterson relies on, as best I understand it, the continuing violation doctrine.  Though

2    he does not use that term and he cites no cases—about that doctrine or any other—that is the gist

3    of his argument, so I address it under that rubric.  The continuing violation doctrine holds that "a

4    systematic policy of discrimination is actionable even if some or all of the events evidencing its

5    inception occurred prior to the limitations period."  *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918,

6    924 (9th Cir. 1982), *as modified on denial of reh'g*, No. 79-4110, 1982 WL 308873 (9th Cir. June

7    11, 1982).  But "continuing impact from past violations is not actionable.  Continuing violations

8    are."  *Id.* (internal quotation marks and citation omitted).  The Ninth Circuit has "recognized two

9    applications of the continuing violations doctrine: first, to a series of related acts, one or more of

10   which falls within the limitations period, and second, to the maintenance of a discriminatory

11   system both before and during the limitations period."  *Bird v. Dep't of Hum. Servs.*, 935 F.3d

12   738, 746 (9th Cir. 2019) (internal quotation marks, alteration, and citation omitted).

13   Peterson has not alleged any discriminatory violations against him that happened within

14   the limitations period.  First, he relies on the fact that the public record of his disciplinary

15   investigation remained up on the MBC website.  Sutter Oppo. 17–18.  That is best conceptualized

16   not as a "new violation" but instead as the "continuing impact" from the past violation of the

17   disciplinary proceeding, which is insufficient.  *Williams*, 665 F.2d at 924.  Next, he relies on

18   various "warnings" given to other healthcare companies and prospective physician partners about

19   the disciplinary problems.  Sutter Oppo. 17–18.  The paragraphs of the complaint that mention

20   these "warnings" discuss them only in the most conclusory terms.  To plead an act within the

21   limitations period, he needed to allege what it was.  Here, though, he merely states that

22   unidentified warnings from unidentified individuals occurred "though 2021," which is insufficient.

23   *See* SAC ¶ 171.  And it is, in any event, difficult to see how true warnings about the existence of a

24   disciplinary proceeding (even if the proceeding itself was improper) are actionable as

25   discriminatory.  Last, Peterson relies on the alleged continued existence of the MediCal strategy

26   itself.  Sutter Oppo. 17–18.  But the harms he is suing over occurred (allegedly) as a result of the

27   MediCal strategy culminating in him losing his license.  He has not identified any invasion of a

28   legally protected interest *of his* inside the limitations period.

United States District Court
Northern District of California

15

ii.    **Antitrust Claims**

I previously dismissed with leave to amend the antitrust claims as time-barred against the Sutter Defendants.  *See* Prior Order, at *13 ("As discussed in section I.C.iii.2 above concerning the MBC Defendants, the federal antitrust claims are subject to a somewhat different analysis based on antitrust-specific accrual rules.  And for the reasons explained there, the antitrust claims against the Sutter Defendants are also dismissed as time-barred.").  The Sutter Defendants again move to dismiss.  Sutter Mot. 15–17.  Peterson's only response is, oddly, that those claims "survived the first motion to dismiss," Sutter Oppo. 19, which is not accurate.  Peterson makes no substantive argument that he has adequately pleaded delayed discovery or tolling this time around.

### D.    State-Law Claims

The Sutter Defendants move to strike the state-law claims under the anti-SLAPP law; they also move to dismiss those claims under Rule 12(b)(6) for overlapping reasons.  *See generally* Strike Mot.; *see also* Sutter Mot. 21–25.[4]

i.    **Timeliness**

As an initial matter, Peterson argues that the anti-SLAPP motion should be denied as untimely because California law provides that an anti-SLAPP motion "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper."  Cal. Civ. P. Code § 425.16(f).  But the Ninth Circuit has held that this requirement does not apply in federal court and, instead, the timelines for bringing motions under the Federal Rules of Civil Procedure govern.  *Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016).

ii.    **Prong One**

As noted, at prong one of the anti-SLAPP analysis, the defendants must make a prima facie showing that the speech is protected.  Here, the speech and communications that form the basis of the state-law claims are protected.

First, most of the underlying speech is protected by California-law privileges.  When

---

[4] The Sutter Defendants also argue that some of the state-law claims are time-barred.  There is no need to address that argument.

