1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    RALPH PETERSON,                          Case No.  3:21-cv-04908-WHO

8                  Plaintiff,
                                              **ORDER GRANTING MOTION FOR**
9            v.                               **SUMMARY JUDGMENT**

10   SUTTER MEDICAL FOUNDATION, et            Re: Dkt. No. 149
     al.,
11                Defendants.

12

13          Plaintiff Ralph Peterson filed this case against the defendants—Sutter Bay Medical

14   Foundation and Sutter Bay Hospitals, as well as the three individual physicians Neil Stollman,

15   Rod Perry, and Philip Rich—asserting various claims arising out of his resignation from

16   employment with Sutter in April 2009.  After several rounds of motions to dismiss, his remaining

17   claims are for First Amendment and Due Process violations related to the disciplinary proceedings

18   carried out by the defendants before Peterson's resignation, as well as allegations concerning

19   kickbacks that the defendants accepted but Peterson refused to accept.  The defendants filed the

20   pending motion for summary judgment on both of Peterson's remaining claims.  Because there is

21   no genuine dispute of fact contesting that the statute of limitations bars the claims, the defendants

22   did not act under state law, and there was no kickback "scheme" related to Peterson's employment

23   or resignation, the claims fail, and the motion is GRANTED.

24                                    **BACKGROUND**

25   **I.     FACTUAL BACKGROUND**

26          The following facts are undisputed.

27          Peterson was a medical doctor who practiced gastroenterology and worked for Summit

28   Hospital, an affiliate of Sutter Bay Medical Foundation and Sutter Bay Hospitals, from about 1999

United States District Court
Northern District of California

United States District Court
Northern District of California

to 2009.  Declaration of Ralph Peterson ("Peterson Decl.") [Dkt. No. 154] ¶¶ 4-5, 8.  As of 2009, Peterson had "Hospital Consultation" privileges at Sutter, which are similar to outpatient privileges, and well as privileges to perform specific procedures like colonoscopies.  *Id.* ¶ 5; Deposition of Ralph Peterson ("Peterson Depo.") [Dkt. No. 149-28 Exs. F, G; Dkt. No. 154-6] 50:15-51:9; ("Application") [Dkt. No. 149-2, Dkt. No. 154-1].  The agreement provided that the "exercise of all privileges may occur only in the context of prevailing bylaws, rules and regulations and hospital policies."  Application.  Peterson received a copy of those rules and regulations, Peterson Depo. 65:20-23, which provided in part that he was required to find another physician to provide "coverage" for any of his patients that were admitted in-patient, *see* [Dkt. No. 149-20] at -306.

In early February 2009, Peterson met with Perry, then Chair of the Department of Medicine, and Stollman, then Chief of Gastroenterology, to discuss concerns about certain patients and practices, including withdrawal times for sedation procedures, whether Peterson should have anesthesiologists during certain procedures, and whether he had sufficient "coverage" for his patients.  *See* Peterson Depo. 83:15-25 (confirming they spoke about patients, withdrawal times, and coverage); [Dkt. Nos. 149-13, 149-18] (letter confirming topics discussed).

On March 2, 2009, Perry sent Peterson a letter about their February meeting with Stollman, noting that failure to meet the coverage requirements "constitutes grounds for corrective action" include that Peterson's staff "membership and clinical privileges may be in jeopardy" if he failed to meet his coverage obligations by the end of March.  [Dkt. Nos. 149-13, 149-18]; *see also* Peterson Depo. 82:9-25.

On March 25, 2009, Peterson sent Stollman a letter asking if Stollman's medical group could help provide coverage for Peterson's patients.  [Dkt. No. 149-19].

On March 15, 24, and 25, 2009, three of Peterson's patients were admitted to Summit.  Peterson Decl. ¶¶ 15-16; *see also* [Dkt. No. 149-3].  Peterson did not provide care for these patients and did not have coverage in place for another doctor to provide care.  Peterson Decl. ¶¶ 16-18; [Dkt. No. 149-3].

On March 26, 2009, Rich, then Medical Staff President, sent Peterson a letter outlining

1    those three instances, noting it was "intolerable" that Peterson failed to provide care or coverage

2    for the patients, and requesting that Peterson stipulate to suspending his clinical privileges until he

3    found coverage.  [Dkt. No. 149-3].

4          On March 30, 2009, Peterson sent a letter to Rich acknowledging his prior conversations

5    with and letter from Perry, discussing the three patient incidents, contesting the portrayal of

6    Peterson as (in Peterson's words) "a physician who does not care for his patient, neglects them and

7    readily abandons them," and declaring he intended to continue scheduling patients at Summit.

8    [Dkt. No. 149-4].

9          On April 1, 2009, Rich sent a letter to Peterson, suspending his privileges due to lack of

10   coverage and Peterson's "unwillingness or inability to understand the problems at issue and your

11   responsibilities toward your patients."  [Dkt. No. 149-5].  The letter stated that the suspension

12   would be considered by the hospital's Medical Executive Committee on April 6, 2009, that

13   Peterson's presence was "required" at the meeting, and that Peterson would have an opportunity to

14   make a statement and provide written materials to the committee if he wanted.  *Id.*

15         On April 6, 2009, Peterson sent Rich a letter stating that he resigned at 5:30 p.m. "due to

16   inability to secure coverage."  [Dkt. No. 149-6].