16

statements are made in connection with official proceedings under the state-law immunity or when they are shielded by the litigation privilege, they are protected speech for anti-SLAPP purposes. *See* Cal. Civ. P. Code § 425.16(e); *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999). California Civil Code § 47(b) privileges any "publication or broadcast" made, as relevant here, "[i]n any . . . judicial proceeding [or] in any other official proceeding authorized by law." The privilege is to be given "broad application." *Moore v. Conliffe*, 7 Cal. 4th 634, 641 (1994) (internal quotation marks and citation omitted). It applies to "any communication" and to "all torts except malicious prosecution." *Id.* And it applies to those communications even if they are outside of the proceedings so long as they are made "to achieve the objects of the litigation." *Id.* California Business and Professions Code § 805 requires, as a general matter, reporting physician disciplinary action to the MBC. When a person's speech is made "in connection with issues considered in such proceedings—such as criticism of a doctor's competence supplied to a body reviewing his or her hospital privileges," those statements are "protected activity under the anti-SLAPP law" and cannot be subject to liability. *Bonni v. St. Joseph Health Sys.*, 11 Cal. 5th 995, 1016 (2021).

Most of the statements for which Peterson would impose liability on the Sutter Defendants are shielded by one or both of these protections. To the extent liability would attach for the peer review proceeding itself, or any statement made in the course of it, that is protected from a later civil suit. *See Moore*, 7 Cal. 4th at 641. So too with the reporting, required by law, of the discipline to the MBC. *Bonni*, 11 Cal. 5th at 1016. It appears that Peterson also takes issue with filings made in his suit against Stollman and Perry. But those are communications made in the course of litigation; if they were indeed false, the remedy was to be sought in that litigation or through perjury charges, not through this federal suit. Cal. Civ. Code. § 47(b). And Peterson also alleges that the Sutter Defendants "encouraged" the filing of the complaint against him with the MBC but the litigation privilege "applies to a communication intended to prompt an administrative agency charged with enforcing the law to investigate or remedy a wrongdoing." *Hagberg v. California Fed. Bank*, 32 Cal. 4th 350, 362 (2004).

To resist this, Peterson argues that his state-law claims do not seek to impose liability for

United States District Court
Northern District of California

1    the communications but instead that "the core of the case is Sutter's MediCal fraud scheme which

2    includes the kickbacks, up-coding, diversion of profitable procedure to Sutter facilities which

3    reduces the pool of Medical funds available for the indigent population served by Dr. Peterson,

4    and the targeting of noncompliant physicians."  Sutter Oppo. 24.  And *those* acts, he argues, are

5    not "communications" protected by the privilege.  *Id.*  As I explained in an earlier section of this

6    Order, however, although the MediCal Strategy allegedly supplied a motive, *liability* would attach

7    for the communications.  Peterson's state-law claims all allege that the harm to him is due to the

8    communications.  While the federal antitrust claims do challenge other behavior, the state-law

9    claims do not.

10       The alleged defamatory publication of falsehoods is not protected by these same principles,

11   but the speech on which the claims are based is nonetheless still protected under prong one.

12   Peterson, again, alleges that the Sutter Defendants falsely told other healthcare-related entities and

13   individuals about his disciplinary records.  Those communications were not made as part of

14   litigation or to further its objects—indeed the official proceedings had long since finished—so

15   they cannot be protected by that privilege.  Nor are they protected by the medical-reporting

16   immunity because, again, the reports had already been issued and the defendants were not

17   communicating information *to the MBC*.  *Bonni*, 11 Cal. 5th at 1016.  These statements are,

18   however, still protected speech for purposes of prong one because they satisfy the catchall prong

19   of the anti-SLAPP statute, which protects "conduct in furtherance of the exercise of the

20   constitutional right of petition or the constitutional right of free speech in connection with a public

21   issue or an issue of public interest."  Cal. Civ. P. Code § 425.16(e)(4).  These statements qualify

22   under this provision because the basis of these statements are "the qualifications, competence, and

23   professional ethics of a licensed physician," which "implicate[]" the public interest for anti-

24   SLAPP purposes.  *Yang v. Tenet Healthcare Inc.*, 48 Cal. App. 5th 939, 947 (2020).

25       Peterson replies that the anti-SLAPP statute does not protect the speech here because it

26   does not apply to criminal conduct that is not protected by the First Amendment.  *Flatley v.*

27   *Mauro*, 39 Cal. 4th 299, 328 (2006).  As I have explained, however, Peterson is not bringing some

28   sort of citizen suit against the kickbacks.  These state-law claims are about discrete

1   communications by the Sutter Defendants.  Peterson has made no colorable argument that those

2   statements are themselves criminal.