17         On April 8, 2009, Rich sent Peterson a letter informing him that a report was filed with the

18   Medical Board of California ("MBC") "as required by law" due to "the circumstances surrounding

19   [his] resignation."  [Dkt. No. 149-7].  Rich attached the report to the letter, which showed a check

20   mark next to the box, "Following notice of an impending investigation based on information

21   indicating medical disciplinary cause or reason . . . Licentiate resigned from staff."  *Id.*

22         On May 28, 2009, Peterson sent a letter through counsel to Perry, explaining the events

23   from March and stating that the hospital's conduct undermined Peterson's reputation, caused him

24   financial damages due to inability to practice, and noting that he would have claims of tortious

25   interference with economic gain as well as federal constitutional claims against the defendants.

26   [Dkt. No. 149-22].  Perry responded through counsel, noting that the report to the MBC was

27   required by state law, stating that the defendants would respond to a lawsuit from Perry by filing

28   an anti-Strategic Lawsuit Against Public Participation ("SLAPP") motion, and denying any basis

1    for damages.  [Dkt. No. 149-23].  Peterson's counsel responded, noting Peterson "believes he was

2    set up in an elaborate conspiracy to terminate his hospital privileges" and that he has "a myriad of

3    . . . federal and state claims that he may bring."  [Dkt. No. 149-24].

4         Subsequently, in November 2012, Peterson sued the individual doctor defendants for

5    claims related to the end of his employment at Sutter and the disciplinary proceedings, including

6    extensive allegations that the doctor defendants steered low-income patients of color away from

7    Sutter in favor of wealthier white patients, which benefitted the Sutter entities.  ("2012 Compl.")

8    [Dkt. No. 149-28] Ex. 35; Peterson Depo. 180:12-182:21.  The defendants filed an anti-SLAPP

9    motion to strike, and in response Peterson submitted an opposition and declaration that stated he

10   cared for underserved, low income, and African American patients using Medi-Cal insurance; the

11   defendants did not want these patients because they provided less compensation for the hospital;

12   and the defendants unfairly subjected him to "peer review" and then "remov[ed]" him from the

13   hospital so that the hospital would not have to serve those patients.[1]  [Dkt. No. 149-28] Ex. 34.

14        In November 2019, a previously sealed federal court lawsuit against Sutter was made

15   publicly available.  [Dkt. No. 154-32]; *see also* [Dkt. Nos. 154-22, -23].  That whistleblower

16   complaint was initially filed on September 10, 2014, and brought causes of action under the

17   federal and California state False Claims Acts, alleging that Sutter unlawfully paid kickbacks to

18   doctors and entities that referred patients to Sutter.  ("Qui Tam Compl."[2]) [Dkt. No. 154-20].  It

19   alleged in part that Sutter implemented a "scheme" in which it paid or provided to physicians

20   "unlawful kickbacks, excessive compensation, free employees and other illegal incentives" for

21   referring patients to Sutter.  *See, e.g.*, *id.* ¶ 85.  Subsequent media coverage indicated that the case

22   settled.  *See* [Dkt. Nos. 154-22, -23].

23        On December 13, 2020, the news program "60 Minutes" aired an episode discussing a

24   lawsuit filed by the California Attorney General against Sutter, in which the state declared that

25

26   [1] The defendants state in their motion that the anti-SLAPP motion to strike was granted and the
     case was dismissed, Mot. 10:8, but they point to no supporting evidence nor do they request
27   judicial notice of relevant court documents.  Peterson does not mention the dismissal of that case.

28   [2] Because the parties refer to this as the "Qui Tam Case" in their papers, I use that language in this
     Order.

United States District Court
Northern District of California

1    Sutter merged with and acquired many hospitals, physicians, and clinics to reduce competition,

2    raise prices, and "use its market power to dominate, to dictate" and then to "jack[] up prices."

3    [Dkt. No. 154-24].  Peterson watched this program.  Peterson Decl. ¶ 23.

4    **II.    PROCEDURAL BACKGROUND**

5            Peterson filed this case on June 26, 2021.  [Dkt. No. 1].  I granted in part and denied in part

6    the first round of motions to dismiss, dismissing some defendants with prejudice.  [Dkt. No. 74].  I

7    subsequently granted in part and denied in part another round of motions to dismiss, dismissing

8    with prejudice all but the remaining defendants here, and dismissing all claims against these

9    defendants except for Peterson's First Amendment and Due Process claims.  [Dkt. No. 102].  That

10   order also granted the defendants' anti-SLAPP motion to strike.  *Id.*

11           The defendants filed their answers.  ("Sutter Answer") [Dkt. No. 105]; ("Perry Stollman

12   Answer") [Dkt. No. 106]; ("Rich Answer") [Dkt. No. 107].  Discovery ensued.

13           Now the defendants move for summary judgment on Peterson's two remaining claims.

14   ("Mot.") [Dkt. No. 149].  Peterson opposed.  ("Oppo.") [Dkt. No. 153].  The defendants replied.

15   ("Repl.") [Dkt. No. 161].  I held a hearing at which counsel for both parties appeared.

16                                         **LEGAL STANDARD**

17           Summary judgment on a claim or defense is appropriate "if the movant shows that there is

18   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

19   law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must

20   show the absence of a genuine issue of material fact with respect to an essential element of the

21   non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

22   persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

23   made this showing, the burden then shifts to the party opposing summary judgment to identify

24   "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary

25   judgment must then present affirmative evidence from which a jury could return a verdict in that

26   party's favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

27           On summary judgment, the Court draws all reasonable factual inferences in favor of the

28   non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

United States District Court
Northern District of California

5

1   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

2   facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony

3   does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See*

4   *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.    STATUTE OF LIMITATIONS**

7       The defendants argue that both remaining claims are barred by the statute of limitations

8   and seek summary judgment in their favor for that reason alone. *See* Mot. 14:7-16:24. Peterson

9   opposes, arguing that the delayed discovery doctrine, continuing violations doctrine, and equitable

10  tolling all apply to delay accrual of his claims or toll the statute of limitations. *See* Oppo. 9:25-

11  13:7.