3                 iii.        Prong Two

4        At the second prong, I ask whether Peterson has shown a sufficient probability of

5   prevailing on the merits as a matter of law.  *Mindys Cosms., Inc. v. Dakar*, 611 F.3d 590, 599 (9th

6   Cir. 2010).

7        When it comes to the statements and communications shielded by state-law privileges or

8   immunities, Peterson cannot show any probability on the merits.  For the reasons above and

9   incorporated here, those statements cannot create liability as a matter of law because the privileges

10  discussed are an absolute bar to liability.  *See Moore*, 7 Cal. 4th at 641; *Bonni*, 11 Cal. 5th at

11  1016.[5]

12       Peterson has also not shown the "minimal merit," *Mindys*, 611 F.3d at 599, needed when it

13  comes to the other statements—the alleged defamation to third parties that survived the motion to

14  dismiss.  As noted, I disagree with the Sutter Defendants that these statements fall within the

15  privileges.  The Sutter Defendants offer two reasons those claims are meritless separate from the

16  other claims: that (1) the communications to others about Peterson are true and (2) there are no

17  allegations supporting a finding of actual malice.  *See* Strike Mot. 12–15.  Peterson's opposition

18  does not respond to these arguments at all, despite addressing other ones.  *See* Dkt. No. 93 ("Strike

19  Oppo.").  The burden was his to show that the claims had merit.  *Mindys*, 611 F.3d at 599.  And, in

20  the absence of any argument to the contrary, the Sutter Defendants' argument that the statements

21  are substantially true and, therefore, cannot result in defamation or trade libel liability appears

22  correct.  *See, e.g.*, *Campanelli v. Regents of Univ. of California*, 44 Cal. App. 4th 572, 582 (1996)

23  (holding that substantial truth is an absolute defense to defamation liability).  Accordingly,

24  Peterson has failed to show any probability of success on these claims because they would fail as a

25  matter of law.

26

27

28  [5] This would also require dismissal under Rule 12(b)(6) because the Sutter Defendants make the
    same argument in that motion.

United States District Court
Northern District of California

1    **E.  Sutter Defendants Conclusion**

2         The First Amendment and due process claims again survive the motion to dismiss.  The

3    federal discrimination claims, Unruh Act claim, and antitrust claims are dismissed as time-barred.

4    Because this is the second time I have dismissed them on this basis and is the third version of the

5    complaint—and because Peterson has not identified any other allegations he could plead to make

6    them timely—dismissal is without leave to amend.  The state-law claims are struck under the anti-

7    SLAPP law.

8    **III.     DOCTOR DEFENDANTS' MOTION**

9         Many of the grounds for dismissal that the Doctor Defendants put forward mirror those the

10   Sutter Defendants put forward.  *Compare* Dkt. No. 81 ("Doctor Mot."), *with* Sutter Mot.  The

11   plaintiffs' counterarguments do not raise any different issues.  *Compare* Dkt. No. 96 ("Doctor

12   Oppo."), *with* Sutter Oppo.  Accordingly, I reach the same conclusion about those issues.  *See*

13   *supra* Section II.  I find that the federal discrimination claims are time-barred.  I reject the

14   argument that the federal civil rights claims must fail because the defendants were not acting

15   under color of state law.[6]  And I reject the argument, at least for now, that Peterson has not

16   pleaded a deprivation of property for due process purposes.

17        The Doctor Defendants also raise several different issues than the Sutter Defendants.  I

18   address those here.

19        **A.  Statute of Limitations on First Amendment and Due Process Claims**

20        The Doctor Defendants argue that the First Amendment and due process claims are time-

21   barred.  I rejected this argument the last time around and denied these defendants' motion to

22   dismiss those claims.  *See* Prior Order, at *12.  That could end the analysis.

23        To get around this, the Doctor Defendants now argue that "[t]he SAC fails to allege any

24   specific facts concerning any of the Doctor Defendants that Plaintiff allegedly learned in 2019, but

25   did not know and could not reasonably have discovered earlier."  Doctor Mot. 8 (emphasis in

26   original).  The Doctor Defendants appear to believe they get this second bite at the apple because,

27   _____

28   [6] The Doctor Defendants are alleged to have worked in concert with the Sutter Defendants and
     MBC, so the joint-action analysis applies equally to them as to the Sutter Defendants.

United States District Court
Northern District of California

1    last time around, they *and* the Sutter Defendants filed a consolidated motion to dismiss.  They are

2    wrong.