12      The statute of limitations is an affirmative defense and so the defendants bear the burden of

13  proof to warrant summary judgment in their favor. *United States v. Real Prop., Titled in the*

14  *Names of Godfrey Soon Bong Kang & Darrell Lee*, 120 F.3d 947, 949 (9th Cir. 1997); *Menzel v.*

15  *Scholastic, Inc.*, No. 17-CV-05499-EMC, 2019 WL 6896145, at *2 (N.D. Cal. Dec. 18, 2019);

16  *Pollock v. Tri-Modal Distrib. Servs., Inc.*, 11 Cal. 5th 918, 945, 491 P.3d 290, 305 (2021)

17  (California law). The defendants properly asserted the statute of limitations defense in their

18  answers. *See* Fed. R. Civ. Proc. 8(c)(1); Sutter Answer 41:21-42:13; Stollman Perry Answer 25:7-

19  27; Rich Answer 24:10-25:2.

20      The basis for Peterson's First Amendment and Due Process claims is 42 U.S.C. § 1983,

21  and the statute of limitations for federal civil rights claims brought under § 1983 is "governed by

22  the forum state's statute of limitations for personal injury actions." *Bonelli v. Grand Canyon*

23  *Univ.*, 28 F.4th 948, 951 (9th Cir. 2022) (citation omitted). As the parties agree, California's

24  personal injury statute of limitations is two years from the accrual date. Cal. Code Civ. Proc.

25  § 335.1; *see also Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014).

26  Federal law governs when the claim accrues, which is "when the plaintiff knows or has reason to

27  know of the injury which is the basis of the action." *Bonelli*, 28 F.4th at 952 (quoting *Lukovsky v.*

28  *City & Cnty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008)).

United States District Court
Northern District of California

6

This federal accrual standard mirrors California's discovery rule, which some courts apply in § 1983 cases,[3] that "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807, 110 P.3d 914, 920 (2005) (citing *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397, 981 P.2d 79, 88 (1999)). Under California law, "[a] plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements,'" and the "suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." *Id.* (citing *Norgart*, 981 P.2d at 88-89 & n.3). To employ the discovery rule, the plaintiff "must conduct a reasonable investigation of all potential causes of that injury," and if that investigation "would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light." *Id.* at 921 (citations omitted). Ignorance of the legal theories underlying the cause of action is "irrelevant" to the delayed discovery analysis. *Norgart*, 981 P.2d at 88 n.2.

The federal standard for equitable tolling also borrows the rules from the forum state, and in California equitable tolling applies "when, possessing several legal remedies [the plaintiff], reasonably and in good faith, pursues one designed to lessen the extent of [the plaintiff's] injuries or damage." *Butler*, 766 F.3d at 1204 (quoting *Addison v. State,* 21 Cal. 3d 313, P.2d 941, 943 (1978)). To equitably toll the statute of limitations, "a plaintiff must establish 'timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff.'" *Id.* (quoting *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 194 P.3d 1026, 1033 (2008)).

To analyze whether the defendants met their burden to establish that summary judgment is warranted in their favor based on the statute of limitations defense, *see Real Prop.*, 120 F.3d at 949; *Pollock*, 491 P.3d at 305, I must first assess when the claim accrued, which requires

---

[3] *See, e.g., James v. Contra Costa Cnty.*, No. 22-CV-05939-SI, 2023 WL 4410504, at *2 (N.D. Cal. July 7, 2023); *Dutro v. Cnty. of Contra Costa*, No. 12-CV-02972 NC, 2013 WL 5444431, at *3-5 (N.D. Cal. Sept. 30, 2013).

United States District Court
Northern District of California

1    determining what injuries Peterson is asserting—something that is not entirely clear from the

2    papers, the record, the hearing, the SAC, or prior litigation in this case.  As best I can understand

3    it, and as informed by counsel's representations at the hearing, Peterson contends that the

4    defendants had a policy in which Sutter paid "kickbacks" to doctors, including the three individual

5    physician-defendants in this suit, who intentionally steered away less profitable patients such as

6    those using Medi-Cal insurance, and that Sutter and the complying physicians punished doctors

7    that refused to steer patients and accept kickbacks.  *See* Oppo. 1:11-9:10, 14:20-25; *see also* SAC

8    ¶¶ 168-70, 179.  Peterson believes that this policy led to the violation of his First Amendment

9    rights because he refused to accept the kickbacks and instead advocated for indigent and low-

10   income patients with Medi-Cal insurance, including by educating them about their medical rights,[4]

11   for which he was punished and subjected to disciplinary proceedings: by carrying out disciplinary

12   proceedings, Peterson asserts that the defendants interfered with and violated Peterson's First

13   Amendment rights to advocate for patients.  *See* Oppo. 2:19-3:5, 14:20-25; SAC ¶¶ 166-70, 179-

14   80.  And Peterson believes his Due Process rights were violated because, while he voluntarily

15   resigned and gave up his medical privileges, he did so without knowing that the disciplinary

16   processes were instigated by the kickback scheme, and that the proceedings did not provide

17   adequate process because they were marred by fraud and fabrication.  *See* Oppo. 20:12-21:26;

18   SAC ¶¶ 199, 224, 232.[5]

19        With respect to timing, based on Peterson's theories of liability, the injuries from these

20   remaining defendants were caused when he was subjected to disciplinary proceedings for

21   advocating for patients instead of participating in the kickback scheme, and when those

22   proceedings were tainted by fabrication and fraud—both of which occurred in April 2009, or

23   would have if he had not first resigned.  *See* [Dkt. Nos. 149-5, -6].  Accordingly, the record shows

24

25   [4] In his deposition, Peterson frames this as his refusal to "upcode" his patients by unnecessarily
     using and charging for an anesthesiologist, and he asserts that his refusal was motivated in part by
26   his desire to protect the "Medi-Cal budget."  *See* Peterson Depo. 193:1-24, 195:10-96:14.