3              But even if they were not, I reject their argument.  As I explained last time,

4              Peterson has plausibly alleged that the discovery rule saves the First Amendment and due
         process claims. He alleges that the Sutter Defendants maintained a secret policy of
5        providing kickbacks to compliant doctors and punishing uncompliant ones. *See* Sutter
         Oppo. 11. He has adequately pleaded that he could not reasonably have discovered that
6        information until it was made public in November 2019, when the previously confidential
         California Attorney General investigation was publicized. *See Lukovsky*, 535 F.3d at 1048
7        (holding that a claim accrues when the plaintiff knows or has reason to know the
         "underlying facts" and the "cause" of the injury); *Bibeau v. Pac. Nw. Rsch. Found. Inc.*,
8        188 F.3d 1105, 1108 (9th Cir. 1999), *opinion amended on denial of reh'g*, 208 F.3d 831
         (9th Cir. 2000) ("[T]he statute only begins to run once a plaintiff has knowledge of the
9        'critical facts' of his injury, which are that he has been hurt and who has inflicted the
         injury." (emphasis added)). Because of the nature of the alleged violation here, "what
10       [Peterson] knew and when [he] knew it are questions of fact." *Bibeau*, 188 F.3d at 1108.

11   Prior Order, *12.  And because the Doctor Defendants' alleged First Amendment and due process

12   violations are based on these same facts, it is plausible the claims against them are similarly not

13   time-barred.  Said another way, it is not clear from the face of the complaint that the discovery rule

14   does not save these claims because the Doctor Defendants' alleged violations are predicated on the

15   same alleged secret conspiracy.

16

17             **B.   Retaliatory Intent**

18             Next, the Doctor Defendants argue that the First Amendment claim fails because Peterson

19   does not "allege facts showing that the Doctor Defendants were motivated to participate in the

20   peer review proceeding because of Plaintiff's purported exercising of his First Amendment

21   rights."  Doctor Mot. 15.[7]

22             To plead a First Amendment retaliation claim, a plaintiff must adequately allege that "(1)

23   he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a

24   person of ordinary firmness from continuing to engage in the protected activity and (3) the

25   protected activity was a substantial or motivating factor in the defendant's conduct."  *Capp v.*

26   *Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (internal quotation marks and citations

27

28   ---
     [7] Peterson raises his 12(g)(2) objection to this; I again reject it.  *See supra* Section II.A.

United States District Court
Northern District of California

1   omitted).

2        Here, Peterson argues that the constitutionally protected activity was "advocating for

3   patients [sic] rights and refusing to accept kickbacks or participate in the Medical [sic] scheme."

4   Doctor Oppo. 21.  No party challenges whether this can amount to constitutionally protected

5   activity, so I do not address that issue.  Instead, the Doctor Defendants argue that there is no

6   allegation showing that their actions were *motivated* by Peterson engaging in this activity.  I

7   disagree.  Peterson pleads that the peer-review process conducted by the Doctor Defendants was

8   motivated by Peterson refusing to participate in the MediCal Strategy, as they "punished" other

9   non-cooperating physicians.  *See, e.g.*, SAC ¶¶ 169, 171, 179.  Assuming for the sake of argument

10  that his refusal to participate was constitutionally protected speech, he has drawn a plausible link

11  between it and the Doctor Defendants' motivation for reviewing him.

12        **C.  Doctor Defendants' Conclusion**

13        The First Amendment and due process claims again survive the motion to dismiss.  The

14  federal discrimination claims are dismissed as time-barred.  Because this is the second time I have

15  dismissed them on this basis and the third version of the complaint—and because Peterson has not

16  identified any other allegations he could plead to make them timely—dismissal is without leave to

17  amend.

18                                    **CONCLUSION**

19        The MBC Defendants' motion to dismiss is GRANTED WITH PREJUDICE and they are

20  DISMISSED from the suit.  The Sutter Defendants' motion to dismiss is DENIED on the First

21  Amendment and due process claims and GRANTED WITHOUT LEAVE TO AMEND on the

22  federal discrimination, Unruh Act, and antitrust claims.  The Sutter Defendants' anti-SLAPP

23  motion to strike the state-law claims is GRANTED.  The Doctor Defendants' motion to dismiss is

24  DENIED on the First Amendment and due process claims and GRANTED WITHOUT LEAVE

25  TO AMEND on the federal discrimination claims.

26        The Sutter Defendants and Doctor Defendants shall answer the remaining claims within 14

27  days.

28        A Case Management Conference is set for September 13, 2022, at 2:00 p.m.  The Joint

United States District Court
Northern District of California

1   Case Management Statement is due September 6, 2022.

2          **IT IS SO ORDERED.**

3   Dated: July 20, 2022



William H. Orrick
United States District Judge