27   [5] To clarify, I cite the allegations in the SAC to understand and explain the framework of
     Peterson's theories of liability and injury because these were not well explained by the opposition
28   or the oral arguments.  I do not rely on the allegations as evidence or argument in deciding this
     motion.

that Peterson's civil rights injuries occurred in April 2009 and accrued then. Peterson does not appear to contest this.[6] And because there appears to be no evidence in the record suggesting these injuries occurred at a different time, I find that the claims accrued in 2009 and were subject to a two-year statute of limitations, *see Butler*, 766 F.3d 1191, 1198, and so the defendants met their burden to prove the statute of limitations bars the claims, *see Real Prop.*, 120 F.3d at 949; *Pollock*, 491 P.3d at 305.

Rather than point to evidence in the record that would create a dispute of fact regarding the accrual date, Peterson mostly relies on the discovery doctrine to argue that there is a genuine dispute of fact whether he could have known of these claims and injuries before the unsealing of Qui Tam Case in 2019 and the news show in 2020. He argues that because the qui tam investigations were under seal, he could not have previously discovered the kickback scheme or known that it was the basis of his First Amendment and Due Process injuries. *See* Oppo. 7:25-9:10; 10:11-12:10. Previously I found that these allegations were sufficiently plausible to deny the defendants' motion to dismiss based on the statute of limitations because Peterson alleged that the kickback policy was secret and so he could not have known about it and the related injuries earlier. *See* [Dkt. No. 75] 20:28-21:11. But now, after an opportunity for discovery and with plenty of evidence in the record, I find that this kickback theory—including when Peterson learned of the theory as well as its general existence and relationship with his injuries—cannot delay the accrual date or toll the statute of limitations to allow him to bring his claims now.

First, the discovery doctrine does not provide for accrual once the plaintiff knows of *all* facts and causes of his injury—it accrues when the plaintiff has reason to know of the injury that is the basis for his action. *See Bonelli*, 28 F.4th at 952. Peterson's claims accrued when he knew or

---

[6] To the extent that Peterson argues that his First Amendment rights were violated when he was precluded from "testifying" on behalf of another physician, Dr. Bonner, *see* Peterson Decl. ¶ 27; Oppo. 19:7-10, he fails to point to any evidence at all that explains either what this injury was or how it affected him, and he likewise fails to explain how that injury is connected to the defendants, *see* SAC ¶¶ 99, 181, 234 (alleging that the *MBC* prevented Peterson from testifying on Bonner's behalf). As the defendants point out, the SAC asserts that this testimony incident occurred in January 2013, *see id.*, so even if this somehow constituted a First Amendment injury, the statute of limitations ran in January 2015. There is no evidence in the record suggesting otherwise, nor does Peterson appear to argue otherwise.

United States District Court
Northern District of California

United States District Court
Northern District of California

had reason to know of his injuries—being subjected to sham disciplinary proceedings because of his patient advocacy and related refusal to participate in the patient steering and kickback scheme—not when he learned the specific contours of the kickback policy.  He sued the individual defendants in 2012 based on similar allegations and explained the role of the entity defendants in that suit:[7] in April 2013 he explained in his papers and declaration that he was punished and subject to a "charade" disciplinary process for refusing to participate in the financially-motivated "scheme" perpetrated by the defendants (except Rich) to steer high compensation patients to Sutter and steer low compensation patients—like those treated by Peterson on Medi-Cal insurance—away from Sutter.  [Dkt. No. 149-28] Ex. 34 2:10-3:19, 4:21-25, ¶¶ 7-12.  At least by April 2013, then, he believed that he was injured by sham disciplinary proceedings and his refusal to participate in the steering scheme, even if he did not know the specific contours of his kickback policy allegations.  Therefore, even if Peterson did not or could not have known about the "secret" kickback policy until the unsealing of the AG investigation and related media reports, he knew of the basis for his First Amendment and Due Process injuries, and so the claims accrued two years after the date of his April 2013 declaration.  *See Bonelli*, 28 F.4th at 952.

Second, even if I accept that Peterson could not have known the bases for and causes of his injuries until he learned of the kickback policy, the tolling doctrines do not apply because there is nothing in the record that shows there *was* a kickback scheme, let alone evidence connecting the scheme to Peterson's injuries.  *See id.*; *see also Fox*, 110 P.3d at 921 (explaining that under California law, the discovery rule applies only where a reasonable investigation into the causes of the injury "would have disclosed *a factual basis for a cause of action*" (emphasis added)).  To the extent that Peterson relies on the unsealing of the Qui Tam Case or its underlying allegations, or the related media reports as evidence of the kickback policy, *see* Oppo. 11:10-12:10; [Dkt. Nos.

---

[7] While the allegations in Peterson's 2012 complaint focused more on the race-based motivations of the defendants rather than on their financial motivations, it is clear from the complaint that Peterson believed he was injured because the allegedly racist actions in the steering scheme and sham disciplinary processes were motivated by the defendants' financial incentives to steer away poor patients of color and steer toward Sutter wealthy, usually white, patients.  *See* 2012 Compl.

United States District Court
Northern District of California

154-11, -20-23[8]], these documents show allegations, not evidence, and so are insufficient to create a genuine dispute of fact concerning the existence of any such policy or any connection to Peterson's career and resignation.  Peterson conceded in his deposition that he did not know if the investigation involved the defendants.  *See* Peterson Depo. 195:7-96:14.  And while there was a settlement in the Qui Tam Case, it appears there was no admission of liability or concession of the existence of any policy, *see* [Dkt. No. 154-23], and Peterson points to no contradictory evidence.  Additionally, the news program from 2020 concerned investigations into Sutter's anticompetitive business practices, including mergers and acquisitions, and is unrelated to Peterson's kickback allegations.  [Dkt. No. 154-24]; [Dkt. No. 149-35] ¶ 3; *see also* Peterson Dep. 194:12-21 (conceding that the individual defendants were not mentioned in the news program).  The most that the Qui Tam Case and news show demonstrate is that there were *investigations* into Sutter's general practices, which is not enough to create a dispute of material fact whether these practices actually existed, let alone that they caused Peterson's injuries.  Indeed, the documents that Peterson cites suggest that the investigations concerned whether Sutter was paying external doctors to refer patients to Sutter and then paying kickbacks to those external doctors—not whether Sutter was paying kickbacks to its own doctors to refer indigent patients out, as Peterson suggests.  *See* Qui Tam Compl. ¶¶ 85-199; [Dkt. No. 154-23].

Further, no record evidence creates a genuine dispute whether the defendants participated in a kickback policy or whether such a policy caused Peterson's injuries.  Each piece of evidence that Peterson cites shows standard salaries and stipends paid to medical staff.[9]  Though Peterson's

---

[8] Peterson's request for judicial notice says that Dkt. No. 154-21 is "an Order filed" in the qui tam case, but he attached a copy of my prior order in this case.  At any rate, he does not cite that exhibit as including evidence establishing the existence of kickbacks and their connection to his injuries and the defendants.  *See generally* Oppo.

[9] *See* Peterson Depo. 193:1-24 (Peterson stating he refused to "upcode" and use anesthesiologists when unnecessary); Deposition of Rod Perry ("Perry Depo.") [Dkt. No. 154-4] 35:5-9 (Perry received stipend for role as department chair), 72:8-73:21 (Perry received stipend for role as chief of general medical); Deposition of Neil Stollman ("Stollman Depo.") [Dkt. No. 154-5] 14:16-20 (Stollman received payment for role as department chair), 17:3-7 (Stollman and gastroenterologists received $1,700 for each 24 hour period on call); Deposition of Philip Rich ("Rich Depo.") [Dkt. No. 154-8] 19:19-21:21 (Rich or his medical group was compensated when he was medical staff president but not for his duties on the executive committee), 71:17-72:9 (Rich knew the hospital had contracts for service in the emergency department). 72:22-73:7 (Rich

declaration asserts these were unlawful kickbacks, there is no other evidence in the record[10]—that he points to or that I could find—that even alludes to these being anything but valid business payments. *See also Bohmker v. Oregon*, 903 F.3d 1029, 1044 (9th Cir. 2018) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (as amended)). Peterson cannot create a dispute of fact from mere conjecture and speculation that the payments were unlawful or unfair without pointing to a single line in the record that supports that theory. Accordingly, there is no evidence suggesting that the kickback policy or related injuries form the "basis of the action," *see Bonelli*, 28 F.4th at 952, and so there is no evidence showing that the discovery of the scheme provides the accrual date for Peterson's claims.

Peterson also argues that his claims should be tolled under the doctrine of equitable tolling because he has been pursuing his rights diligently and because there were extraordinary circumstances that prevented timely filing. *See* Oppo. 12:19-13:3. This argument is foreclosed for the same reasons that his claims are not saved by discovery doctrine—he knew at least by the filing of his declaration in 2013 of all the facts underlying his injuries and claims, and to the extent that Peterson learned new information in 2019 and 2020, he fails to point to evidence connecting that information to his injuries. Accordingly, there *was* no new information to discover, and so to the extent that he was pursuing his rights diligently, he already pursued them—in the case he filed in 2012.

Finally, Peterson cites the continuing violations doctrine as a reason to toll the statute of limitations but failed to explain in his papers or at the hearing why it applies, given that his injuries arose in 2009 and he knew of them by the latest in 2012, let alone cite record evidence

---

was aware of media reports concerning kickbacks), 87:13-16 (Rich received a salary).

[10] *See, e.g.*, Declaration of Philip Rich ("Rich Decl.") [Dkt. No. 149-1] ¶ 13 (Rich received stipend from Summit Medical Staff for role as President); Declaration of Rod Perry ("Perry Decl.") [Dkt. No. 149-11] ¶ 9 (Perry received stipend from Summit Medical Staff for compensation for role as Chair); Declaration of Neil Stollman ("Stollman Decl.") ¶ 11 (Stollman received stipend from Summit Medical Staff for compensation for role as Chair), ¶ 21 (all on-call gastroenterologists receive $1,700 per 24-hour shift, though rate was lower in 2009).

United States District Court
Northern District of California

1   showing that  there is a genuine dispute of material fact to foreclose summary judgment.  *See*

2   Oppo. 12:11-18; *see also Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001) ("[The] mere

3   'continuing *impact* from past violations is not actionable.'" (citations omitted)).

4        Accordingly, Peterson's claims ran in April 2015 at the latest.  They are barred by the two-

5   year statute of limitations and the defendants' motion is GRANTED.

6   **II.      COLOR OF STATE LAW**

7        The defendants argue that Peterson's 42 U.S.C. § 1983 claims also fail because each

8   defendant is a private actor and there is no evidence showing that any defendant acted under color

9   of state law, as required to establish liability under § 1983.  *See* Mot. 17:1-21:4.  In opposition,

10  Peterson asserts that the defendants' private conduct constituted state action under the joint action,

11  governmental compulsion or coercion, and government nexus standards.  *See* Oppo. 13:8-18:10.

12       "A § 1983 plaintiff must demonstrate a deprivation of a right secured by the Constitution

13  or laws of the United States, and that the defendant acted under color of state law."  *Kirtley v.*

14  *Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)).

15  "While generally not applicable to private parties, a § 1983 action can lie against a private party

16  when" the private party "is a willful participant in joint action with the State or its agents."  *Id.*

17  (quoting *Dennis v. Sparks,* 449 U.S. 24, 27 (1980)).

18       There are four tests that identify whether a private party acted under color of state law: "(1)

19  public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental

20  nexus."  *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (quoting *Kirtley*,

21  326 F.3d at 1092).  "Satisfaction of any one test is sufficient to find state action, so long as no

22  countervailing factor exists."  *Id.* (quoting *Kirtley*, 326 F.3d at 1092).  "At bottom, the inquiry is

23  always whether the defendant has exercised power possessed by virtue of state law and made

24  possible only because the wrongdoer is clothed with the authority of state law."  *Id.* at 748

25  (quoting *West*, 487 U.S. at 49) (internal quotation marks omitted).

26       Before answering the question of whether the defendants acted under color of law, courts

27  first "must identify the 'specific conduct of which the plaintiff complains.'"  *Id.* at 747 (quoting

28  *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010)).  Here, as

United States District Court
Northern District of California

discussed above, Peterson complains that his First Amendment rights were violated when he was subjected to disciplinary proceedings for advocating for patients rather than participating in the kickback scheme, and that his Due Process rights were violated when he resigned his privileges without knowing about the scheme and was subjected to disciplinary processes marred by fabrication and fraud. The "relevant inquiry" is therefore whether the defendants' roles in initiating and carrying out the disciplinary proceedings and related actions constituted state action. *See id.*

### a.    Joint Action

"[T]he joint action test . . . consider[s] whether 'the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity.'" *Kirtley*, 326 F.3d at 1093 (quoting *Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1486 (9th Cir. 1995)); *see also Rawson*, 975 F.3d at 748 (same). "This occurs when the state knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley*, 326 F.3d at 1093 (quoting *Parks Sch.*, 51 F.3d at 1486).

I previously denied the defendants' motion to dismiss because I found that Peterson plausibly alleged joint action between the defendants and the MBC by pleading that they engaged in an illicit, improper strategy to subject Peterson to the disciplinary powers of the state agency because he refused to accept kickbacks. *See* [Dkt. No. 75] at 12-13. But after discovery, the defendants point to evidence showing that their peer review proceedings were initiated by the defendants to address coverage issues and focus on patient safety,[11] which suggests no role played by and no connection with the MBC. There is also no evidence showing that the defendants had any role in the MBC's subsequent investigation besides the initial filing of the statutorily

---

[11] *See* [Dkt. Nos. 149-21-24] (letters between Peterson's counsel and defendants' counsel showing that coverage issues led to the inquiries, suspension, and disciplinary hearings); Peterson Depo. 289:14-290:8 (explaining that Peterson and Rich discussed coverage issues on date of resignation, without mentioning MBC); Rich Decl. ¶¶ 25-35 (Rich explaining the initial inquiries and suspension were due to coverage and quality of care issues); [Dkt. Nos. 149-3-5] (letters confirming same, including Peterson confirming the conversations concerned "COVERAGE" issues); Perry Decl. ¶¶ 20-21 (explaining that initial inquiries concerned coverage issues); [Dkt. No. 149-18] (letter confirming same); Stollman Decl. ¶¶ 26-29 (explaining that initial inquiries concerned coverage issues); *see also* [Dkt. No. 149-20] at -306 (by-laws requiring physicians to maintain coverage).

1    mandated 805 report.[12]

2         After discovery and the opportunity to depose the defendants and investigate their

3    documents, Peterson has come up with no contradictory evidence sufficient to show a genuine

4    dispute of fact concerning joint action. Rather, his opposition relies almost entirely on the

5    allegations in the Qui Tam Case, *see* Oppo. 15:15-17:4, which are not evidence and cannot create

6    a dispute of fact. He also cites records that he says show that none of the defendants have a

7    disciplinary record, *see id.* 16:20-25, and even if he had not withdrawn some of these records,

8    [Dkt. No. 156], it is unclear how showing the defendants have not been professionally disciplined

9    could create a dispute of fact whether they jointly participated with the MBC to deprive Peterson

10   of his rights. Similarly, noting that a partner at the law firm that represented the defendants is also

11   a member of the MBC, *see* Oppo. 17:5-9; [Dkt. Nos. 154-29, 30], does not create a dispute of fact

12   concerning joint participation, particularly where that attorney apparently did not join the MBC or

13   the law firm until years after the underlying actions in this case, *see* Repl. 10 n.21. Even if I credit

14   Peterson's declaration that Rich submitted a falsified 805 report to the MBC, this is insufficient to

15   show joint action because it does not show that the MBC knowingly accepted benefits derived

16   from any unconstitutional behavior, *see Kirtley*, 326 F.3d at 1093, in part because Peterson

17   concedes that the MBC cleared him of wrongdoing, and in part because it is not clear what

18   benefits the MBC was deriving, *see* Peterson Decl. ¶ 35.

19        Accordingly, the evidence shows that any injuries were caused by the actions of the

20   defendants alone and the state was not a joint actor; there is no genuine dispute of fact.

21        **b.    Governmental Compulsion or Coercion**

22        "Governmental compulsion or coercion may exist where the State 'has exercised coercive

23   power or has provided such significant encouragement, either overt or covert, that the choice must

24

---

25   [12] *See* Peterson Depo. 303:17-304:17 (Peterson had no information that defendants discussed
     anything with MBC other than 805 report); Rich Decl. ¶¶ 38-42 (Rich confirming he submitted
26   805 report as required by law but had no other communication with MBC); [Dkt. Nos. 149-7-8]
     (letters to Peterson with and about MBC report); Perry Decl. ¶ 25 (no communication with MBC);
27   Stollman Decl. ¶ 33 (no communication with MBC); *see also* Cal. Bus. & Prof. Code § 805(c)(1)
     (requiring medical peer review bodies to file 805 report within 15 days after licentiate resigns
28   privileges after receiving notice of pending investigation for a medical disciplinary cause or
     reason).

1    in law be deemed to be that of the State.'" *Rawson*, 975 F.3d at 748 (quoting *Blum v. Yaretsky*,

2    457 U.S. 991, 1004 (1982)).  "The compulsion test considers whether the coercive influence or

3    'significant encouragement' of the state effectively converts a private action into a government

4    action." *Kirtley*, 326 F.3d at 1094 (citation omitted).

5          Peterson argues that the compulsion and coercion tests apply because when he "refused to

6    participate in upcoding, kickbacks[,] or steering," he was subjected to disciplinary proceedings

7    through the MBC.  But the MBC did not initiate investigations against compliant doctors.  *See*

8    Oppo. 17:20-25.  This argument seems to imply that the MBC coerced *Peterson's* actions, not

9    those of the defendants; indeed it is not clear how these allegations could show that the state

10   compelled, coerced, or encouraged the private actions carried out by the defendants.  *See Rawsom*,

11   975 F.3d at 748; *Kirtley*, 326 F.3d at 1094.  Generously, it seems possible that Peterson is arguing

12   that the MBC's general participation in the Medi-Cal/kickback scheme is enough to show it

13   encouraged or compelled the defendants' participation in the scheme, though Peterson does not

14   explain (or point to evidence showing) why the MBC would do that.  But even if this established

15   governmental compulsion or coercion—it does not—there is no evidence that the MBC

16   participated in any such scheme, in part because there is no evidence of such a scheme.  *Supra* Part

17   I.  As addressed, *supra* Part II.A, the evidence shows that the defendants initiated the disciplinary

18   proceedings, but nothing shows that the MBC played a role in the hospital's processes.  And while

19   Rich filed the 805 report, there is no evidence that suggests the filing of that report was caused by

20   the coercive power of the MBC as opposed to the procedure required by law.  *See* Cal. Bus. &

21   Prof. Code § 805.  Indeed, because it is legally required, the Ninth Circuit has suggested that the

22   filing of the 805 report alone is "irrelevant" to addressing whether medical defendants acted under

23   color of state law.  *See Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1034 (9th Cir. 1989), *aff'd*,

24   500 U.S. 322 (1991).

25         Accordingly, it is not clear how this theory could support Peterson's argument, but it is

26   clear that there is no evidence that genuinely disputes that the defendants acted independently and,

27   with respect to the 805 report, were merely following the law.  This standard is not met.

28

United States District Court
Northern District of California

16

c.      **Governmental Nexus**

Finally, the nexus test is "satisfied where the court finds a sufficiently close nexus between the state and the private actor so that the action of the latter may be fairly treated as that of the State itself." *Rawson*, 975 F.3d at 748 (citation and quotation marks omitted); *see also Kirtley*, 326 F.3d at 1094-95 (same).

Again, Peterson fails to explain why or how this test applies and he cites no evidence in support. *See* Oppo. 17:26-18:7. Merely arguing that there is "a factual issue" concerning whether "the Sutter defendants acted in concert or conspiracy with the MBC members" is insufficient to show a nexus between the MBC conduct and that of the defendants. *Id.* To the extent that Peterson intends to argue that there is a nexus between the MBC's actions and the defendants' actions because both participated in the Medi-Cal and kickback scheme, he again fails to cite any evidence showing that the scheme existed, the defendants participated, or that the scheme caused his injuries.

\*      \*      \*

For those reasons, there is no genuine dispute of fact suggesting that the defendants acted under color of state law.[13] The motion is GRANTED on this basis.

### III.   FIRST AMENDMENT

Peterson argues that his First Amendment claim is one for retaliation. *See* Oppo. 18:13-17. The defendants assert that even if this claim survives the arguments addressed above, it fails because there is no evidence supporting any elements of the claim.

To prevail on a First Amendment retaliation claim, a plaintiff must show (1) she was engaged in constitutionally protected speech; and (2) there was "a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)); *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019).[14] "Specifically, a plaintiff must show that the defendant's retaliatory animus was 'a

---

[13] Peterson does not argue that the public action test applies.

[14] *Capp* requires that, to state a claim, a plaintiff also allege that "the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity." 940 F.3d at 1053. It is not clear this is a required element to *prove* a First Amendment retaliation claim, *see*

1    "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken

2    absent the retaliatory motive.'"  *Capp*, 940 F.3d at 1053 (quoting *Nieves*, 139 S. Ct. at 1722).

3        Even if Peterson's First Amendment claim survived the statute of limitations, and even if

4    he showed that the injuries were caused by the defendants acting under color of state law,

5    Peterson's First Amendment claim still fails for many of the same reasons addressed above: he

6    does not point to any evidence supporting his theories of liability.  As addressed, he explains his

7    injury as being subjected to disciplinary proceedings for advocating for patients instead of

8    participating in the kickback scheme, and possibly as being precluded from testifying on behalf of

9    Dr. Bonner.  *Supra* n.6.  If Peterson's patient advocacy constituted protected speech—which I do

10   not find, in large part because it is not entirely clear what "advocacy" he did, due to his failure to

11   point to evidence—the claim fails because he points to no evidence that he participated in

12   "advocacy" activities, *see* Oppo. 18:13-19:17, nor could I find any in the record.[15]  And there is no

13   evidence of causation, *see Capp*, 940 F.3d at 1053, because Peterson's own uncontradicted

14   testimony affirms that he did not tell any of the defendants about his advocacy activities before his

15   resignation, *see* Peterson Depo. 288:15-290:25;[16] *see also* Rich Decl. ¶ 43 (confirming he did not

16   know of advocacy activities); Stollman Decl. ¶ 35 (same); Perry Decl. ¶ 26 (same).

17       If Peterson's First Amendment injury was instead caused by being prohibited from

18   testifying on Bonner's behalf, and even if this constituted protected speech, the claim still fails for

19   lack of evidence of causation.  *See Nieves*, 139 S. Ct. at 1722.  Peterson provides only general and

20   vague statements about the Bonner testimony.  *See* Peterson Decl. ¶¶ 26-27.  The allegations in the

21   SAC seem to suggest that Peterson believes the MBC prevented him from testifying at Bonner's

22

23   _____
     *Nieves*, 139 S. Ct. at 1722, but Peterson's claims fail regardless for the reasons addressed in this
24   section.

25   [15] At the hearing, Peterson's counsel seemed to argue this advocacy was on behalf of patient B.E.,
     but he failed to point to evidence of such advocacy or that this advocacy caused Peterson's
26   injuries.

27   [16] Peterson's deposition testimony confirms *lack* of causation because it shows that he believed the
     disciplinary proceedings and his resignation were caused by the coverage issues, not any advocacy
28   activities, and does not suggest he was concerned about informing patients on Medi-Cal of their
     rights.  Peterson Depo. 288:15-290:25.

1    hearing, though it is not entirely clear why.  *See* SAC ¶ 99; *see also id.* ¶¶ 123-24 (MBC retaliated

2    against *Bonner* for certain activities and revoked license), ¶ 124 (Medi-Cal terminated *Bonner*'s

3    provider status), ¶¶ 11, 181, 234 (MBC investigator threatened Peterson with discipline if he

4    testified at Bonner hearing).  Of course, the complaint allegations are not evidence and cannot

5    create a dispute of fact, and at any rate there is no evidence connecting the testimony with the

6    defendants as opposed to the MBC, let alone showing the defendants caused the issue.  *See Nieves*,

7    139 S. Ct. at 1722 (requiring a causal connection between the defendant's "animus" and the

8    plaintiff's injury).

9         Therefore, the First Amendment claim fails because there is no evidence in the record

10   supporting Peterson's theories of his injuries.  The motion is GRANTED on this basis.

## IV.   DUE PROCESS

12        Peterson's theory of liability for his Due Process claim is that he did not know of the

13   underlying kickback scheme when he resigned his privileges, so he gave up those rights

14   unknowingly, and that the disciplinary process was unfair because it was marred by fabrication

15   and fraud.  *See* Oppo. 19:18-21:26.

16        To prevail on a due process claim based on deprivation of property, a plaintiff must prove

17   "(1) a property interest protected by the Constitution; (2) a deprivation of the interest by the

18   government; and a (3) lack of required process."  *Ulrich v. City & Cnty. of San Francisco*, 308

19   F.3d 968, 974 (9th Cir. 2002) (citing *Portman v. Cnty. of Santa Clara*, 995 F.3d 898, 904 (9th Cir.

20   1993)).

21        I previously found that Peterson sufficiently alleged deprivation of a property interest

22   because he plausibly alleged that any waiver of his rights (meaning relinquishment of his property

23   rights) was not done knowingly.  [Dkt. No. 75] 13:24-14:3.  I will assume without finding that his

24   medical privileges at Sutter were a constitutionally protected property interest.  Even if the

25   deprivation of that interest was caused by the government—which I do not find, *supra* Part II—the

26   claim still fails because Peterson points to no evidence that there was a lack of required process.

27   His theory appears to be that there was no process because he did not know about the kickback

28   scheme and so he did not know he was giving up his privileges for unfair reasons.  But as

19

1   addressed, Peterson points to no evidence showing that kickbacks existed, let alone that his refusal

2   to accept them, played any role in the disciplinary proceedings.  His theory that he relinquished his

3   rights unknowingly because he did not know of the kickbacks at the time fails because he does not

4   show there were any kickbacks that he could have known about or that affected the proceedings or

5   his decision.  His new theory that his consent was vitiated by fraud, *see* Oppo. 21:3-13, fails for

6   similar reasons—he points to no such evidence.  Nor is there any evidence that the defendants or

7   even the MBC fabricated anything in the proceedings leading up to or after his resignation, or

8   otherwise failed to give him the required process.

9          Accordingly, like his other claims, this one too fails for lack of evidence.  The motion is

10  GRANTED on this basis.[17]

**CONCLUSION**

12         For the above reasons, the motion is GRANTED.  Judgment will be entered accordingly.

13         **IT IS SO ORDERED.**

14  Dated: October 6, 2023



William H. Orrick
United States District Judge

---

[17] Because I grant the defendants' motion for summary judgment on the above grounds, I need not address their argument concerning specific intent under § 1983 or whether they are a separate entity from the medical staff.  *See* Mot. 23:11-24:19.

20